Andrew W. Stavros (8615)
Austin B. Egan (13203)
**STAVROS LAW P.C.**
8915 South 700 East, Suite 202
Sandy, Utah 84070
Tel: 801.758.7604
Fax: 801.893.3573
andy@stavroslaw.com
austin@stavroslaw.com

Meiram Bendat (*pro hac vice* forthcoming)
**PSYCH-APPEAL, INC.**
8560 West Sunset Boulevard, Suite 500
West Hollywood, CA 90069
Tel: (310) 598-3690, x 101
Fax: (888) 975-1957
mbendat@psych-appeal.com

*Attorneys for Plaintiff*

---

## IN THE UNITED STATES DISTRICT COURT IN AND FOR
## THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JANE DOE, | |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| INTERMOUNTAIN HEALTHCARE, INC. and SELECTHEALTH, INC. | Case No. 2:18-cv-00807-EFJ |
| Defendants. | Magistrate Judge Evelyn J. Furse |

Plaintiff Jane Doe ("Plaintiff")[1] complains as follows on her own behalf, based on the best of her knowledge, information and belief, formed after an inquiry reasonable under the circumstances by herself and her undersigned counsel, against Defendants:

## INTRODUCTION

1.      Plaintiff suffers from chronic and severe mental illnesses, including Major Depressive Disorder and Post-Traumatic Stress Disorder ("PTSD"), stemming from protracted childhood sexual abuse by her father and from a brutal rape as an adult.

2.      In 2016, Plaintiff was hospitalized twice at the University of Utah Neuropsychiatric Institute, where she underwent 27 unsuccessful trials of electroconvulsive treatment ("ECT"). Because her symptoms continued to worsen and expanded to include recurrent nightmares, flashbacks, dissociation, and intrusive images, Plaintiff's outpatient psychiatrist recommended psychiatric hospitalization at the Menninger Clinic Professionals in Crisis Unit ("Menninger Clinic"). Plaintiff was hospitalized at the Menninger Clinic for over three months. Eventually, the Menninger Clinic recommended step-down residential treatment at The Austen Riggs Center ("Austen Riggs"), consistently ranked among the top ten best psychiatric treatment centers in the United States by U.S. News & World Report and renowned for treating refractory mental illnesses through a continuum of community-based care. On April 10, 2017, Plaintiff admitted for residential mental health treatment at Austen Riggs, where she

---

[1] Because Plaintiff has legitimate concerns about publicly disclosing her most intimate psychiatric conditions stemming from childhood sexual abuse and rape as an adult, and because Plaintiff's claims against Defendants include breach of privacy of her protected mental health information, Plaintiff seeks to file this action pseudonymously as "Jane Doe." Her identity has been fully disclosed to Defendants and will be disclosed to the Court, so long as such identifying information is not released into the public record. Plaintiff's motion to proceed under a pseudonym will be filed nearly contemporaneously with this complaint, pending assignment of a judge and case number.

remained until August 7, 2018, at which point she was involuntarily hospitalized. Thereafter, Plaintiff re-admitted to Austen Riggs on September 13, 2017, where she remained until April 27, 2018, at which point she was again hospitalized.

3.      Up until April 15, 2017, Plaintiff worked as a physician for Defendant Intermountain Healthcare, Inc. ("Intermountain Healthcare"), the largest private employer in Utah. As Plaintiff's employer, and in its capacities as Plan Sponsor and Plan Administrator, Intermountain Healthcare established Plaintiff's Select Med Plus health plan ("Plan"), a non-grandfathered, large-group, self-funded health plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA") and the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 ("Federal Parity Act"). Intermountain Healthcare issued Plaintiff a "Benefits Participation Handbook" and "Health Insurance Handbook," which set forth the provisions constituting the Plan. As described therein, the two handbooks work together as a Summary Plan Description ("SPD"). The Health Insurance Handbook also references a "Schedule of Benefits," which identifies Plan participants' financial responsibility for in- and out-of-network mental healthcare, including mental health residential treatment.

4.      The Health Insurance Handbook identifies Defendant SelectHealth, Inc. ("SelectHealth"), an NCQA-accredited, licensed health maintenance organization wholly owned by Intermountain Healthcare, as the "claims review fiduciary" to which Intermountain Healthcare has delegated sole discretionary authority to determine the availability of benefits and to interpret the applicable terms of the Plan. SelectHealth's claims and appeals determinations are conclusive and binding.

5.     The Plan expressly covers mental health treatment for psychiatric conditions listed in the Diagnostic and Statistical Manual ("DSM"), as periodically revised. Plaintiff's severe mental illnesses, Major Depressive Disorder and PTSD, are both listed in the DSM.

6.     The Plan expressly covers residential mental health treatment rendered by non-participating facilities, both in- and outside of Utah. To prevent illusory benefits, when the Plan cannot identify suitable in-network facilities, the Plan must arrange for care rendered by non-participating providers as if rendered on an in-network basis.

7.     Despite the Plan expressly covering out-of-network (and out-of-area) residential mental health treatment for Plaintiff's severe mental illnesses, SelectHealth has unlawfully denied Plaintiff's medically necessary claims for such services based on a Plan-offending, discriminatory, and clinically insupportable geographic restriction imposed exclusively on mental health benefits, and specifically, on residential mental health treatment.

8.     Through multiple correspondences in 2017 and 2018, SelectHealth communicated to Plaintiff and Austen Riggs that, although residential mental health treatment was clinically appropriate for Plaintiff's severe mental illnesses, SelectHealth would only cover such care at in-network facilities that it had identified in Utah. When Plaintiff and Austen Riggs repeatedly alerted SelectHealth that her Plan expressly covered out-of-network (and out-of-area) residential mental health treatment, that SelectHealth's self-imposed geographic restriction on residential mental health treatment was discriminatory, that the in-network facilities SelectHealth identified were clinically unsuitable for Plaintiff, and that current treatment in Utah only exacerbated Plaintiff's suicidality due to highly triggering family relationships and conflicts, lack of close

friends, and her loss of employment at Intermountain Healthcare, SelectHealth only cemented its bad faith.

9.     Subject to an even costlier obligation to cover Plaintiff's out-of-network residential mental health treatment on an in-network basis due to the unsuitability of the Utah facilities it had identified, SelectHealth responded with unwavering indifference and insisted that Plaintiff either: (1) receive residential treatment from: (a) an in-network Utah facility for eating disorders (which Plaintiff did not have) or (b) an in-network Utah facility for young adults with substance use and/or borderline personality disorders (despite Plaintiff neither being a young adult nor suffering from substance use or borderline personality disorders); or (2) cycle through non-prophylactic, short term hospitalizations, if lucky and capable enough to even seek out such care when imminently suicidal.

