Andrew W. Stavros (8615)
Austin B. Egan (13203)
**STAVROS LAW P.C.**
8915 South 700 East, Suite 202
Sandy, Utah 84070
Tel: 801.758.7604
Fax: 801.893.3573
andy@stavroslaw.com
austin@stavroslaw.com

D. Brian Hufford (*Pro Hac Vice*)
Jason S. Cowart (*Pro Hac Vice*)
**ZUCKERMAN SPAEDER LLP**
485 Madison Avenue, 10th Floor
New York, NY 10022
Tel: (212) 704-9600
Fax: (212) 704-4256
dbhufford@zuckerman.com
jcowart@zuckerman.com

Meiram Bendat (*Pro Hac Vice*)
**PSYCH-APPEAL, INC.**
7 West Figueroa Street, Suite 300
PMB #300059
Tel: (310) 598-3690, x 101
Fax: (888) 975-1957
mbendat@psych-appeal.com

Andrew N. Goldfarb (*Pro Hac Vice*)
**ZUCKERMAN SPAEDER LLP**
Washington, DC 20036
1800 M Street, NW, Suite 1000
Tel: (202) 778-1800
Fax: (202) 822-8106
agoldfarb@zuckerman.com

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT IN AND FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JANE DOE, by ▮▮▮▮▮▮▮▮, as her Personal Representative, on Ms. Doe's own behalf and, for certain claims, on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>vs.<br><br>INTERMOUNTAIN HEALTHCARE, INC. and SELECTHEALTH, INC.<br><br>    Defendants. | **THIRD AMENDED COMPLAINT PROPOSED CLASS ACTION**<br><br>**Redacted, Public Version**<br><br>Case No. 2:18-cv-00807-RJS-JCB<br><br>Chief District Judge Robert J. Shelby<br>Magistrate Jared C. Bennett |

7784897.1

Plaintiff ███████ ("Plaintiff"), as representative and on behalf of her late daughter, Jane Doe,[1] and for certain claims detailed herein on behalf of a putative class of all others similarly situated, based on the best of her knowledge, information and belief, formed after an inquiry reasonable under the circumstances by herself and her undersigned counsel, complains as follows against Defendants:

## **INTRODUCTION**

1.      Up until April 18, 2019, when she tragically took her own life, Plaintiff's daughter, Jane Doe, suffered from chronic and severe mental illnesses, including Major Depressive Disorder and Post-Traumatic Stress Disorder ("PTSD"), stemming from protracted childhood sexual abuse by her father and from a brutal rape as an adult.

2.      Jane was hospitalized at the University of Utah Neuropsychiatric Institute twice in 2016, where she underwent 27 unsuccessful trials of electroconvulsive treatment ("ECT"). Because her symptoms continued to worsen and expanded to include recurrent nightmares, flashbacks, dissociation, and intrusive images, Jane's outpatient psychiatrist recommended psychiatric hospitalization at the Menninger Clinic Professionals in Crisis Unit ("Menninger Clinic"), where Jane was treated from December 30, 2016 through April 8, 2017. Eventually, the Menninger Clinic recommended step-down residential treatment at The Austen Riggs Center ("Austen Riggs"), consistently ranked among the top ten best psychiatric treatment centers in the United States by U.S. News & World Report and renowned for treating refractory mental illnesses

---

[1] On May 17, 2019, the Court granted Jane Doe's Motion to Proceed Under a Pseudonym and Motion for Modification to the Standard Protective Order (Docket No. 56), and on July 12, 2019 the Court granted, under seal, Jane's Motion to Substitute Party (Docket No. 56). The real identity of Jane is known to the Court and Defendants.

7784897.1

through a continuum of community-based care. On April 10, 2017, Jane was admitted for residential mental health treatment at Austen Riggs, where she remained until August 7, 2018, at which point she was involuntarily hospitalized. Thereafter, Jane re-admitted to Austen Riggs on September 13, 2017, where she remained until April 27, 2018, at which point she was again hospitalized.

3.      Up until her termination from employment on April 15, 2017, Jane worked as a physician for Defendant Intermountain Healthcare, Inc. ("Intermountain Healthcare"), the largest private employer in Utah. Jane was insured under the Intermountain Life and Health Benefit Plan ("Plan"), which Intermountain Healthcare, in its capacity as Plan Sponsor, established for its employees and the employees of its affiliates, including Defendant SelectHealth, Inc. ("SelectHealth"). Jane remained covered by the Plan through July 31, 2018. Among the various coverage options available under the Plan, Jane chose the Select Med Plus Medical Plan, in part due to it offering out-of-network mental health benefits (i.e., benefits for services she could receive from providers who had not elected to join Defendants' network ("in-network" providers) and thereby subject to Defendants' internal policies and requirements.)

4.      Intermountain Healthcare issued Jane a "Benefits Participation Handbook" and "Health Insurance Handbook," which set forth the provisions constituting the Plan. As described therein, the two handbooks work together as a Summary Plan Description ("SPD"). The Health Insurance Handbook also references a "Schedule of Benefits," which identifies Plan participants' financial responsibility for in- and out-of-network mental healthcare, including residential mental health treatment.

3

5.      The SPD identifies Defendant SelectHealth, an NCQA-accredited, licensed health maintenance organization wholly owned by Intermountain Healthcare, as the "claims review fiduciary" to which Intermountain Healthcare, in its capacity as Plan Administrator, has delegated sole discretionary authority to determine the availability of benefits and to interpret the applicable terms of the Plan. SelectHealth's claims and appeals determinations are conclusive and binding on the Plan.

6.      The Plan expressly covers mental health treatment for psychiatric conditions listed in the Diagnostic and Statistical Manual ("DSM"), as periodically revised. Jane's severe mental illnesses, Major Depressive Disorder and PTSD, are both listed in the DSM.

7.      The Plan also expressly covers hospitalization and residential mental health treatment rendered by non-participating facilities, both in and outside of Utah. To prevent illusory benefits, when the Plan cannot identify suitable in-network facilities, the Plan must arrange for care rendered by non-participating providers as if rendered on an in-network basis so that participants are not responsible for anything beyond an in-network cost share.

8.      Under the Plan, benefits for out-of-network services are paid based on an "Allowed Amount," defined by the Plan as "[t]he dollar amount allowed by the Plan for a specific Covered Service." Defendants confirmed in letters to Jane that they have interpreted this language to mean that reimbursements for out-of-network services under the Plan should "generally" match in-network "target" rates set by Defendants, thereby granting to themselves even broader discretion to interpret their own reimbursement policy.

9.      The Plan is a non-grandfathered, large-group, self-funded health plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA") and the Paul Wellstone and

4

Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 ("Federal Parity Act"). The Federal Parity Act, which mandates that mental health services be treated with "parity" to medical/surgical services, amended Section 712 of ERISA (29 U.S.C. § 1185a), to forbid exclusive or incomparable "treatment limitations" for mental health benefits. The Federal Parity Act's implementing regulations explain that treatment limitations can be expressed quantitatively or non-quantitatively and that plans may not "impose a nonquantitative treatment limitation with respect to mental health or substance use disorder benefits in any classification unless, under the terms of the plan (or health insurance coverage) as written and in operation, any processes, strategies, evidentiary standards, or other factors used in applying the nonquantitative treatment limitation to mental health or substance use disorder benefits in the classification are comparable to, and are applied no more stringently than, the processes, strategies, evidentiary standards, or other factors used in applying the limitation with respect to medical/surgical benefits in the classification." 29 C.F.R. § 2590.712(c)(4)(i). These provisions are referred to herein as the "parity provision" of ERISA.

10.     The Federal Parity Act also amended ERISA to require health plans to disclose, upon request, the treatment limitations imposed on mental health benefits and to analyze their compliance with the parity provision.

11.     Moreover, ERISA, under 29 U.S.C. § 1185d (which incorporates 42 U.S.C. § 300gg-5), specifies that ERISA plans "shall not discriminate . . . against any health care provider who is acting within the scope of that provider's license or certification under applicable State law." While "varying reimbursement rates" are permissible under this statute, that is only if such variations are "based on quality or performance measures." This provision is referred to herein as

the "non-discrimination provision" of ERISA.

12.     In their respective roles—Intermountain Healthcare as Plan Administrator delegating sole discretionary authority to determine the availability of benefits and to interpret applicable Plan terms to SelectHealth, and SelectHealth as claims review fiduciary administering the mental health benefits under the Plan, including by interpreting Plan terms and making all final and binding benefit determinations—both Defendants are "fiduciaries" under ERISA, which requires them to discharge their duties solely in the interests of plan beneficiaries and participants, and in accordance with the provisions of ERISA (such as the parity provision in § 1185a). *See* ERISA, 29 U.S.C. § 1104. ERISA not only imposes liability where the fiduciary itself breaches these duties, but also where the fiduciary participants in another fiduciary's breach, or where the fiduciary knows about another fiduciary's breach but does not take reasonable steps to stop it. ERISA also imposes remedies on a non-fiduciary who participates in a fiduciary's breach.

13.     During the December 2016 to April 2018 period, Defendants fully denied coverage for some of the mental health services that Jane received, and therefore paid no benefits for these services.

14.     Despite the Plan expressly covering out-of-network (and out-of-area) residential mental health treatment for Jane's severe mental illnesses, Defendants unlawfully denied her medically necessary claims for such services based on a discriminatory and clinically insupportable geographic restriction imposed exclusively on mental health benefits, and specifically, on residential mental health treatment. Throughout this process, Defendants repeatedly misrepresented the basis for their denials while also refusing to provide supporting documentation relevant to such denials, in explicit violation of ERISA.

7784897.1

15.     During the same time period, Defendants covered some of Jane's mental health services, but applied discriminatory reimbursement policies in violation of Jane's Plan,  ERISA and the Federal Parity Act, in the ways described below.

16.     First, while Defendants tied their out-of-network reimbursement rates to their in-network fee schedule, Defendants failed to update the out-of-network rates to account for increases in their in-network fee schedule. As a result, Defendants systematically underpaid out-of-network mental health services. Defendants admitted to this systematic failure only after Jane discovered it during the course of her internal appeals of Defendants' under-reimbursements. While Defendants increased benefits for certain services Jane received to ostensibly address this error, they continued to underpay Jane's approved benefits and failed to pay interest for the material delay in making proper benefit payments, which benefits and interest Jane was entitled to receive under ERISA.