10.     While recognizing Plaintiff's need for residential mental health treatment by expressly directing her to receive such care from the unsuitable network facilities it identified, and contrary to all norms of psychiatric practice, SelectHealth simultaneously declared that attending to chronic suicidality demarcated by lethal, covert, and impulsive attempts was not within the clinical purview of residential mental health treatment, and willfully blinded itself to Plaintiff's comprehensive treatment plan (by pretending that Austen Riggs' clinical focus on Plaintiff's suicidality, central in its own right, was Plaintiff's *only* identified therapeutic task). Perversely, SelectHealth also accused Plaintiff of not improving fast enough (despite Plaintiffs' severe and pervasive mental illness being fraught with setbacks and complications that necessitated the very care at issue), faulted Plaintiff for not having evidenced "recovery" (despite "recovery" from mental illness being a life-long process and that, owing to far less restrictive

residential treatment, Plaintiff was able to avoid psychiatric hospitalization for 8 months, the longest duration in 2 years), and shamelessly suggested that Plaintiff transfer SelectHealth's private liabilities for treatment of her severe mental illnesses, which by definition are disabling, to "disability coverage" shouldered by the taxpayers.

11.    Not only did SelectHealth unilaterally impose a Plan-offending, discriminatory, and clinically insupportable geographic restriction on Plaintiff's medically necessary residential mental health treatment, and not only did SelectHealth exploit the profoundly disabling character of severe mental illness in a transparent bid to sidestep its obvious coverage obligations, but SelectHealth made a mockery of the administrative review process, too. First, SelectHealth repeatedly lied to Plaintiff about her Plan mandating two levels of internal appeals when, in fact, the Plan only mandated one internal appeal for preauthorization denials prior to administrative exhaustion. Subsequently, rather than ensure that Plaintiff's appeals were adjudicated by independent reviewers who paid no deference to prior psychiatric consultants (let alone to actual prior decision-makers), SelectHealth permitted the same psychiatrist who single-handedly denied Plaintiff's first internal appeal to lead and adulterate a wholly unqualified second-level appeal panel comprised of a layperson, product development specialist, pharmacist, and family medicine specialist. SelectHealth also failed to explain or (at least) identify any specific rule, guideline, or protocol on which it relied in issuing its final adverse determination. In yet another round of appeals applicable to Plaintiff's re-admission to Austen Riggs, SelectHealth again failed to explain or (at least) identify any specific rule, guideline, or protocol on which it relied. It subsequently enlisted the same unqualified panel (consisting of a layperson, pharmacist, and family medicine specialist) to adjudicate Plaintiff's second-level appeal – this time without

consulting any subject matter expert at all. Subsequent diligence by Plaintiff's counsel revealed that SelectHealth's unqualified appeals panel denied Plaintiff's final appeal after consulting substance use guidelines – although Plaintiff had never been diagnosed with or sought treatment for a substance use disorder.

12.      SelectHealth also intentionally violated Plaintiff's privacy. Pursuant to ERISA (at 29 U.S.C. §1185(d) (incorporating 42 U.S.C. 300gg-19(a)(1)(C), Plaintiff requested SelectHealth to electronically produce to her counsel its Designated Record Set ("DRS," consisting, in part, of SelectHealth's internal utilization management records) via email. The Health Insurance Portability and Accountability Act of 1996 ("HIPAA") required SelectHealth to produce Plaintiff's DRS in the form and format requested, holds "covered entities" (such as Defendants) responsible for breach notification for unsecured transmissions, and assigns liability for impermissible disclosures of protected health information that occur in all contexts. Defying Plaintiff's explicit request to receive her DRS by email and not by hardcopy/mail, SelectHealth mailed Plaintiff's counsel her unsecured physical records, which arrived exposed in a torn envelope. Despite being immediately notified of its intentional privacy breach, SelectHealth failed to notice Plaintiff and to take remedial action, as required. Subsequently, when Plaintiff's counsel asked SelectHealth to electronically supplement the DRS and again expressly declined to accept the DRS by mail, SelectHealth intentionally defied its mandate and mailed another unsecured parcel, which also arrived partially torn. Although SelectHealth was immediately notified of its intentional privacy breach, it again failed to notice Plaintiff and to take remedial action. Without knowing who may have accessed her most intimate mental healthcare records,

Plaintiff, who suffers from PTSD, struggles with paranoia, and has legitimate concerns about her professional prospects, has been subjected to undue emotional distress.

## THE PARTIES

### Plaintiff

10.     Plaintiff, a physician, was insured as a participant under the Plan, which is a self-funded, non-grandfathered large group policy sponsored by her employer. The Plan, identified as "Select Med Plus," is governed by ERISA and is both insured and administered by Defendant Intermountain Healthcare.

### Defendants

11.     Defendant Intermountain Healthcare is headquartered at 36 South State Street, Suite 2200, Salt Lake City, Utah, 84130. As the largest private employer in Utah, and in its capacities as Plan Sponsor and Plan Administrator, Intermountain Healthcare established Plaintiff's Plan, a non-grandfathered, large-group, self-funded health plan governed by ERISA. Intermountain Healthcare has delegated sole discretionary authority to determine the availability of benefits and to interpret the applicable terms of the Plan to its "claims review fiduciary," Defendant SelectHealth. Defendant Intermountain Healthcare wholly owns Defendant SelectHealth.

12.     Defendant SelectHealth is located at 5381 Green Street, Murray, Utah, 84123, and its registered agent, Anne D. Armstrong, shares the same office address as Defendant Intermountain Healthcare. SelectHealth, a licensed health maintenance organization accredited by NCQA, is the "claims review fiduciary" for Plaintiff's Plan. SelectHealth's claims and appeals determinations are conclusive and binding.

13.     In light of Intermountain Healthcare's sole ownership of SelectHealth, SelectHealth suffers from an inherent financial conflict of interests when adjudicating benefits under Plaintiff's Plan.

14.     Due to the authority, discretion, and control they have been granted and exercised to make decisions with respect to benefit claims in connection with Plaintiff's ERISA-governed Plan,  each Defendant is a fiduciary and must comply with ERISA's fiduciary requirements in fulfilling its roles, duties and responsibilities.