17.     Second, SelectHealth interpreted the Plan definition of "Allowed Amount" for claims as permitting it to set reimbursement rates for out-of-network mental health services by "generally" matching them to "target" rates paid for in-network mental health services. However, after granting itself broad discretion in setting reimbursement rates, SelectHealth proceeded to exercise that self-granted discretion unreasonably, by reimbursing out-of-network, inpatient mental health services policy far less than in-network rates for those same services.

18.     Third, in setting reimbursement rates, Defendants applied discriminatory methodologies for mental health benefits that were incomparable to and more stringent than those for medical/surgical benefits. Thus, Defendants reimbursed inpatient mental health services, which are provided at an ***acute*** level of care, at the same rate they paid for skilled nursing facilities, an ***intermediate*** level of care for medical/surgical services. Moreover, they reimbursed residential

7

mental health treatment, which represents an intermediate level of care, at the same rate they paid for a lower level of care for medical/surgical services provided by an even more reduced level of skilled nursing. The different reimbursement levels reflected in these methodologies discriminated against mental health care, were not based on quality or performance measures, and further devalued and depressed the reimbursement for out-of-network mental health services, which under Defendants' policy were allegedly linked to the in-network rates.

19.     In addition, for medical/surgical services, Defendants applied their "matching" policy by setting Allowed Amounts for in-network and out-of-network services at the exact same amounts. However, for intermediate-level mental health services, Defendants took a very different approach: they uniformly set out-of-network Allowed Amounts rates *29%-44%* below the "target" in-network rates.

20.     Through this action, Plaintiff is representing the interests of her late daughter on an individual basis in challenging Defendants' adverse benefit determinations in which they concluded that no coverage was available for the mental health services being sought, and thereby paid no benefits. For these denied claims, Plaintiff seeks appropriate individual relief under ERISA.

21.     Plaintiff also seeks appropriate relief under ERISA on behalf of her daughter and all other similarly situated individuals who were subjected to Defendants' discriminatory reimbursement policies for covered mental health services.

## THE PARTIES

### Plaintiff

7784897.1

22.     Plaintiff is the court-appointed Personal Representative of the late Jane Doe, who tragically took her own life on April 18, 2019. Up through July 31, 2018, Jane, a physician, was covered by the Plan, a self-funded, non-grandfathered large group policy sponsored by her former employer, Intermountain Healthcare.

**<u>Defendants</u>**

23.     Defendant Intermountain Healthcare is headquartered at 36 South State Street, Suite 2200, Salt Lake City, Utah 84130. Intermountain Healthcare is the largest private employer in Utah. In its capacity as Plan Sponsor, Intermountain Healthcare established the Plan for its employees and those of its corporate affiliates, including Defendant SelectHealth. Intermountain Healthcare, in its capacity as Plan Administrator, has delegated sole discretionary authority to determine the availability of benefits and to interpret the applicable terms of the Plan to its "claims review fiduciary," Defendant SelectHealth. Defendant Intermountain Healthcare wholly owns Defendant SelectHealth.

24.     Defendant SelectHealth is located at 5381 Green Street, Murray, Utah 84123, and its registered agent, Anne D. Armstrong, shares the same office address as Defendant Intermountain Healthcare. SelectHealth, a licensed health maintenance organization accredited by NCQA, is the "claims review fiduciary" for Jane's Plan. SelectHealth's claims and appeals determinations are conclusive and binding.

25.     In light of Intermountain Healthcare's sole ownership of SelectHealth, SelectHealth suffers from an inherent financial conflict of interests when adjudicating benefits under Jane's Plan, as those benefits will be paid by SelectHealth's parent company, Intermountain Healthcare.

7784897.1

26.     Due to the authority, discretion, and control they have been granted and exercised to delegate fiduciary duties and to make decisions with respect to benefit claims in connection with Jane's ERISA-governed Plan, both Defendants are fiduciaries and must comply with ERISA's fiduciary requirements in fulfilling their roles, duties, and responsibilities.

## JURISDICTION AND VENUE

27.     Defendants' actions in administering Jane's employer-sponsored health plan are governed by ERISA, 29 U.S.C. § 1001, *et seq.* This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and 29 U.S.C. § 1132(e) (ERISA).

28.     Venue is appropriate in this District. Defendants administer Jane's Plan in this District, conduct significant operations in this District, and are headquartered in this District.

## STATEMENT OF FACTS

### I.     Jane Doe's Plan

29.     Jane Doe was insured through her employer pursuant to the Plan, which includes the Select Med Plus Medical Plan, effective January 1 for each plan year.

30.     The Plan, through the SPD and Schedule of Benefits, provides in-network and out-of-network coverage for medically necessary medical and mental health services, including psychiatric hospitalization and residential mental health treatment.

31.     The Plan, through the SPD, defines "medically necessary" as:

Services that a prudent healthcare professional would provide to a patient for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or its symptoms in a manner that is:

a. in accordance with ***generally accepted standards of medical practice*** in the United States;
b. ***clinically appropriate*** in terms of type, frequency, extent, site, and duration; and
c. not primarily for the convenience of the patient, Physician, or other Provider.

10

When a medical question-of-fact exists, Medical Necessity shall include the *most appropriate* available supply or level of service for the Member in question considering potential benefit and harm to the Member.

32.     The Plan, through the SPD, states: "SelectHealth has developed medical policies to serve as guidelines for coverage decisions. These guidelines detail when certain Services are considered Medically Necessary or Experimental and/or Investigational. *Medical policies do not supersede the express provisions of the SPD*." (Emphasis added.)

33.     As an interpretation of the Plan's definition of the "Allowed Amount," Defendants established a policy stating that they would determine out-of-network reimbursement rates for particular services "generally" based on the fee schedule they negotiated for in-network providers offering the same services.

34.     The Plan, through the SPD and Schedule of Benefits, identifies that for clinically appropriate, in-network hospitalization and residential mental health treatment, a participant's cost share is capped at "20% after deductible," whereas a participant's out-of-network hospitalization and residential mental health treatment cost share is "40% after deductible" in addition to anything above an "Allowed Amount." When a participant reaches an in- or out-of-network out-of-pocket annual maximum ("stop loss"), the Plan pays 100% of an "Allowed Amount."

35.     The Plan requires preauthorization from SelectHealth for residential mental health treatment. As such, any requests for preauthorization are pre-service claims under ERISA.

36.     The Plan expressly allows for the submission of claims up to one year from any date of service.

37.     With respect to appeals of denied pre- and post- service claims, which must be submitted within 180 days of adverse benefit determinations, the Plan provides for *one* mandatory

review and provides for additional voluntary reviews, stating: "It is your choice, however, whether or not to seek voluntary review, and you are not required to do so before pursuing civil action . . . After a mandatory review process, you may choose to pursue civil action under ERISA Section 502(a)."

38.     The Plan, through the SPD, declares:

Intermountain Healthcare understands the importance and sensitivity of your health information. We protect the privacy of your health information because that is the right thing to do. We also follow federal and state laws that govern the use of your health information. We use your health information in written, oral and electronic format (and allow others to have it) only as permitted by federal and state laws. These laws give you certain rights regarding your health information . . .

Intermountain Healthcare benefits are administered by SelectHealth. For more information about the specific privacy practices of SelectHealth and its employees, please contact them directly by visiting their website at SelectHealth.org, or by calling SelectHealth's Privacy Office at 801-442-7253.

39.     The Notice of Privacy Practices appearing on SelectHealth's website (https://selecthealth.org/-/media/selecthealth/pdf-documents/notice-of-privacy-practices/2015_npps-ncqa.ashx) contains similar assurances:

We understand the importance and sensitivity of your personal health information, and we have security in place to protect it. Access to your information is limited to those who need it to perform assigned tasks. We restrict access to work areas and use locking filing cabinets and password-protected computer systems. We follow all federal and state laws that govern the use of your health information. We use your health information in written, oral, and electronic formats (and allow others to use it) only as permitted by federal and state laws. These laws give you certain rights regarding your health information.

40.     Consistent with 29 U.S.C. § 1024(b) and 29 U.S.C. § 1132(c) and (g), the Plan urges participants to "Enforce Your Rights":

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of Plan documents or the latest annual report from the Plan and do not receive them within 30 days, you may file suit in a Federal court. In such

7784897.1

a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Plan Administrator . . .

41.     With respect to litigation for wrongful denial of benefits, the Plan provides for up to three years in which to commence legal action from the date a claim is made. With respect to breach of fiduciary duty claims of which participants do not have actual knowledge, such claims are subject to a six-year limitations period under ERISA (29 U.S.C. § 1113).

## II.     Jane Doe's Admissions to the Menninger Clinic and Austen Riggs

42.     In 2016, Jane was hospitalized twice (in November and December) at the University of Utah Neuropsychiatric Institute, where she underwent 27 unsuccessful trials of ECT. Because her symptoms continued to worsen and expanded to include recurrent nightmares, flashbacks, dissociation, and intrusive images, Jane's in-network, outpatient psychiatrist recommended psychiatric hospitalization at the Menninger Clinic. Jane was hospitalized at the Menninger Clinic for over three months (December 30, 2016 through April 8, 2017). Defendants approved and paid for a significant duration, in an amount that Jane later learned was unlawfully low.

43.     Eventually, the Menninger Clinic recommended step-down residential treatment at The Austen Riggs Center ("Austen Riggs"), which is consistently ranked among the top ten best psychiatric treatment centers in the United States by U.S. News & World Report and renowned for treating refractory mental health disorders through a continuum of community-based care.

44.     By letter dated April 6, 2017, Intermountain Healthcare informed Jane that her position would be terminated effective April 15, 2017 due to her extended medical leave and her employer's need to fill her position. In the same letter, Intermountain Healthcare advised: "If you

anticipate being released to return to work in any capacity in the foreseeable future please provide

pertinent medical information, including the anticipated date of your release to return to work and

information concerning any applicable work restrictions and we will appropriately consider such

information."

45.     By letter dated letter dated April 6, 2017, Jane's attending psychiatrist at the

Menninger Clinic responded as follows:

> [Jane] continues to engage in treatment and is making good progress. She will
> require further treatment, but if that treatment is completed satisfactorily, it is
> reasonable to expect that she will be released back to work without restrictions.
> However, given the variable nature of patient recovery, my unfamiliarity with her
> exact work requirements, and her need for treatment at another facility after
> discharge from Menninger on 4/8/17, it is unclear what that time table would be. I
> would encourage updates with her treaters at Austen Riggs, her next treatment
> facility, in that regard.