<u>**JURISDICTION AND VENUE**</u>

15.     Defendants' actions in administering Plaintiff's employer-sponsored health plan are governed by ERISA, 29 U.S.C. § 1001, *et seq.* This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and 29 U.S.C. § 1132(e) (ERISA).

16.     Venue is appropriate in this District. Defendants administer Plaintiff's Plan in this District, conduct significant operations in this District, and are headquartered in this District.

<u>**STATEMENT OF FACTS**</u>

**I.  <u>Plaintiff's Plan</u>**

17.     Plaintiff was insured through her employer pursuant to a Select Med Plus health plan effective January 1 for each plan year. Plaintiff's large-group, self-funded policy is non-grandfathered under the Affordable Care Act.

18.     Defendant Intermountain Healthcare issued Plaintiff a "Benefits Participation Handbook" and "Health Insurance Handbook," which set forth the provisions constituting the Plan. As described therein, the two handbooks work together as a Summary Plan Description ("SPD"). The Health Insurance Handbook also references a "Schedule of Benefits," which

identifies Plan participants' financial responsibility for in- and out-of-network mental healthcare, including residential mental health treatment.

19.     The Plan, through the Health Insurance Handbook and Schedule of Benefits, provides in- and out-of-network coverage for medically necessary medical and behavioral health services, including residential mental health treatment.

20.     The Plan, in the Health Insurance Handbook, defines "medically necessary" as:

> Services that a prudent healthcare professional would provide to a patient for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or its symptoms in a manner that is:
>
> a. in accordance with **generally accepted standards of medical practice** in the United States;
> b. **clinically appropriate** in terms of type, frequency, extent, site, and duration; and
> c. not primarily for the convenience of the patient, Physician, or other Provider.
>
> When a medical question-of-fact exists, Medical Necessity shall include the **most appropriate** available supply or level of service for the Member in question, considering potential benefit and harm to the Member.

21.     The Plan, in the Schedule of Benefits, identifies that for clinically appropriate, in-network residential mental health treatment, a participant's cost share is "20% after deductible," whereas a participant's out-of-network residential mental health treatment cost share is "40% after deductible." When a participant reaches an out-of-pocket annual maximum ("stop loss"), the Plan pays 100% of an Allowed Amount, which the Plan cryptically defines as "[t[he dollar amount allowed by the Plan for a specific Covered Service."

22.     The Plan requires preauthorization from SelectHealth for residential mental health treatment. As such, any requests for preauthorization are pre-service claims under ERISA.

23.     With respect to appeals of denied pre-service claims, the Plan provides for *one* mandatory review and provides for additional voluntary reviews, stating that, "It is your choice,

however, whether or not to seek voluntary review, and you are not required to do so before pursuing civil action . . . After a mandatory review process, you may choose to pursue civil action under ERISA Section 502(a)."

24.     Consistent with mirroring terms at 29 C.F.R. § 2560.503-1(h)(3)(ii),(iii), and (v), incorporated directly into ERISA at 29 U.S.C. § 1185(d) by way of 42 U.S.C. § 300gg-19(a)(2)(A), the Plan promises that:

> During an Appeal process, **no deference** will be afforded to the Adverse Benefit Determination, and **decisions will be made by fiduciaries who did not make the Adverse Benefit Determination** and who do not report to anyone who did. If the Adverse Benefit Determination was based on medical judgment, including determinations that Services are Experimental and/or Investigational or not Medically Necessary, **the fiduciaries during any Appeal will consult with a medical professional with appropriate training and experience in the appropriate field of medicine** and **who was neither consulted in connection with the Adverse Benefit Determination** nor is the subordinate of such an individual. (Emphasis added.)

25.     The Plan, in the Benefit Participation Handbook, declares that:

> Intermountain Healthcare understands the importance and sensitivity of your health information. We protect the privacy of your health information because that is the right thing to do. We also follow federal and state laws that govern the use of your health information. We use your health information in written, oral and electronic format (and allow others to have it) only as permitted by federal and state laws. These laws give you certain rights regarding your health information . . .

> Intermountain Healthcare benefits are administered by SelectHealth. For more information about the specific privacy practices of SelectHealth and its employees, please contact them directly by visiting their website at SelectHealth.org, or by calling SelectHealth's Privacy Office at 801-442-7253.

26.     The Notice of Privacy Practices appearing on SelectHealth's website (https://selecthealth.org/-/media/selecthealth/pdf-documents/notice-of-privacy-

practices/2015_npps-ncqa.ashx) contains similar assurances:

> We understand the importance and sensitivity of your personal health information, and we have security in place to protect it. Access to your information is limited to those who need it to perform assigned tasks. We restrict access to work areas and use locking filing cabinets and password-protected computer systems. We follow all federal and state laws that govern the use of your health information. We use your health information in written, oral, and electronic formats (and allow others to use it) only as permitted by federal and state laws. These laws give you certain rights regarding your health information.

II. **Plaintiffs' Admissions to Austen Riggs**

27.    In 2016, Plaintiff was hospitalized twice (in October and December) at the University of Utah Neuropsychiatric Institute, where she underwent 27 unsuccessful trials of ECT. Because her symptoms continued to worsen and expanded to include recurrent nightmares, flashbacks, dissociation, and intrusive images, Plaintiff's outpatient psychiatrist recommended psychiatric hospitalization at the Menninger Clinic. Plaintiff was hospitalized at the Menninger Clinic for over three months (December 30, 2016 through April 8, 2017). Eventually, the Menninger Clinic recommended step-down residential treatment at The Austen Riggs Center ("Austen Riggs"), consistently ranked among the top ten best psychiatric treatment centers in the United States by U.S. News & World Report and renowned for treating refractory mental health disorders through a continuum of community-based care.

28.    By letter dated April 6, 2017, Intermountain Healthcare informed Plaintiff that her position would be terminated effective April 15, 2017 due to her extended medical leave and her employer's need to fill her position. In the same letter, Intermountain Healthcare advised, "If you anticipate being released to return to work in any capacity in the foreseeable future please provide pertinent medical information, including the anticipated date of your release to return to

work and information concerning any applicable work restrictions and we will appropriately consider such information."

29.     By letter dated April 6, 2017, Plaintiff's attending psychiatrist at the Menninger Clinic responded as follows:

> [Plaintiff] continues to engage in treatment and is making good progress. She will require further treatment, but if that treatment is completed satisfactorily, it is reasonable to expect that she will be released back to work without restrictions. However, given the variable nature of patient recovery, my unfamiliarity with her exact work requirements, and her need for treatment at another facility after discharge from Menninger on 4/8/17, it is unclear what that time table would be. I would encourage updates with her treaters at Austin Riggs, her next treatment facility, in that regard.