46.     Jane was terminated from Intermountain Healthcare effective April 15, 2017, per

the terms of Intermountain Healthcare's April 6, 2017 letter. Pursuant to COBRA, she continued

to participate in the Plan until July 31, 2018.

47.     Jane was admitted to Austen Riggs on April 10, 2017, and following extensive

assessments, Austen Riggs prescribed a course of residential treatment, consisting of intensive

psychotherapy, psychopharmacology, social work and family services, a skills-building

psychosocial therapeutic milieu, and 24-hour nursing availability. In Jane's case, a 24-hour

therapeutic milieu was especially warranted given her propensity for self-harm and suicidal

behaviors that she routinely concealed (particularly from her highly triggering family members

who contributed to her suicidality).

14

48.     On behalf of the Plan, SelectHealth initially approved Jane's residential treatment from April 10, 2017 through May 17, 2017, and paid certain benefits that Jane later learned were unlawfully low.

49.     Despite Jane's extensive, persistent symptomatology and lack of adequate coping skills, SelectHealth prematurely curtailed coverage for her care at Austen Riggs as of May 17, 2017, only one month into treatment. By letter dated May 23, 2017, SelectHealth asserted that, while medically necessary, residential treatment could only continue at Center for Change, an in-network, Utah-based facility for patients with primary eating disorders, which Jane did not have.

50.     Jane judiciously remained at Austen Riggs through August 9, 2017, when her treatment was interrupted due to extreme suicidality, and she was committed involuntarily to Berkshire Medical Center, where she remained for nine days. The exacerbation of Jane's symptoms precipitating the nine-day hospitalization was not altogether unexpected given that she was addressing extremely painful childhood sexual abuse and rape as an adult that she could not have safely begun to process outside a 24-hour therapeutic structure. In fact, because Jane was known to conceal her urges to self-harm and suicide, it took the safety, structure, and therapeutic trust established during an initial course of residential treatment at Austen Riggs to allow her to disclose, for the first time, that she attempted suicide in the prior year by injecting her pacemaker with oral bacteria to induce sepsis, which nearly killed her.

51.     Upon her discharge from Berkshire Medical Center, Jane was again followed by her outpatient psychiatrist and resided for a few weeks with her mother and step-father in Utah. This arrangement was clinically contraindicated given that Jane's family was implicated in the origin of her PTSD, destabilized her, and actually precipitated suicidal crises. Jane remained

concerned that without further residential treatment, she would continue to isolate in her parents' home, lapse into suicidality, and act on self-destructive impulses, just as she had done in the past year by inducing sepsis. Indeed, as Jane revealed during her previous episode of care at Austen Riggs, she had frequent ideations of being struck by a car on one of her daily runs. This suicidal plan was actually acted on and resulted in injury when Jane stepped in front of a car while running when Jane was an inpatient as an adolescent. During this same time period, Jane also engaged in self-harm by cutting her wrists.

52.      Without a local support structure (i.e., minimal and highly conflictual family relations, no close friends), and having lost her employment at Intermountain Healthcare within days of discharging from the Menninger Clinic, remaining in the state of Utah to continue her treatment was too painful and triggering. Unfortunately, this time, SelectHealth identified only two facilities for Jane's residential mental healthcare. Not only were both in Utah, where Jane did not want to be, but neither facility treated patients with Jane's clinical profile. As discussed above, Center for Change is a facility for patients with primary eating disorders, which Jane did not have, and the only alternative residential program proposed by Defendants, New Roads Behavioral Health, targeted young adults (from 17.5-28) with substance use and/or borderline personality disorders, which also was not suitable for Jane's mental health conditions. A highly educated professional in her 40s, Jane was neither a young adult nor suffering from substance use or borderline personality disorders. Thus, Jane made an informed choice to resume treatment at Austen Riggs, for which preauthorization was reflexively denied on September 18 and 22, 2017 by SelectHealth based on its unlawful and nonsensical geographic restriction:

> The request for out of state residential treatment has been denied. SelectHealth medical policy 475 states that "care will be provided in a reasonable proximity to a

7784897.1

member's community or residence and support system . . ." Local Utah options for care are Center for Change or New Roads treatment.

53.    Jane's decision to resume treatment at Austen Riggs was prudent. Although she did not immediately express suicidal intent during her initial evaluation, she was nonetheless assessed to be at moderately high risk of suicide due to her history of concealed, impulsive, and lethal attempts. In fact, after her admission, Jane disclosed a number of highly lethal suicide plans, including driving to Northern California to shoot herself in the head (potentially with firearms owned by her parents, who resided in Utah). She also continued to struggle with highly impairing symptoms of PTSD, including intrusive thoughts and imagery related to abuse, flashbacks, nightmares, lack of memory and focus, and significant preoccupation with past traumatic events.

54.    During her second episode of care at Austen Riggs, frequent medication changes were required to address Jane's complex and rapidly shifting symptomatology. Through the use of intensive psychotherapy, Jane made substantial gains in her insight and ability to speak about her traumas. The processing of intensely painful and triggering affects would not have been safe, let alone possible, in the absence of the 24-hour therapeutic structure afforded by Austen Riggs. As her treatment deepened, Jane became increasingly torn by family dynamics, including her parents' wish for her to return to Utah, and experienced command hallucinations of her father's voice telling her to leave. Unfortunately, Jane's parents were not fully able to grasp the extent to which she struggled with PTSD. Unable to find her own voice in the mix, Jane became increasingly despondent and threatened to kill herself upon discharging from Austen Riggs. In light of her previous and lethal suicide attempts, Jane was again transferred to Berkshire Medical Center on April 27, 2018.

55.     Although SelectHealth covered Jane's hospitalizations in August 2017 and April 2018, SelectHealth refused to authorize the interim periods of Jane's residential treatment, thereby denying her claims for residential treatment at Austen Riggs from May 17, 2017 through August 9, 2017 and from September 13, 2017 through April 27, 2018.

56.      In order to fund over $350,000 in unreimbursed residential treatment expenses, Jane was forced to sell her home. Tragically, on April 18, 2019, Jane took her own life in Utah.

### III.     Jane Doe's Administrative Appeals re: First Admission to Austen Riggs

57.     On or about September 7, 2018, Jane and Austen Riggs submitted a timely appeal of SelectHealth's May 23, 2017 preauthorization denial (for the May 17, 2017 through August 9, 2017 admission). In it, Jane and Austen Riggs challenged SelectHealth's geographic restriction by, among other things, highlighting the clinical inappropriateness of Center for Change due to Jane not having a primary eating disorder and due to her ubiquitous suicide triggers in Utah.

58.     In responding with an October 20, 2017 adverse benefit determination to Jane's first level appeal, SelectHealth only dug its foot deeper. Not only did SelectHealth fail to identify any suitable in-network residential treatment providers in Utah, but contrary to generally accepted mental health standards prioritizing patient autonomy, SelectHealth insisted that Jane return to Utah to be near her "support" system, although the clinical evidence clearly indicated that Jane was estranged from her family, suicidal around her parents, lost her employment, lacked friends, and did not want to live in the state.

59.     As cover for its unlawful geographic restriction and lack of suitable in-network, Utah facilities, SelectHealth fabricated additional denial rationales that ignored and perverted the clinical evidence as well as the terms of Jane's Plan. For example, Dr. Scott Whittle, the

SelectHealth physician reviewer assigned to adjudicate the first level appeal and responsible for issuing an October 20, 2017 adverse determination:

> (1)     Incompetently disregarded the role of Jane's treatment resistance and challenges in establishing an effective therapeutic alliance due to her extensive traumas;

> (2)     Concocted criteria requiring "significant change" in Jane's condition as a predicate for continued coverage of severe mental illness, despite:

>> (a) "Significant change" not being required by Jane's Plan or generally accepted standards of medical practice (applicable to Jane's mental health treatment);

>> (b) Generally accepted standards of medical practice not authorizing residential discharge (let alone to a lower level of care) in the absence of improvement and in the presence of serious suicide risk.

>> (c) Center for Change, a residential treatment facility for primary eating disorders, certainly not being expected to bring about "significant change" in Jane's conditions since she could not even admit there.

60.     Effectively, SelectHealth posited that unless Jane returned to Utah to be near her suicide triggers and receive treatment from a residential treatment facility for primary eating disorders, which she did not have, her medically necessary residential treatment would not be covered.

61.     SelectHealth failed to comply with 29 C.F.R. §2560.503(j)(5)(i), which required it to explain or (at least) identify the specific rule, guideline, protocol, or other similar internal criterion on which it relied in making the adverse determination. SelectHealth also falsified the Plan's claims review procedures, which only require one mandatory review prior to administrative exhaustion. In its October 20, 2017 letter, SelectHealth stated:

> If you feel this matter requires further consideration, the Plan allows you to request a second review of the appeal. This request must be made in writing to SelectHealth Appeals within 60 days from the date of this letter. ***This second level <u>mandatory</u>***

7784897.1

*review is required by the Plan before you may pursue judicial review under Section 502(a) of the Employee Retirement Income Security Act*, as applicable. (Emphasis added.)

62.     On or about December 5, 2017, Jane submitted to SelectHealth's so-called "mandatory" second level review, even though her Plan actually required only one level of appeal. As part of her appeal, Jane's psychotherapist at Austen Riggs refuted Dr. Whittle's mischaracterizations in great detail and explained that, pursuant to generally accepted standards of mental health practice articulated by the Level of Care Utilization System ("LOCUS"), a patient placement tool developed by the American Association of Community Psychiatrists, validated by field testing, and used extensively in 26 states and internationally, Jane clearly satisfied criteria for moderate intensity long-term residential treatment. The LOCUS states that "moderate intensity long term residential treatment programs" offered at Austen Riggs should have the "capacity to treat persons who are suffering from *long term* and *persistent disabilities* that require *extended rehabilitation and skill building in order to develop capacity for community living* . . . These facilities will provide intensive treatment as described for all Level 5 programs and *the length of stay will vary from two months to a year*." (Emphasis added.)