30.     Plaintiff was terminated from Intermountain Healthcare effective April 15, 2017.

31.     Plaintiff admitted to Austen Riggs on April 10, 2017, and following extensive assessments, Austen Riggs prescribed a course of residential treatment, consisting of intensive psychotherapy, psychopharmacology, social work and family services, a skills-building psychosocial therapeutic milieu, and 24-hour nursing availability. In Plaintiff's case, a 24-hour therapeutic milieu was especially warranted given her propensity for self-harm and suicidal behaviors that she routinely concealed (especially from her highly triggering family members who contributed to her suicidality).

32.     Despite Plaintiff's extensive, persistent symptomatology and lack of adequate coping skills, SelectHealth prematurely curtailed coverage for Plaintiff's care at Austen Riggs as of May 17, 2017. By letter dated May 23, 2017, SelectHealth asserted that, while medically necessary, residential treatment could only continue at Center for Change, an in-network, Utah-based facility for patients with primary eating disorders, which Plaintiff did not have.

33.     Plaintiff judiciously remained at Austen Riggs through August 9, 2017, when her treatment was interrupted due to extreme suicidality and an involuntary, 9-day hospital commitment at Berkshire Medical Center. The exacerbation of Plaintiff's symptoms precipitating the 9-day hospitalization was not altogether unexpected given that she was addressing extremely painful childhood sexual abuse and rape as an adult that she could not have safely begun to process outside a 24-hour therapeutic structure. In fact, because Plaintiff was known to conceal her urges to self-harm and suicide, it took the safety, structure, and therapeutic trust established during of an initial course of residential treatment at Austen Riggs to allow her to disclose, for the first time, that she attempted suicide in the prior year by injecting her pacemaker with oral bacteria to induce sepsis, which nearly killed her.

34.     Upon her discharge from Berkshire Medical Center, Plaintiff was again followed by her outpatient psychiatrist and resided for a few weeks with her mother and step-father. This arrangement was clinically contraindicated given that Plaintiff's family was implicated in the origin of her PTSD, destabilized her, and actually precipitated suicidal crises. Plaintiff remained concerned that without further residential treatment, she would continue to isolate in her parents' home, lapse into suicidality, and act on self-destructive impulses, just as she had done in the past year by inducing sepsis. Indeed, as Plaintiff revealed during her previous episode of care at Austen Riggs, she had frequent ideations of being struck by a car on one of her daily runs. This suicidal plan was actually acted on and resulted in injury while Plaintiff was an inpatient as an adolescent, when she also cut her wrists.

35.     Without a local support structure (i.e., minimal and highly conflictual family relations, no close friends), and having lost her employment at Intermountain Healthcare within

days of discharging from the Menninger Clinic, remaining in the state of Utah to continue her treatment was too painful and triggering. Unfortunately, this time, SelectHealth identified only two, in-network facilities for Plaintiff's residential mental healthcare. Not only were both in Utah, where Plaintiff did not want to be, but neither facility treated patients with Plaintiff's clinical profile. As discussed above, Center for Change is a facility for patients with primary eating disorders, which Plaintiff did not have, and New Roads Behavioral Health's residential programs targeted young adults (from 17.5-27) with substance use and/or borderline personality disorders. A highly educated professional in her 40s, Plaintiff was neither a young adult nor suffering from substance use or borderline personality disorders. Thus, Plaintiff made an informed choice to resume treatment at Austen Riggs, for which preauthorization was reflexively denied on September 18 and 22, 2017 by SelectHealth based on its unlawful and nonsensical geographic restriction:

> The request for out of state residential treatment has been denied. SelectHealth medical policy 475 states that "care will be provided in a reasonable proximity to a member's community or residence and support system . . ." Local Utah options for care are Center for Change or New Roads treatment.

36.     Plaintiff's decision to resume treatment at Austen Riggs was prudent. Although she did not immediately express suicidal intent during her initial evaluation, she was nonetheless assessed to be at moderately high risk of suicide due to her history of concealed, impulsive, and lethal attempts. In fact, after her admission, Plaintiff disclosed a number of highly lethal suicide plans, including driving to Northern California to shoot herself  in the head (potentially with firearms owned by her parents, who resided in Utah). She also continued to struggle with highly impairing symptoms of PTSD, including intrusive thoughts and imagery related to abuse,

flashbacks, nightmares, lack of memory and focus, and significant preoccupation with past traumatic events.

37.     During her second episode of care at Austen Riggs, frequent medication changes were required to address Plaintiff's complex and rapidly shifting symptomatology. Through the use of intensive psychotherapy, Plaintiff made substantial gains in her insight and ability to speak about her traumas. The processing of intensely painful and triggering affects would not have been safe, let alone possible, in the absence of the 24-hour therapeutic structure afforded by Austen Riggs. As her treatment deepened, Plaintiff became increasingly torn by family dynamics, including her parents' wish for her to return to Utah, and experienced command hallucinations of her father's voice telling her to leave. Unfortunately, Plaintiff's parents were not fully able to grasp the extent to which she struggled with PTSD. Unable to find her own voice in the mix, Plaintiff became increasingly despondent and threatened to kill herself upon discharging from Austen Riggs. In light of her previous and lethal suicide attempts, Plaintiff was again transferred to Berkshire Medical Center on April 27, 2018.

38.     Although SelectHealth covered Plaintiff's hospitalizations in August 2017 and April 2018, SelectHealth perversely refused to authorize the interim periods of Plaintiff's residential treatment. In order to fund over $350,000 in unreimbursed residential treatment expenses, Plaintiff was forced to sell her home.

### III. Plaintiffs' Administrative Appeals re: First Admission to Austen Riggs

39.     On or about September 7, 2018, Plaintiff and Austen Riggs submitted a timely appeal of SelectHealth's May 23, 2017 preauthorization denial (for the May 17, 2017 through August 9, 2017 admission). In it, Plaintiff and Austen Riggs challenged the absurdity of

SelectHealth's geographic restriction by, among other things, highlighting the clinical inappropriateness of Center for Change due to Plaintiff not having a primary eating disorder and her ubiquitous suicide triggers in Utah.