63.     The Plan, in the SPD, consistent with mirroring terms at 29 C.F.R. §2560.503-1(h)(3)(ii),(iii), and (v), promises that, during an appeal, "no deference" will be afforded to the original denial and that "decisions will be made by fiduciaries who did not make the Adverse Benefit Determination and who do not report to anyone who did." Moreover, the Plan represents that for any denial based on medical judgment or medical necessity, such as that applicable to Jane, "the fiduciaries during any Appeal will consult with a medical professional with appropriate

20

7784897.1

training and experience in the appropriate field of medicine and who was neither consulted in connection with the Adverse Benefit Determination nor is the subordinate of such an individual."

64.     Nonetheless, Jane's second level appeal was adjudicated on February 28, 2018 by a kangaroo panel comprised of: Sonja Nielson, a layperson; Darren Hansen, a product development specialist; Michael Eaton, a pharmacist, and Catherine Burton, a family medicine specialist. None of these individuals were board-certified psychiatrists, and it is clear from the February 28, 2018 appeals committee transcript that no consultation occurred between them and anyone other than Dr. Whittle, who single-handedly issued the October 20, 2017 adverse benefit determination regarding Jane's first-level appeal. In fact, over the objections of Jane's treatment team, Dr. Whittle ran the February 28, 2018 appeals committee meeting, in which he conceded that residential treatment was medically necessary and that Jane's **"[first level] appeal has been denied not because of level of care, but that we generally won't do business with residential care geographically outside of their community and support system."**

65.     Not only did Dr. Whittle concede the medical necessity of Jane's residential mental health treatment, and not only did he trumpet SelectHealth's unlawful geographic restriction, but unbelievably, he also asserted that SelectHealth's coverage determination was based on an "expectation that this will get better in a **short to medium time frame**," despite the fact that Jane's Plan did not limit coverage in such a fashion or that such limitations are contrary to generally accepted standards of medical practice (applicable to residential treatment for Jane's severe mental illnesses which, by definition, are pervasive and therefore slow to clinically respond, especially in the presence of treatment-undermining environmental factors).

7784897.1

66.     Even more egregious was Dr. Whittle's inquiry as to why liability for Jane's treatment should not be relegated to "disability coverage" borne by the taxpayers, as if Jane's Plan did not actually cover severe and persistent mental illnesses. Dr. Whittle's self-serving commentary exposed the sad truth that, with respect to severe mental illnesses, Intermountain Healthcare and SelectHealth are simply not willing to fund the "most appropriate" care required by Jane's Plan.

67.     Following the appeal panel's review, on March 9, 2018, SelectHealth issued Jane a "final internal adverse benefit determination" acknowledging her right to "pursue judicial review under Section 502(a) of the Employee Retirement Income Security Act." As with its first level appeal adverse benefit determination, SelectHealth failed to comply with 29 C.F.R. §2560.503(j)(5)(i) by not explaining or (at least) identifying any specific rule, guideline, or protocol on which it relied. Moreover, SelectHealth nonsensically:

(a) decried the lack of a discharge plan for Jane, despite one plainly appearing in her medical record and despite Jane's actual August 9, 2017 discharge to an even higher level of (hospital) care, which SelectHealth approved;

(b) perversely blamed Jane for "no indication of goals or progress towards goals except to address persistent [suicidal ideations]," as if preventing the loss of life was not critical in its own right, and as if SelectHealth did not possess ample evidence of additional treatment goals. (i.e., April 18, 2017 Problem and Goal Sheet).

(c) grafted a new requirement for "evidence of recovery," despite:

(1) "recovery" from severe mental illness being a life-long-process;
(2) Jane having been actively engaged in her treatment, which resulted in a period of expectable decompensation due to the processing of long-suppressed trauma; and
(3) SelectHealth's identified in-network facility, Center for Change, certainly not being able to bring about recovery for Jane since she could not be admitted there in the first instance.

**IV.**     **Jane Doe's Administrative Appeals re: Second Admission to Austen Riggs**

68.     On or about March 16, 2018, Jane and Austen Riggs submitted a timely appeal of SelectHealth's September 18 and 22, 2017 preauthorization denials (for the September 13, 2017 through April 27, 2018 admission) in which, for the first time, SelectHealth identified that its unlawful geographic restriction was rooted in Medical Policy 475.

69.     In her appeal, Jane explained that even her Utah-based psychiatrist agreed that local treatment options were unsuitable for her. Jane's psychotherapist at Austen Riggs was equally clear:

> As stated in my other appeals letters based on a prior admission, the two residential treatment centers in Utah that you recommend simply do not provide the type of care that [Jane] needs. Realizing that this is inordinately repetitive: The Center for Change indicates that they are a residential treatment facility for eating disorders, and this is not [Jane's] diagnosis. New Roads [Behavioral Health] seems to be geared to young adults and either substance abuse or borderline personality disorder again, not the diagnoses of [Jane]. Despite our attempts to be clear about why neither option is appropriate, your reviewers continue to recommend them as adequate and appropriate treatment for her difficulty.

70.     In responding with an April 18, 2018 adverse benefit determination to Jane's first level appeal, SelectHealth spoke from both sides of its mouth. First, SelectHealth callously insisted that Center for Change and New Roads Behavioral Health were clinically appropriate local residential mental health treatment options for Jane and that any assertion to the contrary was nothing more than "member statement and therapist statement." Then, without complying with 29 C.F.R. § 2560.503(j)(5)(i) by not explaining or (at least) identifying any specific rule, guideline, or protocol on which it relied, SelectHealth faithlessly asserted that Jane didn't meet "criteria" for residential treatment at all.

71.     Again, SelectHealth falsified the Plan's claims review procedures, which only require one mandatory review for preauthorization denials prior to administrative exhaustion. In its April 18, 2018 letter, SelectHealth stated:

> If you feel this matter requires further consideration, the Plan allows you to request a second review of the appeal. This request must be made in writing to SelectHealth Appeals within 60 days from the date of this letter. ***This second level <u>mandatory</u> review is required by the Plan before you may pursue judicial review under Section 502(a) of the Employee Retirement Income Security Act***, as applicable. (Emphasis added.)

72.     On June 14, 2018, Jane submitted to SelectHealth's "mandatory" second level review, though her Plan required only one level of appeal. This time, Jane's voluminous appeal expressly put SelectHealth on notice of its Plan-violating and discriminatory geographic treatment limitation (set by Medical Policy 475). Additionally, Austen Riggs alerted SelectHealth to its flagrant misrepresentation of the two publications it cited in support of Medical Policy 475's geographic restriction on residential mental health treatment:

> In support of this discriminatory provision, SelectHealth misleadingly cites to two publications in the "Key References" section of Medical Policy #475. The first misleadingly referenced study by Vandevooren, J. (2007) did not evaluate the relative superiority of local versus non-local residential treatment. The study did not even attempt to examine considerations for selecting local versus non-local residential treatment, nor did it examine any of a multitude of variables for selecting the most <u>suitable</u> treatment, local or not. Rather, based on a very small sample of only 25 individuals treated in community residential settings, the study concluded that these individuals did better after residential treatment than before, as measured by longer tenures in independent settings subsequent to treatment. This is a far cry from any endorsement to discard patient autonomy regarding provider selection in the name of local treatment. In fact, it is patient autonomy which drives patient-centered care[10] and which correlates with positive treatment outcomes,[11] such that it is simply absurd for SelectHealth to unilaterally impose such a coercive and clinically contraindicated policy on any mental health patients (let alone those with out-of-network coverage). Evidence-based, patient-centered treatment approaches that promote patient autonomy and provide for peer support, like the ones at Austen Riggs, are specifically endorsed by SAMHSA. In fact, the very SAMHSA publication – 2009 Guiding Principles and Elements of Recovery-Oriented Systems

7784897.1

of Care – cited in Medical Policy #475, emphasizes that *"recovery is self-directed and empowering"* (page 1). Not only does SAMHSA highlight self-direction and that *"recovery-oriented systems need to provide 'genuine, free and independent choice' among an array of treatment and recovery support options"* (page 2), but nowhere does it even come close to recommending treatment of patients in clinically mismatched settings.

[10] Dixon, L.,B,, Holoshitz, Y., & Nossel, I. (2016). Treatment engagement of individuals experiencing mental illness: review and update. *World Psychiatry*, 15(1), 13-20.

[11] Plakun, M., (Ed.) 2004. Treatment resistance and patient authority: *The Austen Riggs Reader*. New York, NY US: W.W. Norton & Co.

73.     Jane's appeal also included written program descriptions from Center for Change and New Roads Behavioral Health, which demonstrated that neither facility was appropriate for Jane, given her diagnosed mental health conditions. The Center for Change FAQ, "Comprehensive Treatment" program description retrieved from its website, expressly stated that:

> *Do I have to have an* <u>*eating disorder*</u> *to receive treatment at Center for Change?*
>
> <u>*Yes*</u>, we are a <u>*specialized treatment center for eating disorders*</u>. While we treat co-occurring disorders such as depression, anxiety, OCD, bipolar and substance abuse, <u>*all patients*</u> *in 24-hour care at the Center have a* <u>*significant eating disorder*</u>. (Emphasis added.)

74.     Likewise, the published New Roads Behavioral Health program description confirmed its unsuitability for Jane, given that its residential mental health treatment programs are geared toward young adults (ages 17.5-28) with either substance use disorders and/or borderline personality disorders, neither of which applied to Jane.

75.     Finally, Austen Riggs went through great lengths to explain that Jane's residential mental health treatment was clearly consistent with generally accepted standards of medical practice, as reflected by a detailed patient placement analysis under the LOCUS and by prominent,

peer-reviewed research (published in the Journal of the American Medical Association ("JAMA"))
supporting Jane's care.

76.     On July 11, 2018, Jane's second level appeal was adjudicated by the same kangaroo
panel that had convened on February 28, 2018. None of the three panelists was a board-certified
psychiatrist, and the panel failed to consult with *any* psychiatric expert. Unsurprisingly, the wholly
unqualified panel failed to respond to any of Jane's arguments on appeal, ignored the clinical
evidence with which it had been presented, and simply copied its March 9, 2018 final adverse
benefit determination (with respect to Jane's initial admission to Austen Riggs) *verbatim*. In
keeping with prior denials, it also failed to explain or (at least) identify any *specific* rule, guideline,
or protocol on which it relied in issuing its final adverse determination, as required under ERISA.