40.     In responding with an October 20, 2017 adverse benefit determination to Plaintiff's first level appeal, SelectHealth only dug its foot deeper. Not only did SelectHealth fail to identify any suitable in-network residential treatment providers in Utah, but contrary to generally accepted mental health standards prioritizing patient autonomy, SelectHealth insisted that Plaintiff return to Utah to be near her "support" system, although the clinical evidence clearly indicated that Plaintiff was estranged from her family, suicidal around her parents, lost her employment, lacked friends, and did not want to live in the state.

41.     As cover for its unlawful geographic restriction and lack of suitable in-network, Utah facilities, SelectHealth fabricated additional denial rationales that ignored and perverted the clinical evidence as well as the terms of Plaintiff's Plan. For example, Dr. Scott Whittle, the SelectHealth physician reviewer assigned to adjudicate the first level appeal and responsible for issuing an October 20, 2017 adverse determination:

  1)     Incompetently disregarded the role of Plaintiff's treatment resistance and challenges in establishing an effective therapeutic alliance due to her extensive traumas;

  2)     Concocted criteria requiring "significant change" in Plaintiff's condition as a predicate for continued coverage of severe mental illness, despite:

    a) "Significant change" not being required by Plaintiff's Plan or generally accepted standards of medical practice (applicable to Plaintiff's mental health treatment);

    b) Generally accepted standards of medical practice not authorizing residential discharge (let alone to a lower level of care) in the absence of improvement and in the presence of serious suicide risk.

> c) Center for Change, a residential treatment facility for primary eating disorders, certainly not being expected to bring about "significant change" in Plaintiff's conditions since she could not even admit there.

42.     Effectively, SelectHealth posited that unless Plaintiff returned to Utah to be near her suicide triggers and receive treatment from a residential treatment facility targeting primary eating disorders, which she did not have, her medically necessary residential treatment would not be covered.

43.     To cap its bad faith, SelectHealth failed to comply with 29 C.F.R. §2560.503(j)(5)(i), which required it to explain or (at least) identify the specific rule, guideline, protocol, or other similar internal criterion on which it relied in making the adverse determination. SelectHealth also falsified the Plan's claims review procedures, which only require one mandatory review prior to administrative exhaustion. In its October 20, 2017 letter, SelectHealth stated:

> If you feel this matter requires further consideration, the Plan allows you to request a second review of the appeal. This request must be made in writing to SelectHealth Appeals within 60 days from the date of this letter. **This second level _mandatory_ review is required by the Plan before you may pursue judicial review under Section 502(a) of the Employee Retirement Income Security Act**, as applicable. (Emphasis added.)

44.     On or about December 5, 2017, Plaintiff submitted to SelectHealth's "mandatory" second level review. As part of Plaintiff's appeal, Plaintiff's psychotherapist at Austen Riggs refuted Dr. Whittle's mischaracterizations in great detail and explained that, pursuant to generally accepted standards of mental health practice articulated by the Level of Care Utilization System ("LOCUS"), a patient placement tool developed by the American Association of Community Psychiatrists, validated by field testing, and used extensively in 26 states and

internationally, Plaintiff clearly satisfied criteria for moderate intensity long-term residential treatment. The LOCUS states that "moderate intensity long term residential treatment programs" offered at Austen Riggs should have the "capacity to treat persons who are suffering from **long term** and **persistent disabilities** that require **extended rehabilitation and skill building in order to develop capacity for community living** . . . These facilities will provide intensive treatment as described for all Level 5 programs and **the length of stay will vary from two months to a year**." (Emphasis added.)

45.     The Plan, in the Health Insurance Handbook, consistent with mirroring terms at 29 C.F.R. §2560.503-1(h)(3)(ii),(iii), and (v), promises that:

> During an Appeal process, **no deference** will be afforded to the Adverse Benefit Determination, and **decisions will be made by fiduciaries who did not make the Adverse Benefit Determination** and who do not report to anyone who did. If the Adverse Benefit Determination was based on medical judgment, including determinations that Services are Experimental and/or Investigational or not Medically Necessary, **the fiduciaries during any Appeal will consult with a medical professional with appropriate training and experience in the appropriate field of medicine** and **who was neither consulted in connection with the Adverse Benefit Determination** nor is the subordinate of such an individual. (Emphasis added.)

46.     Nonetheless, Plaintiff's second level appeal was adjudicated on February 28, 2018 by a kangaroo panel comprised of: Sonja Nielson, a layperson; Darren Hansen, a product development specialist; Michael Eaton, a pharmacist, and Catherine Burton, a family medicine specialist. None of these individuals were board-certified psychiatrists, and it is clear from the February 28, 2018 appeals committee transcript that no consultation occurred between them and anyone other than Dr. Whittle, who single-handedly issued the October 20, 2017 adverse benefit determination regarding Plaintiff's first-level appeal. In fact, over the objections of Plaintiff's treatment team, Dr. Whittle ran the February 28, 2018 appeals committee meeting, in which he

conceded that residential treatment was medically necessary and that Plaintiff's **"[first level] appeal has been denied not because of level of care, but that we generally won't do business with residential care geographically outside of their community and support system."** Not only did Dr. Whittle concede the medical necessity of Plaintiff's residential mental health treatment, and not only did he unabashedly trumpet SelectHealth's  unlawful geographic restriction, but unbelievably, he also asserted that SelectHealth's coverage determination was based on an "expectation that this will get better in a **short to medium time frame**," as if such a clinically-bereft provision even appeared in Plaintiff's Plan or in generally accepted standards of medical practice (applicable to residential treatment for Plaintiff's severe mental illnesses which, by definition, are pervasive and therefore slow to clinically respond, especially in the presence of treatment-undermining environmental factors). Even more egregious was Dr. Whittle's inquiry as to why liability for Plaintiff's treatment shouldn't be relegated to "disability coverage" by the taxpayers, as if Plaintiff's Plan didn't actually cover severe and persistent mental illnesses. Dr. Whittle's self-serving commentary exposed the sad truth that, with respect to severe mental illnesses, Intermountain Healthcare and SelectHealth simply aren't willing to fund the "most appropriate" care required by Plaintiff's Plan.