77.     On August 27, 2018, Emily Johnson, SelectHealth's Appeals Manager and Appeals
Committee Chair, confirmed in writing that SelectHealth's unqualified appeals panel consulted
substance use disorder guidelines with respect to Jane's second-level appeal, although Jane had
never been treated for nor diagnosed with a substance use disorder.

**V.     Jane Doe's Requests for Protected Health Information**

78.     Consistent with her right under ERISA (at 29 U.S.C. § 1185(d), incorporating 42
U.S.C. § 300gg-19(a)(1)(C)) and its implementing regulation at 29 C.F.R. § 2560.503-1(h)(2)(iii))
to access and review SelectHealth's DRS (including SelectHealth's case management, utilization
review, and appeals records), on April 17, 2018, Jane executed a SelectHealth Authorization to
Release Health Information ("Authorization") to her counsel. The Authorization expressly
indicated that "Pursuant to 45 CFR Part 164.524(c)(2)(ii), PHI is to be emailed to mbendat@psych-

7784897.1

appeal.com." This step was taken by Jane's counsel to ensure compliance with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

79.     Subsequently, pursuant to Jane's Authorization, Plaintiff's counsel submitted multiple requests for information to Defendants at various corporate email addresses belonging to Intermountain Healthcare and SelectHealth. Although Defendants were expressly asked to produce Jane's sensitive mental health records by (encrypted) email, they repeatedly failed to produce the DRS as requested and instead mailed the documents in non-secure envelopes that arrived torn, in violation of HIPAA.

80.     As confirmed by the United States Department of Health & Human Services in its publication, "Individuals' Right under HIPAA to Access their Health Information 45 CFR § 164.524," appearing at: https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/access/index.html:

> Where an individual requests an electronic copy of PHI that a covered entity maintains electronically, the covered entity **must** provide the individual with access to the information in the requested electronic form and format, if it is readily producible in that form and format. When the PHI is not readily producible in the electronic form and format requested, then the covered entity must provide access to an **agreed upon** alternative readable **electronic format**. See 45 CFR 164.524(c)(2)(ii) . . . It is only if the individual declines to accept any of the electronic formats readily producible by the covered entity that the covered entity may satisfy the request for access by providing the individual with a readable hard copy of the PHI . . .

> **Covered entities are responsible for breach notification for unsecured transmissions** and may be **liable for impermissible disclosures of PHI that occur in _all_ contexts** except when fulfilling an individual's right of access under 45 CFR 164.524 to receive his or her PHI or direct the PHI to a third party in an unsecure manner . . .

> If a covered entity discovers that the PHI was breached in transit to the designated third party, and the PHI was "unsecured PHI" as defined at 45 CFR 164.402, **the covered entity generally is obligated to notify the individual and HHS of the**

7784897.1

***breach and otherwise comply with the HIPAA Breach Notification Rule at 45 CFR 164**, Subpart D.*

(Emphasis added.)

81.     To date, SelectHealth has failed to notice Jane of its privacy breaches or to advise her of any remedial measures it has taken.

82.     As a direct and proximate result of SelectHealth's intentional privacy breaches, Jane suffered emotional distress.

**VI.      Jane Doe's Requests for Plan Documents**

83.     In 2017 and 2018, Jane submitted timely post-service claims to SelectHealth relating to her psychiatric hospitalization at the Menninger Clinic and the portion of her residential treatment at Austen Riggs that had been pre-authorized by Defendants. SelectHealth subsequently issued limited benefits for those services, along with Explanations of Benefits ("EOBs"), as required under ERISA, to describe how the claims had been processed. The EOBs reflected an aggregate "Allowed Amount" for each claim but did not include any reimbursement methodologies applied to calculate authorized charges, or any citation to Plan terms. The EOBs thus did not provide Jane with notice as to why her claims were not being allowed or paid in full and/or that her benefits were underpaid.

84.     For example, an April 5, 2017 EOB issued by SelectHealth regarding Jane's approved psychiatric hospitalization at the Menninger Clinic from February 1, 2017 to February 15, 2017 noted "Billed Charges" of $28,500 and an "Allowed Amount" of $10,545. Although Jane believed that the daily psychiatric hospitalization rate allowed by Defendants was $703 ($10,545 divided by 15), she had no way of knowing how that rate was set in light of her Plan's and EOB's lack of transparency regarding reimbursement methodologies for these approved out-of-network

28

claims (spanning a period of nearly three months). Comparing the $703 daily rate allowed by SelectHealth to the $1900 daily rate charged by the Menninger Clinic, SelectHealth disallowed approximately $60,000 in approved psychiatric hospitalization claims.

85.     Additionally, although SelectHealth approved Jane's residential treatment at Austen Riggs from April 10, 2017 through May 17, 2017, and although Jane promptly submitted post-service claims to SelectHealth for these dates, SelectHealth withheld payment for these authorized claims for over a year. In a series of EOBs generated on September 7 and 14, 2018— 17 months after the dates of Jane's residential treatment—SelectHealth noted "Billed Charges" of $27,210 for April 10, 2017 through April 30, 2017 and $24,150 for May 1, 2017 through May 17, 2017. The same EOBs noted an "Allowed Amount" of $7,560 and $6,120 for the respective dates of service, and then issued benefit payments, but without paying interest to reflect the improper delay in payment. Although Jane was able to calculate that the daily residential treatment rate allowed by Defendants was $360, she had no way of knowing how that rate was set in light of the lack of transparency in her Plan and in Defendants' EOB regarding reimbursement methodologies for these out-of-network claims.

86.     Having also been denied reimbursement for covered mental health benefits in 2017 and 2018 due to Defendants' unlawful geographic restrictions and insistence on the use of unsuitable, in-network providers, Jane sought Plan documents from Intermountain Healthcare to evaluate Defendants' understanding and analyses of the Plan's non-quantitative treatment limitations, which federal regulations define to include geographic restrictions and reimbursement methodologies. *See* 29 C.F.R. § 2590.712(c)(4)(ii)(D), (E) and (H).

7784897.1

87. Consequently, on December 5, 2018, Jane wrote to the Plan Administrator, Intermountain Healthcare, to exercise her right to receive information concerning her benefits under the Plan, wherein she expressly requested:

(1) Administrative service contracts regarding the Select Med Plus Plan between Intermountain Healthcare and SelectHealth for 2017 and 2018; and

(2) All instruments (including NCQA Utilization Management Program Description) reflecting the non-quantitative treatment limitations imposed by the Select Med Plus Plan in 2017 and 2018, and all instruments analyzing the nonquantitative treatment limitations imposed by the Select Med Plus Plan in 2017 and 2018.

(3) Reimbursement methodologies and schedules for all out-of-network benefits for 2017 and 2018.

88. Intermountain Healthcare was required to comply with 29 U.S.C. § 1024(b)(4), which states that "[t]he administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other *instruments under which the plan is established or operated*." ERISA's implementing regulations at 29 C.F.R. § 2590.712(d)(3) state that "ERISA section 104 and § 2520.104b-1 of this chapter provide that, for plans subject to ERISA . . . *Instruments under which the plan is established or operated include* documents with information on medical necessity criteria for both medical/surgical benefits, as well as *the processes, strategies, evidentiary standards, and other factors used to apply a nonquantitative treatment limitation with respect to medical/surgical benefits and mental health or substance use disorder benefits under the plan.*" (Emphasis added.)

89. The "Self-Compliance Tool for the Mental Health Parity and Addiction Equity Act (MHPAEA)" (published by the United States Department of Labor at

7784897.1

https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/

publications/compliance-assistance-guide-appendix-a-mhpaea.pdf instructs plan administrators

like Intermountain Healthcare that:

> Group health plans and group and individual market health insurance issuers should
> be prepared to provide:
>
> •       A list of the NQTLs that apply to MH/SUD and/or medical/surgical benefits
> offered under the plan or coverage.
>
> •       Records documenting NQTL processes and how the NQTLs are being
> applied to both medical/surgical as well as MH/SUD benefits to ensure they can
> demonstrate compliance with the law. Such records may also be helpful to plans
> and issuers in responding to inquiries from participants, beneficiaries, enrollees,
> and dependents regarding benefits under the plan or coverage. (*See a more detailed
> discussion of disclosure requirements in the following section.*)
>
> Documents or Plan Instruments Participants and Beneficiaries or DOL may request:
>
> Under ERISA section 104(b), participants and beneficiaries may request documents
> and plan instruments regarding whether the plan is providing benefits in accordance
> with MHPAEA and copies must be furnished within 30 days of request. This may
> include documentation that illustrates how the health plan has determined that any
> financial requirement, QTL, or NQTL is in compliance with MHPAEA.

90.     By letter dated January 4, 2019, Intermountain Healthcare acknowledged Jane's

entitlement to Plan documents by producing its administrative service agreements with

SelectHealth. Nonetheless, Intermountain Healthcare refused to produce documents responsive to

Jane's Requests Nos. 2 and 3 above. Specifically, Intermountain Healthcare refused to produce

"instruments analyzing the nonquantitative treatment limitations imposed by the Select Med Plus

Plan in 2017 and 2018" or to provide the reimbursement methodologies and schedules for out-of-

network benefits under the Select Med Plus Plan.

91.     Contrary to ERISA's express statutory and regulatory scheme, Intermountain

Healthcare stated :

> The instruments reflecting and analyzing nonquantitative treatment limitations are part of the formal Plan documents. They are not binding on the Plan Administrator or on SelectHealth to whom the Plan Administrator has delegated its discretionary authority to make and review benefit claims determinations as the claims review fiduciary (the "Claims Fiduciary"). It is the Plan's position that these instruments are not required to be disclosed under Section 104(b)(4).

92.     In asserting the above, Intermountain Healthcare effectively posited that Plan documents designed to ensure consistent, substantive compliance with the Federal Parity Act's prohibition on exclusive or incomparable/more stringent mental health treatment limitations were "not binding" on them and that Defendants were therefore at liberty to impose nonquantitative treatment limitations with impunity. Intermountain Healthcare's cavalier disregard of Defendants' duties under ERISA is the bellwether of a faithless fiduciary.

93.     With respect to the Plan's reimbursement methodologies and schedules for out-of-network benefits, which themselves are a nonquantitative treatment limitation (*see* 29 C.F.R. § 2590.712(c)(4)(ii)(E)), Intermountain Healthcare further asserted that:

> The reimbursement methodologies and schedules for out-of-network benefits are not part of the formal Plan documents and are not binding on the Plan Administrator or the Claims Fiduciary, and therefore it is the Plan's position that these are not required to be disclosed under Section 104(b)(4).