47.     Following the kangaroo appeal panel's review, on March 9, 2018, SelectHealth issued Plaintiff a "final internal adverse benefit determination" acknowledging her right to "pursue judicial review under Section 502(a) of the Employee Retirement Income Security Act." As with its first level appeal adverse benefit determination, SelectHealth failed to comply with 29 C.F.R. §2560.503(j)(5)(i) by not explaining or (at least) identifying any specific rule, guideline, or protocol on which it relied. Moreover, SelectHealth nonsensically:

a) decried the lack of a discharge plan for Plaintiff, despite one plainly appearing in her medical record and despite Plaintiff's actual August 9, 2017 discharge to an even higher level of (hospital) care, which SelectHealth approved;

b) perversely blamed Plaintiff for "no indication of goals or progress towards goals except to address persistent [suicidal ideations]," as if preventing the loss of life was not critical in its own right, and as if SelectHealth did not possess ample evidence of additional treatment goals. (i.e., April 18, 2017 Problem and Goal Sheet).

c) grafted a new requirement for "evidence of recovery," despite:

> (1) "recovery" from severe mental illness being a life-long-process;
> (2) Plaintiff having been actively engaged in her treatment, which resulted in a period of expectable decompensation due to the processing of long-suppressed trauma; and
> (3) SelectHealth's identified in-network facility, Center for Change, certainly not being able to bring about recovery for Plaintiff since she could not be admitted there in the first instance.

### IV. Plaintiff's Administrative Appeals re: Second Admission to Austen Riggs

48.     On or about March 16, 2018, Plaintiff and Austen Riggs submitted a timely appeal of SelectHealth's September 18 and 22, 2017 preauthorization denials (for the September 13, 2017 through April 27, 2018 admission) in which, for the first time, SelectHealth identified that its unlawful geographic restriction was rooted in Medical Policy 475. In her appeal, Plaintiff explained that even her Utah-based psychiatrist agreed that local treatment options were unsuitable for her. Plaintiff's psychotherapist at Austen Riggs was equally clear:

> As stated in my other appeals letters based on a prior admission, the two residential treatment centers in Utah that you recommend simply do not provide the type of care that [Plaintiff] needs. Realizing that this is inordinately repetitive: The Center for Change indicates that they are a residential treatment facility for eating disorders, and this is not [Plaintiff's] diagnosis. New Roads [Behavioral Health] seems to be geared to young adults and either substance abuse or borderline personality disorder again, not the diagnoses of [Plaintiff]. Despite our attempts to be clear about why neither option is appropriate, your reviewers continue to recommend them as adequate and appropriate treatment for her difficulty.

49.     In responding with an April 18, 2018 adverse benefit determination to Plaintiff's first level appeal, SelectHealth spoke from both sides of its mouth. First, SelectHealth callously insisted that Center for Change and New Roads Behavioral Health were clinically appropriate local residential mental health treatment options for Plaintiff and that any assertion to the contrary was nothing more than "member statement and therapist statement." Then, without complying with 29 C.F.R. §2560.503(j)(5)(i) by not explaining or (at least) identifying any specific rule, guideline, or protocol on which it relied, SelectHealth faithlessly asserted that Plaintiff didn't meet "criteria" for residential treatment at all.

50.     Again, SelectHealth falsified the Plan's claims review procedures, which only require one mandatory review for preauthorization denials prior to administrative exhaustion. In its April 18, 2018 letter, SelectHealth stated:

> If you feel this matter requires further consideration, the Plan allows you to request a second review of the appeal. This request must be made in writing to SelectHealth Appeals within 60 days from the date of this letter. **This second level <u>mandatory</u> review is required by the Plan before you may pursue judicial review under Section 502(a) of the Employee Retirement Income Security Act**, as applicable. (Emphasis added.)

51.     On June 14, 2018, Plaintiff submitted to SelectHealth's "mandatory" second level review. This time, Plaintiff's voluminous appeal expressly put SelectHealth on notice of its Plan-offending and discriminatory geographic treatment limitation (set by Medical Policy 475). Additionally, Austen Riggs alerted SelectHealth to its flagrant misrepresentation of the two publications it cited in support of Medical Policy 475's geographic restriction on residential mental health treatment:

> In support of this discriminatory provision, SelectHealth misleadingly cites to two publications in the "Key References" section of Medical Policy #475. The first

misleadingly referenced study by Vandevooren, J. (2007) did not evaluate the relative superiority of local versus non-local residential treatment. The study did not even attempt to examine considerations for selecting local versus non-local residential treatment, nor did it examine any of a multitude of variables for selecting the most <u>suitable</u> treatment, local or not. Rather, based on a very small sample of only 25 individuals treated in community residential settings, the study concluded that these individuals did better after residential treatment than before, as measured by longer tenures in independent settings subsequent to treatment. This is a far cry from any endorsement to discard patient autonomy regarding provider selection in the name of local treatment. In fact, it is patient autonomy which drives patient-centered care[10] and which correlates with positive treatment outcomes,[11] such that it is simply absurd for SelectHealth to unilaterally impose such a coercive and clinically contraindicated policy on any mental health patients (let alone those with out-of-network coverage). Evidence-based, patient-centered treatment approaches that promote patient autonomy and provide for peer support, like the ones at Austen Riggs, are specifically endorsed by SAMHSA. In fact, the very SAMHSA publication – 2009 Guiding Principles and Elements of Recovery-Oriented Systems of Care – cited in Medical Policy #475, emphasizes that "**recovery is self-directed** and empowering" (page 1). Not only does SAMHSA highlight self-direction and that **"recovery-oriented systems need to provide 'genuine, free and independent choice' among an array of treatment and recovery support options"** (page 2), but nowhere does it even come close to recommending treatment of patients in clinically mismatched settings.

[10] Dixon, L.,B,, Holoshitz, Y., & Nossel, I. (2016). Treatment engagement of individuals experiencing mental illness: review and update. *World Psychiatry*, 15(1), 13-20.

[11] Plakun, M., (Ed.) 2004. Treatment resistance and patient authority: *The Austen Riggs Reader*. New York, NY US: W.W. Norton & Co.

52.     Plaintiff's appeal also included written program descriptions from Center for Change and New Roads Behavioral Health. The Center for Change FAQ, "Comprehensive Treatment" program description retrieved from its website expressly stated that:

**Do I have to have an <u>eating disorder</u> to receive treatment at Center for Change?**

<u>**Yes**</u>, we are a **specialized treatment center for eating disorders**. While we treat co-occurring disorders such as depression, anxiety, OCD, bipolar and substance abuse, **<u>all patients</u> in 24-hour care at the Center have a <u>significant eating disorder</u>**.

(Emphasis added.)

Likewise, the published New Roads Behavioral Health program description confirmed its unsuitability for Plaintiff, given that that its residential mental health treatment programs are geared toward young adults (ages 17.5-27) with either substance use disorders and/or borderline personality disorders.