> For your reference, we enclose a copy of the 2017 Health Insurance Handbook and the 2018 Health Insurance Handbook which were part of the Plan/Summary Plan Description during the relevant time. These Handbooks describe the benefits of the Plan when using nonparticipating providers and facilities for covered services, and the amount the Plan pays in these circumstances is determined by the Claims Fiduciary in the exercise of its administrative and interpretative authority. Except in the case of emergency/urgent care, the Plan generally pays non-participating providers and facilities the Plan's allowed amount for the covered services which is what the Claims Fiduciary determines would be paid to a similar provider and facility with which the Claims Fiduciary has a negotiated payment arrangement for those services.

32

94.     As detailed above, Intermountain Healthcare simply directed Jane to the same 2017 and 2018 Plan documents she already had and which failed to provide any parity analyses or a transparent and concrete methodology for determining the Plan's "Allowed Amount" with respect to her 2017 and 2018 out-of-network mental health claims.

95.     Intermountain Healthcare's refusal to provide Jane with the requested documents undermined and delayed Jane's ability to discover, analyze, and remedy Defendants' refusal to provide coverage for mental healthcare and award benefits mandated by her Plan and applicable law. For example, Intermountain Healthcare's refusal undermined and delayed Jane's ability to identify, analyze the strength of, assert, and prevail on her claims asserted herein as well as those alleged in her related (class action) case which is being filed contemporaneously. It further caused Jane to expend additional time and resources to obtain this information.

96.     After amending her complaint on January 28, 2019 to allege a violation of 29 U.S.C. § 1132(c), consistent with the Court's February 8, 2019 First Amended Scheduling Order, "Deadline for motions to conduct discovery," (Docket No. 36), Jane filed a Motion to Conduct Discovery (Docket No. 38) and sought to compel the unlawfully withheld Plan documents. In responding on March 8, 2019 (Docket No. 39, page 3), Defendants, for the first time, admitted that ***"SelectHealth had no instruments analyzing nonquantitative treatment limitations to produce,"*** in direct violation of their obligations under ERISA.

97.     On March 22, 2019, SelectHealth acknowledged to Jane that Defendants' 2017 reimbursement schedule for out-of-network mental health services was flawed and that her approved 2017 claims from Austen Riggs had been underpaid. In other words, Defendants acknowledged that the information they withheld in response to Jane's December 5, 2018 request

33

for Plan documents was materially relevant to her claims for benefits. Despite SelectHealth's concession, and despite Plaintiff's colorable claim to benefits for her 2018 residential treatment claims, Defendants have continued to conceal their 2018 reimbursement schedule for out-of-network mental health services.

### VII.    Defendants' Inadequate Behavioral Health Provider Network

98.    Defendants also violated ERISA (incorporating the Federal Parity Act) by failing to ensure an adequate network of residential treatment centers—particularly for adults with primary mental illnesses unrelated to eating disorders and not suffering from primary substance use disorders. As detailed above, when SelectHealth denied coverage for Jane at Austen Riggs, it concluded that such treatment was medically necessary, but refused to authorize out-of-network and out-of-state care. It then identified only a *single* in-state, in-network residential treatment facility for adults, Center for Change, which exclusively treated patients with primary eating disorders, which Jane did not have.

99.    When pressed, Defendants failed to identify a single in-network facility that could properly treat Jane, re-directed her either to Center for Change (an in-network facility for eating disorders) or New Roads Behavioral Health (an out-of-network facility for young adults with substance use and/or personality disorders that again did not suit Jane), and nonetheless continued to deny coverage at Austen Riggs, an out-of-network facility that was well-suited for providing the type of care that Jane needed.

100.    SelectHealth's 2017 rate chart for in-network providers, produced to Jane on March 22, 2019, corroborates the paucity of Defendants' contracted residential mental health treatment providers for adults and explains why SelectHealth only identified Center for Change and New

7784897.1

Roads Behavioral Health. In contrast, Jane's Plan provides abundant access to in-network, intermediate medical/surgical facilities, as evidenced by the 56 in-network, in-state facilities listed on Intermountain Healthcare's website at https://intermountainhealthcare.org/facilities/%20results.html?brand=sh&plan=D&name=&type=Skilled+Nursing+Facilities&city=&zipCode=%20%20&county=&x=52&y=14#.%20f.

101.    As stated in the preamble to the final rules implementing the Federal Parity Act, "plan standards . . . such as network adequacy (although not specifically enumerated in the illustrative list of NQTLs) must be applied in a manner that complies with the regulations." 78 FR 68239, 68246 (Nov. 13, 2013). Given that Defendants failed to undertake any parity analyses of the Plan's nonquantitative treatment limitations, which comprise network adequacy, and given that Jane could not access *any* suitable in-network residential treatment centers for her mental health disorders, Defendants necessarily established network adequacy standards for behavioral health services that were incomparable to and more stringent than those applied to medical/surgical services, an illegal treatment limitation under ERISA, 29 U.S.C. § 1185a.

### VIII.   Defendants' Reimbursement Methodologies and Schedules

102.    Because Intermountain Healthcare had failed to provide adequate or useful information in response to Jane's repeated requests, on January 23, 2019, she submitted a written appeal to SelectHealth contesting its September 14, 2018 underpayment of her April 10, 2017 through May 17, 2017 residential treatment claims:

> This post-service appeal is submitted with respect to the above referenced claims processed by SelectHealth on September 7, 2018 and September 14, 2018. I hereby challenge the underpayment of the above-referenced claims as arbitrary, discriminatory, and violative of ERISA.

Pursuant to 29 C.F.R. § 2560.503-1(h)(2)(iii), 29 C.F.R. § 2590.712(d)(2), and guidance from numerous United States Department of Labor FAQs posted on https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/faqs, I request SelectHealth to provide me with all documents and information relevant to SelectHealth's calculation of the Allowed Amounts for the above-referenced claims. This includes, but is not limited to, SelectHealth's reimbursement methodologies and schedules for out-of-network residential mental health treatment and reimbursement methodologies and schedules for out-of-network intermediate medical care facilities.

Please note that referencing the Select Med Plus Plan's cryptic definition of "Allowed Amount" or SelectHealth's discretion to interpret that definition will not satisfy SelectHealth's obligations to produce the requested information.

103.    Two months later, by letter dated March 22, 2019, SelectHealth responded to the

appeal and admitted that Defendants had violated their own reimbursement policy by failing to

match out-of-network rates to the in-network fee schedule, stating:

SelectHealth uses the methodology summarized in the enclosed document to determine the Allowed Amount for out-of-network claims. The Allowed Amount for out-of-network services is generally equal to the amount SelectHealth targets to pay in-network providers for the same service.

For residential treatment care ("RTC") benefits, such as the care you received at Austen Riggs, the targeted rate for 2017 is $420 per day as stated on the enclosed "SelectHealth 2017 In-Network Target Rates for Selected Services" (the "In-Network Target Rate Chart"). Under SelectHealth's methodology, the per diem amount reflected in the In-Network Target Rate Chart for RTC benefits is the target rate SelectHealth established for purposes of negotiating new provider contracts for in-network RTCs based upon its current contracted rates and other competitive factors. The 2017 contracted rates are summarized on the enclosed "SelectHealth 2017 In-Network Residential Treatment Centers Contract Rates" ("In-Network RTC Chart").

*In review on appeal, SelectHealth discovered that the out-of-network equivalent of the In-Network Target Rate Chart had not been updated to reflect the increase in the targeted in-network per diem rate for RTC benefits reflected in the In-Network Target Rate Chart.* A copy of the "SelectHealth 2017 Out-of-Network Commercial Rates for Selected Services" (the "Out-of-Network Commercial Rate Chart"), which was used to determine the $360 per diem paid to Austen Riggs, is enclosed. *The RTC per diem rate of $360 in the Out-of-Network Commercial Rate*

36

*Chart had not been updated to $420 to align with the In-Network Target Rate Chart.*

**(Emphasis added.)**

104.    Although SelectHealth conceded that (at least in 2017) it had underpaid out-of-network residential treatment claims on a Plan-wide basis and that it had specifically underpaid Jane's April 10 through May 17, 2017 residential treatment claims by $2,280 as a result of its erroneous Out-of-Network Commercial Rate Chart for 2017, SelectHealth did not pay the full amount of benefits (including interest on the delayed payments) that it owed to Jane under ERISA. Additionally, as described below, SelectHealth underpaid Jane's out-of-network psychiatric hospitalization claims at the Menninger Clinic by more than 50% and never attempted to advise Jane of this or to make her whole.

105.    SelectHealth's under-reimbursements of Jane's mental health claims not only violated Defendants' interpretation of the written Plan terms, they also violated the Federal Parity Act, including its requirement that they conduct a parity analysis. Indeed, on February 22, 2019, Defendants admitted, for the first time, that "*SelectHealth had no instruments analyzing nonquantitative treatment limitations to produce*" (ECF 2:18-cv-00807-RJS-PMW, Docket No. 39, page 3) (emphasis added).

106.    The Federal Parity Act requires SelectHealth to assign mental health benefits to one of four benefit classifications: (1) inpatient, in-network; (2) inpatient, out-of-network; (3) outpatient, in-network; and (4) outpatient, out-of-network. The Final Rules implementing the Federal Parity Act explain that "intermediate services" are "services that fall between inpatient care for acute conditions and regular outpatient care;" further state that intermediate services are comprised of residential treatment, partial hospitalization, and intensive outpatient treatment; and

7784897.1

recognize that "[b]ehavioral health intermediate services are generally categorized in a similar fashion as analogous medical services; for example, residential treatment tends to be categorized in the same way as skilled nursing facility care in the inpatient classification." 78 Fed. Reg. 68240, 68259-62 (Nov. 13, 2013). Along the continuum of intermediate services, residential treatment is more intensive than partial hospitalization, which is in turn more intensive than intensive outpatient treatment.