53.    Finally, Austen Riggs went through great lengths to explain that Plaintiff's residential mental health treatment was clearly consistent with generally accepted standards of medical practice, as reflected by a detailed patient placement analysis under the LOCUS and by prominent, peer-reviewed research (published in *JAMA*) supporting Plaintiff's care.

54.    On July 11, 2018, Plaintiff's second level appeal was adjudicated by the same kangaroo panel (that convened on February 28, 2018) comprised of: Sonja Nielson, a layperson; Michael Eaton, a pharmacist, and Catherine Burton, a family medicine specialist. Although none of these individuals was a board-certified psychiatrist, the panel failed to consult with ***any*** psychiatric expert. Unsurprisingly, the wholly unqualified panel failed to respond to any of Plaintiff's arguments on appeal, ignored the clinical evidence with which it had been presented, and simply copied its March 9, 2018 final adverse benefit determination (with respect to Plaintiff's initial admission to Austen Riggs) *verbatim*. In keeping with prior denials, it also failed to explain or (at least) identify any ***specific*** rule, guideline, or protocol on which it relied in issuing its final adverse determination.

55.    On August 27, 2018, SelectHealth confirmed to Plaintiff's counsel that SelectHealth's unqualified appeals panel consulted substance use disorder guidelines with

respect to Plaintiff's second-level appeal, although Plaintiff had never been treated for nor diagnosed with a substance use disorder.

**V.   Plaintiff's Requests for Protected Health Information**

56.     Consistent with her right under ERISA (at 29 U.S.C. § 1185(d), incorporating 42 U.S.C. § 300gg-19(a)(1)(C)) and its implementing regulation at 29 C.F.R. § 2560.503-1(h)(2)(iii)) to access and review SelectHealth's DRS (including SelectHealth's case management, utilization review, and appeals records), on April 17, 2018, Plaintiff executed a SelectHealth Authorization to Release Health Information ("Authorization") to her counsel. The Authorization expressly indicated, "Pursuant to 45 CFR Part 164.524(c)(2)(ii), PHI is to be emailed to mbendat@psych-appeal.com."

57.     On April 19, 2018, Plaintiff's counsel emailed Plaintiff's Authorization to privacy@imail.org, the contact email address provided by SelectHealth. The imail.org domain is registered to Intermountain Healthcare. The body of the email stated, "Pursuant to 45 CFR Part 164.524(c)(2)(ii) and the attached authorization, please electronically transmit the entire behavioral health Designated Record Set for [Plaintiff], to: mbendat@psych–appeal.com. Paper records will not be accepted and will <u>not</u> serve to comply with HIPAA."

58.     Having not received confirmation of the April 19, 2018 request for SelectHealth's DRS, on May 11, 2018 Plaintiff's counsel also forwarded the April 19, 2018 email (with attachments) to appeals@imail.org, a contact email address also provided by SelectHealth.

59.     On May 16, 2018, Plaintiff's counsel emailed privacy@imail.org to advise that a torn parcel with Plaintiff's compromised, protected health information was received from

SelectHealth. Plaintiff's counsel reminded SelectHealth of its obligation to "immediately take all remedial measures."

60.     On May 21, 2018, SelectHealth's Privacy Coordinator, Brian Hall, emailed Plaintiff's counsel to inquire, "Do you have a name of someone who sent the paper records?"

61.     On May 21, 2018, Plaintiff's counsel responded by email to Mr. Hall, "It is concerning that SelectHealth does not have privacy safeguards to track personnel access of member records/PHI. Attached you will find a cover letter from Whitney G., Project Service Specialist at SelectHealth, that was included in a torn parcel containing exposed PHI." Mr. Hall did not dispute Plaintiff's counsel's assertion.

62.     Despite Mr. Hall's promise to "investigat[e] how this error occurred," Plaintiff never received any notice from SelectHealth advising her of the privacy breach or any remedial action it had taken.

63.     On July 24, 2018, Plaintiff's counsel emailed privacy@imail.org to request that "SelectHealth supplement by EMAIL its production of [Plaintiff's] behavioral health Designated Record Set from May 18, 2018 through the present."

64.      Having not received confirmation of the July 24, 2018 request for SelectHealth's supplemented DRS, on August 6, 2018 Plaintiff's counsel also forwarded the July 24, 2018 email (with attachments) to appeals@imail.org. The body of the email expressly requested that SelectHealth transmit the supplemental data by EMAIL.

65.     On August 7, 2018 at 10:21AM (Pacific Time), Brian Porter from the SelectHealth Appeals Department left Plaintiff's counsel a voice message that SelectHealth intended to send Plaintiff's records by mail.

66.    On August 7, 2018, Plaintiff's counsel left a voice message for Mr. Porter at

11:49AM (Pacific Time) and also emailed appeals@imail.org at 12:05PM (Pacific Time),

stressing that:

> Today, we received a message from Steve at the SelectHealth Appeals
> Department that SelectHealth intends to mail us a hardcopy of [Plaintiff's] DRS.
> Please note that we have repeatedly requested EMAIL production of the DRS and
> that **we do not consent to any hard copy production of the DRS.**
>
> Pursuant to 45 C.F.R. Part 164.524(c)(2)(ii), "if the protected health information
> that is the subject of a request for access is maintained in one or more designated
> record sets electronically and if the individual requests an electronic copy of such
> information, **the covered entity <u>must</u> provide the individual with access to the
> protected health information in the electronic form and format requested by
> the individual**." SelectHealth is welcome to produce the DRS in multiple emails,
> but any hard copy production will be deemed a violation of the HIPAA Privacy
> Rule and will not satisfy our request.

67.    As confirmed by the United States Department of Health & Human Services in its

publication, "Individuals' Right under HIPAA to Access their Health Information 45 CFR §

164.524," appearing at:

https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/access/index.html:

> Where an individual requests an electronic copy of PHI that a covered entity
> maintains electronically, the covered entity **must** provide the individual with
> access to the information in the requested electronic form and format, if it is
> readily producible in that form and format. When the PHI is not readily
> producible in the electronic form and format requested, then the covered entity
> must provide access to an **agreed upon** alternative readable **electronic format**.
> See 45 CFR 164.524(c)(2)(ii) . . . It is only if the individual declines to accept any
> of the electronic formats readily producible by the covered entity that the covered
> entity may satisfy the request for access by providing the individual with a
> readable hard copy of the PHI . . .
>
> **Covered entities are responsible for breach notification for unsecured
> transmissions** and may be **liable for impermissible disclosures of PHI that
> occur in <u>all</u> contexts** except when fulfilling an individual's right of access under
> 45 CFR 164.524 to receive his or her PHI or direct the PHI to a third party in an
> unsecure manner . . .