107.    Although SelectHealth Medical Policy 582, "Intermediate Levels of Care Utilization in Behavioral Health," recognizes that "Acute Inpatient" treatment, also known as psychiatric hospitalization (offered at the Menninger Clinic), represents "[t]he highest intensity of medical and nursing services provided within a structured environment providing 24 hour skilled nursing and medical care," and although the same medical policy explains that "[i]ntermediate levels of care define services to assist patients with behavioral health issues that lie between outpatient/clinic/office-based services to in-patient service," and that "[f]ull and immediate access to ancillary medical care must be available for those programs not housed within general medical centers," Medical Policy 582 categorizes acute inpatient/psychiatric hospitalization (along with residential treatment, partial hospitalization, and intensive outpatient treatment) as an ***intermediate*** level of care.

108.    According to the 2017 In-Network Target Rate Chart and 2017 Out-of-Network Commercial Rate Chart provided by SelectHealth to Jane on March 22, 2019, SelectHealth purportedly set a target reimbursement rate of $703 per day for both in- and out-of-network, acute inpatient psychiatric care. That is the same rate it purportedly assigned to less intensive and less-skilled, intermediate medical services—"skilled nursing level 3," defined as "[s]killed nursing care

for at least 4 hours daily" and "[s]killed therapy care for a minimum of 2 to 3 hours/day at least 5 days/week." This reimbursement methodology violates the Federal Parity Act by equating an *acute* level of care for behavioral health services (inpatient psychiatric hospitalization) to an *intermediate* level of care for medical/surgical services (skilled nursing care).

109.    Significantly, SelectHealth does not follow this discriminatory policy as to *in-network* psychiatric hospitalization, only as to out-of-network services: rather, it allows much more than the stated rate for such in-network facilities. Multiple EOBs that Jane received in 2017 show that SelectHealth actually reimbursed *in-network*, acute inpatient psychiatric providers, like Berkshire Medical Center (where Jane was treated between August 9, 2017 through August 17, 2017), at a rate of $1,493.10 per day. Therefore, Defendants materially underpaid out-of-network acute inpatient psychiatric care by reimbursing only $703, less than half of the actual in-network rate.

110.    Additionally, SelectHealth applied an incomparable and far more generous reimbursement methodology for medical (non-psychiatric) hospitalization than for psychiatric hospitalization. Unlike its reimbursement methodology for out-of-network psychiatric hospitalization, SelectHealth compensates medical hospitalization using a Diagnosis-Related Group ("DRG") system that pays for complete episodes of care and includes quality incentives that generously reward Intermountain Healthcare's hospitals (an approach which benefits Intermountain Healthcare directly, since it owns those same hospitals). In Jane's EOB for an October 2015 medical hospitalization, for example, SelectHealth's DRG reimbursement model was identified in a code "PGR," which reflected that "[t]he charge exceeds the DRG amount for this confinement." Applying this code, SelectHealth compensated Intermountain Medical Center

$41,612.19 out of a billed amount of $41,850.17 for a six-day admission, averaging a reimbursement rate of nearly $7,000 per day, far more than patients are reimbursed for psychiatric hospital stays. (This generous reimbursement was in addition to in-network professional and ancillary charges authorized and paid for by SelectHealth during the same six-day period.)

111.    Residential psychiatric treatment, apart from generally providing access to 24-hour skilled nursing services, can entail 4-8 hours of therapeutic services per day, including pharmacologic, individual, family, and group treatment by board-certified psychiatrists, licensed psychologists, social workers, and other clinicians with advanced degrees. This level of care for mental health services far exceeds services available from skilled nursing services offered in the medical/surgical context. Nevertheless, in 2017 SelectHealth purported to have set a target reimbursement rate of only $420 per day for in-network residential treatment and $360 per day for out-of-network for residential treatment (but, with litigation against it looming, announced on March 22, 2019 that the out-of-network rate should have been set to $420 per day). In comparison, SelectHealth set a higher reimbursement rate of $465 per day for less intensive and less skilled, intermediate medical services—"skilled nursing level 2," which it defined as "[s]killed nursing care for at least 4 hours daily" or "[s]killed therapy care for a minimum of 2 to 3 hours/day at least 5 days." Defendants therefore adopted a reimbursement methodology that intentionally devalues, significantly underpays (by 11% to 29%), and discriminates against mental health services in comparison to (less intensive) medical/surgical services.

112.    Additionally, the methodology that Defendants used to set the 2017 target rate for out-of-network residential treatment (particularly of adult mental health rather than substance use disorders) was patently unreasonable. According to Defendants, "the target rate SelectHealth

established for purposes of negotiating new provider contracts for in-network RTCs [was] based upon its current contracted rates and other [undisclosed] competitive factors." But SelectHealth's 2017 In-Network RTC Chart was comprised of only a dozen Utah-based (non-Intermountain Healthcare-owned facilities), and only one of those was a non-primary substance use rehabilitation facility for adults (almost all facilities are designed for children and/or to provide substance abuse treatment). That single psychiatric facility for adults, Center for Change (which exclusively treats patients with primary eating disorders), was actually contracted at $495 per day since 2014.

113.   Had SelectHealth actually followed its own articulated reimbursement methodology for setting 2017 in-network target rates for residential treatment, the 2017 target rate would have been higher than $495, which was in effect since 2014 but not adjusted for inflation or increased costs, and did not account for SelectHealth's inadequate residential treatment network (as evidenced by the fact that, apart from Center for Change, SelectHealth was unable to identify any other in-network facility that was appropriate for adults with primary mental health disorders).

114.   Medical Policy 582 defines behavioral health partial hospitalization as "[a]n intensive non-residential level of service where multidisciplinary medical and nursing services are required," adding that "[t]his care is provided in a structured setting, similar in intensity to an inpatient setting, meeting for more than four hours (and, generally, le[ss] than eight hours) daily." In 2017, SelectHealth set a target reimbursement rate of $350 per day for in-network partial hospitalization. It set the rate for out-of-network psychiatric partial hospitalization at $250 per day, 29% less than the in-network rate. Yet SelectHealth set a reimbursement rate of $340 per day for less intensive and less skilled, intermediate medical services—"skilled nursing level 1," defined

7784897.1

as "[s]killed nursing care on at least a daily basis" or "[s]killed therapy care for a minimum of 1 hour/day at least five days/week."

115.    Medical Policy 582 describes intensive outpatient treatment as consisting of "[m]ultidisciplinary, structured services provided at a greater frequency and intensity than routine outpatient treatment" services, which "are generally up to four hours per day, up to five days per week." In 2017, SelectHealth set a target reimbursement rate of $200 per day for in-network intensive outpatient treatment, and $112.50 per day for out-of-network intensive outpatient treatment, 44% less than the in-network rate. SelectHealth's 2017 In-Network Target Rate Chart and its 2017 Out-of-Network Commercial Rate Chart did not identify any intermediate medical services to which intensive outpatient treatment could be compared.

116.    By contrast, for *medical* services, SelectHealth followed its "target matching" policy exactly: it set the out-of-network rate for each level of skilled nursing care at exactly the same level as the in-network "target" rate for that same level of skilled nursing care.

117.    Unlike mental health services at all levels of care, which are generally delivered directly by clinicians with advanced degrees and licenses, medical skilled nursing services are frequently rendered by individuals who do not possess advanced degrees and who may not even be licensed. Additionally, as a general rule, mental health services, at all levels of care, are more scarce than skilled nursing services.

118.    In sum, Defendants' benefit payments violated Defendants' own interpretation of the Plan's written terms, which interpretation itself violated ERISA (including its parity provision) and by which SelectHealth unreasonably gave itself extraordinary discretion. First, SelectHealth's 2017 purported target rate of $703 per day for in-network psychiatric hospitalization—the stated

42

basis for the out-of-network rate for the same service—was unreasonable, as evidenced by its 2017 payments of $1493.10 per day for in-network psychiatric hospitalization. Second, SelectHealth improperly classified acute psychiatric hospitalization as an intermediate service and intentionally mismatched the Allowed Amount for psychiatric hospitalization to the Allowed Amount for skilled nursing services, not the legally-recognized analog: the reimbursement rate for medical hospitalization. And third, SelectHealth selectively applied its interpretation of "Allowed Amount" by matching exactly the out-of-network rates to the in-network for medical/surgical services, but not for intermediate-level psychiatric services (where the out-of-network rates were uniformly lower than the in-network rates).

119.    As a result of Defendants' conduct, Jane incurred greater expenses and liability to her providers.

## CLASS ACTION ALLEGATIONS

120.    With respect to their underpayments of behavioral health claims that Defendants otherwise covered, as detailed herein, Defendants' violations of the Plan, ERISA, and the Federal Parity Act were not confined to their benefit calculations for Jane's claims. As a result, Plaintiff brings the claims relating to these ERISA violations as the appointed representative of her late daughter, Jane Doe, and on behalf of the following Class:

> all participants or beneficiaries in ERISA plans whose claim(s) for out-of-network mental health services at the acute inpatient, residential, partial hospitalization, and intensive outpatient levels of care were subjected to Defendants' reimbursement and in-network policies as detailed herein.

121.    Common class claims and issues exist for the Class, including, but not limited to, the following:

1.    Whether Defendants are ERISA fiduciaries;

2.     Whether Defendants' reimbursement policies violate ERISA, 29 U.S.C. § 1185a;

3.     Whether Defendants' legal duties (fiduciary or otherwise) required them to refrain from applying their reimbursement and network policies because they violate ERISA's parity provision;

4.     Whether Defendants' policy interpreting the Plan violates ERISA, 29 U.S.C. § 1185d (incorporating 42 U.S.C. § 300gg-5);

5.     Whether Defendants' application of its plan interpretation was unreasonable in violation of ERISA, 29 U.S.C. § 1185d (incorporating 42 U.S.C. § 300gg-5);

6.     Whether Defendants' legal duties (fiduciary or otherwise) required them to refrain from applying their reimbursement policies because they violate 29 U.S.C. § 1185d; and

7.     What remedies are available for Defendants' ERISA violations.

122.   The members of the Class are so numerous that joinder of all members is impracticable. SelectHealth is the State of Utah's largest claims administrator. Although the exact number of Class members is in the possession of Defendants, Plaintiff believes that the Class consists of at least hundreds of members.

123.   Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class, including the class action claims and issues listed above.

124.   Plaintiff's claims are typical of the claims of the Class members because, as alleged herein, the reimbursement policies applied to Jane were also applied to members of the Class.

125.   Plaintiff will fairly and adequately protect the interests of the members of the Class, is committed to the vigorous prosecution of this action, has retained counsel competent and experienced in class action and ERISA health insurance-related litigation, and has no interests antagonistic to or in conflict with those of the Class.