> If a covered entity discovers that the PHI was breached in transit to the designated third party, and the PHI was "unsecured PHI" as defined at 45 CFR 164.402, **the covered entity generally is obligated to notify the individual and HHS of the breach and otherwise comply with the HIPAA Breach Notification Rule at 45 CFR 164**, Subpart D.

(Emphasis added.)

68.     Incredibly, despite Plaintiff's repeated insistence on receiving her protected health information by EMAIL (subject to encryption safeguards), SelectHealth intentionally defied its mandate and written promises to maintain Plaintiff's privacy and the security of her most sensitive records.

69.     On August 19, 2018, Plaintiff's counsel emailed privacy@imail.org and appeals@imail.org to advise that:

> SelectHealth has violated the HIPAA Privacy Rule by failing to comply with our attached request for **ELECTRONIC** production of [Plaintiff's] complete behavioral health Designated Record Set.
>
> Last week, we received a <u>torn</u> parcel from SelectHealth containing [Plaintiff's] unsecured, personally identifying health information. We expressly and repeatedly warned SelectHealth to NOT send paper records and that doing so would violate HIPAA. 45 CFR Part 164.524(c)(2)(ii) prohibits SelectHealth from sending paper records without our express permission. It specifically requires covered entities to transmit protected health information via electronic means when requested.
>
> SelectHealth is now liable for any breach of privacy to [Plaintiff] and must immediately take all remedial measures.

70.     Nonsensically, on August 20, 2018 at 11:07AM (Pacific Time), Mr. Porter left a message for Plaintiff's counsel confirming that Plaintiff's (unsecured) DRS was mailed by SelectHealth on August 7, 2018.

71.     To date, SelectHealth has failed to notice Plaintiff of its privacy breach or advise her of any remedial measures they have taken.

72.     As a direct and proximate result of SelectHealth's intentional privacy breaches, Plaintiff has suffered and continues to suffer emotional distress.

### FIRST CLAIM FOR RELIEF
### (Claim for relief under ERISA, 29 U.S.C. § 1132(a)(1)(B))

73.     Plaintiff incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein.

74.     This claim is brought pursuant to 29 U.S.C. §1132(a)(1)(B).

75.     SelectHealth wrongfully denied Plaintiff's claims for medically necessary residential mental health treatment at Austen Riggs based on an internally-developed, clinically bereft, Plan-offending geographic restriction (described in SelectHealth Medical Policy 475) that violated the express terms of Plaintiff's Plan. Apart from violating the express terms of Plaintiff's Plan, SelectHealth's geographic restriction also violated the Federal Parity Act, incorporated into ERISA at 29 U.S.C. § 1185a (and implemented by 29 C.F.R. § 2590.712), due to it being a treatment limitation imposed exclusively on (in- and out-of-network) inpatient mental health benefits. No such geographic limitation is imposed by the Plan on (in- and out-of-network) inpatient medical/surgical benefits, such as skilled nursing facilities.

76.     SelectHealth also refused to allow Plaintiff to access her out-of-network benefits and directed her to receive residential mental health treatment from clinically inappropriate, in-network facilities that would not have admitted her. When pressed regarding the inadequacy of its identified, in-network facilities, SelectHealth willfully ignored the evidence in its possession and manufactured additional, pretextual denial rationales. SelectHealth's wrongful denial of

Plaintiff's claims was compounded by its repeated, materially prejudicial failures to provide Plaintiff full and fair reviews, in violation of 29 U.S.C. § 1133 and 29 U.S.C. § 1185(d), (incorporating 42 U.S.C. § 300gg-19(a)(2)(A) and 29 C.F.R. § 2560.503-1).

77.     Plaintiff seeks the relief identified below to remedy this claim.

## SECOND CLAIM FOR RELIEF
### (Claim for relief under ERISA, 29 U.S.C. § 1132(a)(3)(A))

78.     Plaintiff incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein.

79.     This count is brought pursuant to ERISA, 29 U.S.C. § 1132(a)(3)(A), to enjoin SelectHelath's acts and practices which violate 29 U.S.C. § 1185(a), 29 U.S.C. § 1185(d), and 29 U.S.C. § 1133, as incorporated into the Plan and ERISA, as detailed herein. Plaintiff brings this claim only to the extent that the Court finds that the injunctive relief sought is unavailable pursuant to 29 U.S.C. § 1132(a)(1)(B).

## THIRD CLAIM FOR RELIEF
### (Claim for relief under ERISA, 29 U.S.C. § 1132(a)(3)(B))

80.     Plaintiff incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein.

81.     This count is brought pursuant to 29 U.S.C. § 1132(a)(3)(B), to obtain appropriate equitable relief (i) to redress SelectHealth's violations of 29 U.S.C. § 1185(a), 29 U.S.C. § 1185(d), and 29 U.S.C. § 1133, as incorporated into the Plan and ERISA, and/or (ii) to enforce such provisions of ERISA or the Plan. Plaintiff brings this claim only to the extent that the Court finds that the equitable relief sought is unavailable pursuant to 29 U.S.C. § 1132(a)(1)(B) or 29 U.S.C. § 1132(a)(3)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in her favor against Defendants as follows:

A.      Declaring that Defendants violated their legal obligations in the manner described herein;

B.      Ordering Defendants to pay all wrongfully denied claims (subject to the in-network schedule of benefits), with interest;

C.      Ordering Defendants to pay Plaintiff a surcharge for their intentional privacy breaches of her protected health information requested pursuant to 29 U.S.C. § 1185(d) and 29 C.F.R. § 2560.503-1(h)(2)(iii);

D.      Awarding Plaintiff all reasonable attorney's fees, court costs, expert witness fees, and other litigation expenses incurred in this action; and

E.      Granting such other and further relief, such as the removal of Defendants as Plan fiduciaries, as is just and proper in light of the evidence.

Dated this the 17th day of October, 2018.

STAVROS LAW P.C.

s/ Austin B. Egan
Austin B. Egan

PSYCH-APPEAL, INC.

s/ Meiram Bendat
Meiram Bendat
*Pro Hac Vice Application Forthcoming*

*Attorneys for the Plaintiff*