7784897.1

126.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy, because joinder of all members of the Class is impracticable. Further, the expense and burden of individual litigation make it irrational for Class members individually to redress the harm done to them. Moreover, because this case involves Class members who suffer from mental health conditions, and those who suffer from such conditions continue to experience social stigma, it is unlikely that many Class members would be willing to have their conditions become public knowledge by filing individual lawsuits. Given the uniform policy and practices at issue, there will also be no difficulty in the management of this litigation as a class action.

**FIRST CLAIM FOR RELIEF**
**(seeking individual relief under ERISA, 29 U.S.C. §§ 1132(a)(1)(B))**

127.     Plaintiff incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein.

128.     This count is a claim for individual relief under ERISA to recover benefits due to Plaintiff under the terms of her Plan, to enforce her rights under the terms of the Plan, and/or to clarify her rights to future benefits under the terms of the Plan, brought pursuant to ERISA, 29 U.S.C. § 1132(a)(1)(B).

129.     SelectHealth wrongfully denied Jane's claims for medically necessary residential mental health treatment at Austen Riggs based on an internally-developed, clinically inappropriate geographic restriction (described in SelectHealth Medical Policy 475) that violated the express terms of Jane's Plan. Apart from violating the express terms of Jane's Plan, SelectHealth's geographic restriction also violated the Federal Parity Act, incorporated into ERISA at 29 U.S.C. § 1185a (and implemented by 29 C.F.R. § 2590.712), due to it being a treatment limitation imposed

7784897.1

exclusively on (in- and out-of-network) inpatient mental health benefits. No such geographic limitation is imposed by the Plan on (in- and out-of-network) inpatient medical/surgical benefits, such as skilled nursing facilities.

130.     SelectHealth also refused to allow Jane to access her out-of-network benefits and directed her to receive residential mental health treatment from clinically inappropriate, in-network facilities that would not have admitted her. When pressed regarding the inadequacy of its identified, in-network facilities, SelectHealth willfully ignored the evidence in its possession and manufactured additional, pretextual denial rationales. SelectHealth's wrongful denial of Jane's claims was compounded by its repeated, materially prejudicial failures to provide Jane with full and fair reviews, in violation of 29 U.S.C. § 1133 and 29 U.S.C. § 1185(d), (incorporating 42 U.S.C. § 300gg-19(a)(2)(A) and 29 C.F.R. § 2560.503-1).

## SECOND CLAIM FOR RELIEF
### (seeking individual relief under ERISA, 29 U.S.C. §§ 1132(a)(3)(A))

131.     Plaintiff incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein.

132.     This count is brought for individual relief under ERISA, 29 U.S.C. § 1132(a)(3)(A), to enjoin SelectHealth's acts and practices which violate 29 U.S.C. § 1185(a) (and implemented by 29 C.F.R. § 2590.712), and 29 U.S.C. § 1133, as incorporated into the Plan and ERISA, as detailed herein. Plaintiff brings this claim only to the extent that the Court finds that the injunctive relief sought is unavailable pursuant to 29 U.S.C. § 1132(a)(1)(B).

## THIRD CLAIM FOR RELIEF
### (seeking individual relief under ERISA, 29 U.S.C. §§ 1132(a)(3)(B))

7784897.1

133.    Plaintiff incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein.  This count is brought for individual relief under ERISA pursuant to 29 U.S.C. § 1132(a)(3)(B), to obtain appropriate equitable relief (i) to redress SelectHealth's violations of 29 U.S.C. § 1185(a) (and implemented by 29 C.F.R. § 2590.712), and 29 U.S.C. § 1133, as incorporated into the Plan and ERISA, and/or (ii) to enforce such provisions of ERISA or the Plan. Plaintiff brings this claim only to the extent that the Court finds that the equitable relief sought is unavailable pursuant to 29 U.S.C. § 1132(a)(1)(B) or 29 U.S.C. § 1132(a)(3)(A).

## FOURTH CLAIM FOR RELIEF
### (seeking individual relief under ERISA, 29 U.S.C. §§ 1132(c))

134.     Plaintiff incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein, seeking individual relief under ERISA.

135.    Intermountain Healthcare was required to timely produce the Plan documents within 30 days of Plaintiff's request. Defendant's failure to produce the Plan documents is a violation of ERISA, 29 U.S.C. § 1132(c).

136.    Defendant is liable to Plaintiff for a statutory penalty pursuant to ERISA, 29 U.S.C. § 1132(c), along with all further relief the Court deems proper.

## FIFTH CLAIM FOR RELIEF
### (seeking relief on behalf of herself and the Class
### under ERISA, 29 U.S.C. §§ 1132(a)(1)(B))

137.    Plaintiff incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein, subject to the fact that this claim is being pursued both for individual and class relief.

7784897.1

138.     This count is a claim to recover benefits due to Plaintiff and the Class under the terms of the ERISA Plans, to enforce her and the Class members' rights under the terms of the Plan, and/or to clarify her and the Class members' rights to future benefits under the terms of the Plan, brought pursuant to ERISA, 29 U.S.C. § 1132(a)(1)(B).

139.     As ERISA fiduciaries, each Defendant was required to discharge its duties in compliance with the Federal Parity Act as incorporated into ERISA at 29 U.S.C. § 1185a, to refrain from participating in the other Defendant's violation of the parity or non-discrimination provisions of ERISA, and to take reasonable efforts to remedy the other Defendant's breach. Indeed, even if one of the Defendants was not a fiduciary, such Defendant is liable for participating in the breach of the other's fiduciary duty.

140.     Yet, both Defendants knew about, did nothing to stop, and knowingly participated in the application of the mental health reimbursement policies detailed herein, which were in violation of the parity and non-discrimination provisions of ERISA.

141.     By doing so, Defendants not only violated their legal duties, they also wrongfully denied benefits to Plaintiff.

### SIXTH CLAIM FOR RELIEF
**(seeking relief on behalf of herself and the Class
under ERISA, 29 U.S.C. §§ 1132(a)(3)(A))**

142.     Plaintiff incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein, subject to the fact that this claim is being pursued both for individual and class relief, contrary to the first four causes of action, which are limited to Plaintiff's request for individual relief.

7784897.1

143.     This count is brought pursuant to ERISA, 29 U.S.C. § 1132(a)(3)(A), to enjoin

United's acts and practices which violate ERISA, as detailed herein. Plaintiff brings this claim

only to the extent that the Court finds that the injunctive relief sought is unavailable pursuant to

29 U.S.C. § 1132(a)(1)(B).

### SEVENTH CLAIM FOR RELIEF
**(seeking relief on behalf of herself and the Class
under ERISA, 29 U.S.C. §§ 1132(a)(3)(B))**

144.     Plaintiff incorporates by reference the preceding paragraphs as though such

paragraphs were fully stated herein, subject to the fact that this claim is being pursued both for

individual and class relief.

145.     This count is brought pursuant to 29 U.S.C. § 1132(a)(3)(B), to obtain appropriate

equitable relief (i) to redress United's violations of ERISA, as detailed herein, and/or (ii) to enforce

such provisions of ERISA or the Plan. Plaintiff brings this claim only to the extent that the Court

finds that the equitable relief sought is unavailable pursuant to 29 U.S.C. § 1132(a)(1)(B) or 29

U.S.C. § 1132(a)(3)(A).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in her favor against Defendants as

follows:

A.     Declaring that Defendants violated their legal obligations in the manner

described herein;

B.     With respect to the First through Third Claims for Relief, ordering Defendants

to: (1) cover all wrongfully denied claims for residential treatment at Austen Riggs from May 17,

2017 through August 9, 2017 and from September 13, 2017 through April 27, 2018 and (2)

7784897.1

reimburse all covered claims at full billed charges (less any in-network cost sharing) due to Defendants' failure to maintain network adequacy for residential mental health treatment of adults and/or due to Defendants' insistence on the use of unsuitable in-network providers;

C.     Certifying the Class for the Fifth through Seventh Claims for Relief and appointing Plaintiff as Class Representative and Plaintiff's Counsel as Class Counsel;

D.     With respect to the Fifth through Seventh Claims for Relief, ordering Defendants to pay all wrongfully underpaid (and therefore partially denied) claims by Plaintiff and the Class without the illegal limitations described herein, with interest, or remand such benefit determination back to Defendants for reprocessing in a manner consistent with the Plan's written terms and ERISA;

E.     Ordering appropriate equitable relief to Plaintiff individually for the First through Fourth Claims for Relief and to Plaintiff and the Class for the Fifth through Seventh Claims for Relief, including but not limited to an appropriate monetary award based on disgorgement, restitution, surcharge, or other basis;

F.     With respect to Plaintiff's individual claims for relief, ordering Defendants to pay Plaintiff a surcharge for their intentional privacy breaches of her protected health information requested pursuant to 29 U.S.C. § 1185(d) and 29 C.F.R. § 2560.503-1(h)(2)(iii);

G.     With respect to the Fourth Claim for Relief, ordering Defendants to produce the Plan documents and to pay Plaintiff individually a statutory penalty pursuant to 29 U.S.C. § 1132(c), along with all further relief the Court deems proper.

H.     Awarding Plaintiff and the Class all reasonable attorney's fees, court costs, expert witness fees, and other litigation expenses incurred in this action; and

7784897.1

I.       Granting such other and further relief, such as the removal of Defendants as

Plan fiduciaries, as is just and proper in light of the evidence.

Dated this the 28th day of May, 2021.

STAVROS LAW P.C.

/s/ Austin B. Egan
Austin B. Egan


PSYCH-APPEAL, INC.

/s/ Meiram Bendat
Meiram Bendat
*Admitted*


ZUCKERMAN SPAEDER LLP
D. Brian Hufford (*Pro Hac Vice*)
Jason Cowart (*Pro Hac Vice*)
Andrew N. Goldfarb (*Pro Hac Vice*)

*Attorneys for the Plaintiff*

7784897.1

## CERTIFICATE OF SERVICE

I certify that on May 28, 2021, I filed this Third Amended Complaint using the ECF system, which sent automatic notice to:

Matthew Moscon
STOEL RIVES, LLP
201 S. Main Street, Suite 1100
Salt Lake City, Utah 84111
*Attorney for Defendants*

/s/ Austin B. Egan
Austin B. Egan

7784897.1