IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JANE DOE, by LINDA SMITH, as her personal representative,<br><br>     Plaintiff,<br><br>v.<br><br>INTERMOUNTAIN HEALTHCARE, INC. and SELECTHEALTH, INC.,<br><br>     Defendants. | **MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON COUNTS ONE THROUGH FOUR**<br><br>Case No. 2:18-cv-807-RJS-JCB<br><br>Chief District Judge Robert J. Shelby<br><br>Magistrate Judge Jared C. Bennett |

Plaintiff Linda Smith, as personal representative of Jane Doe,[1] brings this action under the Employee Retirement Income Security Act of 1974 (ERISA).[2]  Plaintiff filed both individual and class action claims alleging Defendants Intermountain Healthcare, Inc. (IHC) and SelectHealth, Inc. violated ERISA and the Mental Health Parity and Addiction Equity Act (Parity Act) in denying residential mental health benefits to Doe.[3]  Before the court is Plaintiff's Motion for Summary Judgment on Counts One Through Four (the individual claims).[4]  For the reasons stated below, the Motion is DENIED.

## BACKGROUND

Through her employer, Doe was a participant in an ERISA benefits plan (the Plan) from at least December 30, 2016 to July 31, 2018.[5]  IHC sponsored the Plan and SelectHealth acted as

---

[1] Smith brings this action on behalf of Doe who sadly passed during the pendency of this action.  Dkt. 64 [SEALED].

[2] Dkt. 153, *Third Amended Complaint* (*TAC*) ¶¶ 127–45.

[3] *See id.*

[4] Dkt. 192, *MSJ.*

[5] Dkt. 181, *Answer* ¶¶ 3, 46.

1

the claims review fiduciary.[6]  Before turning to the legal issues, the court reviews the relevant

Plan language, Doe's medical and treatment history, and the procedural history of this case.

## I.        The Plan

The Plan covers treatment for both medical/surgical care and mental health services.[7]  To

qualify for benefits, services must be "medically necessary."[8]  Under the Plan, "Medical

Necessity is determined by SelectHealth's Medical Director or another Physician designated by

SelectHealth."[9]  SelectHealth has "sole discretionary authority" to interpret Plan terms such as

medical necessity and determine the availability of benefits under the Plan.[10]  SelectHealth has

developed additional medical policies "to serve as guidelines for coverage decisions."[11]  These

policies detail when certain services are considered medically necessary and are "subject to

change without notice."[12]

Two SelectHealth internal policies are relevant here—Policy 475 and Policy 582.  Policy

475 lists criteria for coverage at psychiatric residential treatment centers, including a requirement

that treatment be "provided in reasonable proximity to a members[sic] community or residence

and support system."[13]  Concerning this criterion, Policy 475 cites to the Substance Abuse and

Mental Health Services Administration guidelines which indicate "outcomes are improved when

residential care is provided in close proximity to the patient's home" because the treatment can

---

[6] *Answer* ¶ 23; Dkt. 227-1, *Ex. 1* at IHC 193.

[7] *Ex. 1* at IHC 47–48.

[8] *Id.* at IHC 60.

[9] *Id.*

[10] Dkt. 127-2, *IHC Plan* at IHC 193.

[11] *Id.*

[12] *Id.*

[13] Dkt. 227-3, *Policy 475* at IHC 3184.

incorporate a patient's community and family "to build a life that supports recovery."[14]  Policy 582 outlines different levels of care for behavioral health issues and incorporates InterQual criteria to evaluate whether certain care is medically necessary.[15]  To qualify for admission to a residential mental health facility under InterQual, a patient must suffer severe mental illness that cannot be managed at a less intensive level of care or within their current living situation.[16]  InterQual further requires a patient be reevaluated within the first few weeks to see if either a lower level of care is feasible, progress is being made at the current level of care, or more intensive care is needed.[17]

The Plan requires preauthorization to obtain benefits coverage for residential mental health services.[18]  Greater coverage is provided for services received at in-network facilities than those at out-of-network facilities, but the Plan covers both.[19]  Should a claim for benefits be denied, the Plan offers participants an internal review process consisting of one mandatory review and a possible voluntary review.[20]  Participants obtain review of an adverse benefit determination by submitting to SelectHealth a written appeal along with any relevant documents, records, and other information.[21]  "During the appeal process, no deference will be afforded to the adverse benefit determination, and decisions will be made by fiduciaries who did not make

---

[14] *Id.* at IHC 3185.

[15] Dkt. 223-2, *Policy 582* at IHC 2940.

[16] Dkt. 223-1, *2017 InterQual* at IHC 2084–85.

[17] *Id.* at IHC 2086–89.

[18] *IHC Plan* at IHC 69.

[19] *Id.* at IHC 47–48.

[20] *Id.* at IHC 87.

[21] *Id.*

the adverse benefit determination."[22]  A participant must exhaust the mandatory review before

pursuing civil action under ERISA.[23]

## II.     Doe's Medical History and Treatment

In 2016, Doe sought mental health treatment for depression after struggles with her work

as a physician.[24]  Doe presented as "very suicidal" and was diagnosed with Major Depressive

Disorder (MDD), Post Traumatic Stress Disorder (PTSD), and Insomnia Disorder.[25]  She

received prescriptions to treat her symptoms but was unwilling to do therapy and would not limit

her access to guns.[26]  Although Doe's doctor discussed voluntary and involuntary hospitalization

with her, he ultimately determined she did not meet the criteria for admission.[27]

The medications only slightly alleviated Doe's symptoms and by late 2016 she was

hospitalized three separate times for attempted suicide.[28]  Hospital doctors determined Doe was a

good candidate for electroconvulsive therapy (ECT) and she began receiving treatments on an

outpatient basis.[29]  Doe "noted significant improvement with regular ECT treatments," reporting

no suicidal ideation and reduced depressive symptoms.[30]  As Doe tapered the frequency of her

ECT treatments however, she began to experience worsening depressive symptoms and suicidal

ideation.[31]  Doe eventually checked into an out-of-state psychiatric hospital where she remained

---

[22] *Id.* at IHC 86–87.

[23] *Id.* at IHC 87.

[24] Dkt. 194-1 at IHC 1039.

[25] *Id.* at IHC 1040, 1042.

[26] *Id.* at IHC 1042.

[27] *Id.*

[28] Dkt. 194-3 at IHC 934–35.

[29] *Id.* at IHC 937; Dkt. 217-4 at IHC 860–63.

[30] Dkt. 194-3 at IHC 937.

[31] *Id.* at IHC 933.

until April 2017.[32]  SelectHealth covered a portion of Doe's stay at the psychiatric hospital but denied the final few weeks after determining Doe had "no ongoing safety issues" and her symptoms could be "handled safely in outpatient" care.[33]  While hospitalized, Doe was terminated from her job.[34]

## A.  First Stay at Austen Riggs

On April 10, 2017, Doe checked into Austen Riggs Center, a residential mental health treatment facility in Massachusetts (First Stay).[35]  On admission, Doe stated she did "not believe she [could] return to Utah" as "she would need to live with her parents, have no job, [and] she would be moved to take action on ending her life."[36]  Staff considered Doe a "significant risk to seriously harm" herself and found her condition had "been unresponsive to an appropriate course of treatment at a less intensive level of care."[37]  Doe was diagnosed with MDD, PTSD, and schizoid personality disorder.[38]  It was anticipated Doe would stay for six weeks with longer treatment possible.[39]  She was admitted on a short-term basis leading to stepdown care.[40]  A goal sheet completed at admission listed short-term and long-term goals, such as gaining sufficient self-management skills to discharge to outpatient treatment.[41]

---

[32] Dkt. 258-1 at IHC 755–60.

[33] Dkt. 258-3 at IHC 632.

[34] Dkt. 212-1, *Ex. 16* at IHC 1442; *Ex. 15* at IHC 2137.  Exhibit 15 is in seventeen parts, from Docket 195 to Docket 211.  For ease of reference, the court identifies the Exhibit and Bates number rather than the including the docket entry as well.

[35] Dkt. 195-1, *Ex. 15* at IHC 2135.

[36] *Id.* at IHC 2137, 2145.

[37] *Id.* at IHC 2141.

[38] *Ex. 16* at IHC 1444.

[39] *Ex. 15* at IHC 2142.

[40] *Id.*

[41] Dkt. 214-10, *Ex. 26* at IHC 1624–28.

Doe remained at Austen Riggs for four months.[42]  During this stay, suicidal ideation was a constant concern, although Doe's depressive symptoms would "wax and wane."[43]  Additionally, on several occasions doctors noted concerns about Doe's poor nutrition, weight loss, and over-exercise.[44]  Doctors twice ascribed to Doe an "unspecified Feeding and Eating Disorder."[45]  After a month, Doe was sent for a physical to address these concerns.[46]  A doctor conducted a full exam before concluding Doe was likely "over-reporting her mileage that she is running and under-reporting food intake because her electrolytes were all normal . . . and she has not lost any weight."[47]

Therapy during this stay was mostly unsuccessful.  Doe participated only minimally and refused to engage with peers and the therapeutic community, limiting her interactions to doctors and staff.[48]  On a couple occasions Doe did talk about receiving community support from her mother and stepfather although she "intimated to [a] staff member that even [her stepfather] could not keep her from killing herself."[49]  Eventually, Doe's suicidality escalated and she was involuntarily committed for psychiatric hospitalization.[50]  After a nine-day psychiatric hospitalization, Doe elected to return to Utah with her mother and stepfather.[51]

---

[42] Dkt. 217-2 at IHC 1086.

[43] *Ex. 15* at IHC 2149, 2155, 2156–57, 2160, 2166–2200.

[44] *Id.* at IHC 2152, 2156–57, 2160, 2162–64, 2166–2200.

[45] Dkt. 212-1 at IHC 1469, 1477.

[46] *Ex. 15* at IHC 2297.

[47] *Id.* at IHC 2300.

[48] *Id.* at IHC 2152, 2163.

[49] *Id.* at IHC 2162–64, 2201–2217; Dkt. 198-1 at IHC 2277.

[50] *Ex. 15* at IHC 2276–2282.

[51] Dkt. 212-1 at IHC 1501.

**B.  Second Stay at Austen Riggs**

Doe spent nearly a month with her mother and stepfather before reentering Austen Riggs for additional treatment on September 13, 2017 (Second Stay).[52]  In her consultation for the Second Stay, Doe said her time at home had "helped her feel less desperate and depressed"[53] and she "express[ed] interest in re-entering treatment as a way to claim a life she imagines worth having."[54]  She reported that "she had a good month with her parents, feeling their love and support, which left her not wanting to devastate them with her suicide."[55]  While home, her eating and exercising had normalized and she denied having any psychotic symptoms or current suicidal ideation.[56]  A mental status exam found Doe was "mildly depressed although improved since leaving."[57]

Nevertheless, Doe again met the criteria for admission.[58]  Staff found inpatient care was warranted based in part on Doe's prior suicide attempts and that she had previously been unresponsive to treatment at a lower level.[59]  Doe communicated an increased motivation and renewed commitment "to do things differently, not only in being forthcoming about her risk of suicide . . . but also around managing her weight, [food] intake and exercise."[60]  Her decision to return rested on the realization that "feeling better at home could not translate into . . . get[ing]

---

[52] *Ex. 15* at IHC 2445.

[53] *Id.* at IHC 2485.

[54] *Id.* at IHC 2445.

[55] *Id.*

[56] *Id.*

[57] *Id.* at IHC 2447.

[58] *Id.* at IHC 2443–51.

[59] *Id.* at IHC 2449.

[60] *Id.* at IHC 2451.

better and return[ing] to her profession."[61]  Additionally, Doe continued to struggle with PTSD symptoms such as "nightmares, flashbacks, and disassociation."[62]  Doe was admitted for a two week re-evaluation period during which staff and Doe would assess whether treatment at Austen Riggs was viable.[63]

Doe's two-week evaluation period turned into a seven-month stay.[64]  For most of the stay Doe was no longer acutely suicidal, but she still experienced periods of suicidal ideation and her doctor remained concerned given Doe's history and tendency to be secretive.[65]  Doe struggled with worsening PTSD symptoms, marked by severe insomnia, anxiety, inability to trust, anger, and significant trauma from childhood sexual abuse.[66]  Doctors attempted to send Doe to undergo a sleep study on several occasions but she always backed out.[67]

There were few issues with Doe's weight during the Second Stay.  Doctors noted she was healthy, stable, and "less preoccupied with exercise and limited food preferences."[68]  It was only right before discharge that doctors noted renewed concern about Doe's weight.[69]

Doe again struggled to engage in the therapeutic community.  For the first couple months after she reentered treatment, there were positive changes in Doe's activity levels.[70]  She

---

[61] *Id.*

[62] *Id.* at IHC 2485.

[63] *Id.* at IHC 2451.

[64] *Id.* at 2472–74.

[65] *Id.* at IHC 2470–71; *see also id.* at IHC 2445–72 (noting passive and vague suicidal ideation, a lack of a plan, but continued concerns).

[66] *Id.* at IHC 2445–72.

[67] *Id.* at IHC 2467–69.

[68] *Id.*; *see also id.* at IHC 2445, IHC 2457–58, IHC 2459–61.

[69] *Ex. 15* at IHC 2472–74.

[70] *Id.* at IHC 2459–61.

completed her continuing medical education requirements and renewed her medical license.[71] She joined some community groups and began making a quilt.[72] But shortly after that she became less participative, rarely interacting with peers, and eventually isolating herself and confining nearly all her interactions to staff.[73] In March 2018, Doe's doctor confronted her about the problem, writing "I have spoken frankly about how stuck she seems in the treatment now, unable to engage in the therapeutic community program and missing out on a major part of our treatment program by continuing to do this."[74] The doctor further noted, "Doe feels stubbornly opposed to joining any patient groups."[75] Her stepfather also opined that Doe seemed better in her month at home and "thought she might be better off living at home."[76]

Doe's therapist discussed moving her to a step-down facility but she was "powerfully resistant to taking the steps to move to a less expensive lower level of care."[77] She felt certain she would not thrive in lower care because she was connected to Austen Riggs staff and needed them.[78] She indicated she "would rather remain in [her present setting] than work towards actively engaging in treatment that would allow her to" step down.[79] Yet, Doe appeared

---

[71] Dkt. 217-5 at IHC 1756, 1760.

[72] *Id.* at IHC 1754.

[73] *Ex. 15* at IHC 2463–69, 2470–71.

[74] *Id.* at IHC 2470–71 ("[W]e have talked about her insistence on a patient/staff relationship in lieu of family and peer relationships which is countertherapeutic.").

[75] *Id.*

[76] *Id.* at IHC 2631.

[77] *Ex. 15* at IHC 2471.

[78] *Id.*

[79] *Id.*

frustrated and angry over the lack of progress.[80]  She admitted to suicidal ideation with a concrete plan and increased despair.[81]

Eventually, Doe decided to return to Utah with her parents, in part because she was unable to make meaningful relationships within the therapeutic community.[82]  Staff encouraged Doe to go to another program for help with interpersonal relationships but she was resistant.[83] Shortly before discharge, increased safety concerns led to Doe being transferred to a psychiatric hospital.[84]  Once stabilized, Doe returned to Utah with family.[85]

### III.    Administrative Review Process

#### A.    First Stay

##### 1.  *Initial Denial*

In April 2017, Doe requested preauthorization for her First Stay at Austen Riggs.[86] Initially, the doctor reviewing the request denied coverage because Doe did not have a history of active engagement in less intensive levels of care and she had support and resources in Utah.[87]  A doctor from Austen Riggs spoke with the reviewer who then approved treatment from April 10, 2017 to May 17, 2017.[88]  SelectHealth denied coverage for the remainder of the First Stay (May 17, 2017 to August 9, 2017).[89]

---

[80] *Id.* at IHC 2472.

[81] *Id.* at IHC 2472–73.

[82] *Ex. 15* at IHC 2822.

[83] *Id.* at IHC 2472–73, 2822.

[84] *Id.* at IHC 2473.

[85] *Id.*

[86] Dkt. 222-4, *Ex. D* at IHC 684.

[87] *Id.*

[88] *Id.*; *see also* Dkt. 214-27, *Ex. 27* at IHC 670.

[89] *Ex. 27* at IHC 670.

The denial letter indicated the services did "not meet medical criteria."[90]  It referenced

three specific InterQual criteria: current symptoms, treatment progress, and availability of

outpatient programs.[91]  According to the reviewer, Doe was stable and had fewer safety issues.[92]

The reviewer determined the work Doe was doing to address trauma "could best be addressed

with local care."[93]  He felt there were "no unique services . . . delivered at Austen Riggs that

could not be provided in community or in-network."[94]  Center for Change, a Utah facility

focusing on eating disorders, was mentioned as an appropriate option, along with day treatment

or intensive outpatient programs.[95]

### 2.  *Level-One Appeal and Denial*

Doe appealed SelectHealth's denial on June 30, 2017.[96]  In her appeal letter, Doe argued

treatment at Austen Riggs was essential because ECT in Utah had been unsuccessful and "there

are no residential programs in Utah that have the level of expertise and experience to treat my

complicated psychiatric issues."[97]  She mentioned her symptoms—depression, weight loss,

suicidal ideation—and argued out-patient treatment in Utah "would put my life at risk."[98]  Doe

included medical records, therapy notes, and a letter from her therapist at Austen Riggs.[99]

---

[90] *Id.*

[91] *Id.*

[92] *Id.*

[93] *Id.*

[94] *Ex. 27* at IHC 670.

[95] *Id.*

[96] Dkt. 212-1, *Ex.16* at IHC 1442.

[97] *Id.*

[98] *Id.*

[99] *Id.* at IHC 1443.

The letter from Doe's therapist pointed out several "errors of fact" in the initial denial letter.[100]  First, it noted the denial only included Doe's diagnosis for MDD, completely missing her PTSD and personality disorder.[101]  The letter then noted Doe's extreme suicidality and argued the evidence showed Doe had been unable to benefit from prior treatments in Utah.[102]  The therapist opined that the psychotherapy offered at Austen Riggs was unique to their program and unavailable at Center for Change.[103]  Additionally, the therapist indicated Doe did not meet the criteria for an eating disorder, nor was she a candidate for outpatient treatment.[104]

The letter also pushed back against SelectHealth's use of the InterQual criteria.[105]  Using a different set of nationally recognized guidelines, LOCUS, the therapist opined that it was medically necessary for Doe to receive residential mental health treatment.[106]

On October 20, 2017, SelectHealth denied Doe's first-level appeal for the First Stay.[107] The reviewing physician, Dr. Scott Whittle, concluded "[t]he current level of care does not meet medical need based on lack of clinical progress, lack of treatment plan that has reasonable chance of clinical improvement and care being outside of members[sic] support system."[108] Doctor Whittle indicated Doe had more resources and support in Utah than acknowledged.[109]

---

[100] *Id.* at IHC 1444.

[101] *Id.*

[102] *Id.*

[103] *Id.*

[104] *Id.*

[105] *Id.* at IHC 1445.

[106] *Id.*

[107] Dkt. 221-5, *Ex.44* at IHC 571.

[108] *Id.*; *see also* Dkt. 221-8, *Ex. 47* at IHC 2082.

[109] *Ex. 44* at IHC 571.

Based on Dr. Whittle's opinion, SelectHealth denied the appeal.[110]  SelectHealth explained its

determination was based on medical necessity and quoted the relevant provision in the Plan:

> To qualify for Benefits, Covered Services must be Medically Necessary.  Medical
> Necessity is determined by SelectHealth's Medical Director or Another Physician
> designated by SelectHealth.  A recommendation, order or referral from a Provider
> or Facility, including Participating Providers and Facilities, does not guarantee
> Medical Necessity.[111]

The letter concluded by informing Doe of her appeal options and stated "second level mandatory

review is required by the Plan before you may pursue judicial review" under ERISA.[112]

### 3. *Level-Two Appeal and Denial*

On December 1, 2017, Doe requested outside review of SelectHealth's denial on the First

Stay.[113]  Doe claimed Austen Riggs was the best program to treat her diagnoses.[114]  Specifically,

Doe argued Utah's outpatient programs and the Center for Change could not provide the level of

care she needed to become healthy.[115]  Doe also argued she had no support structure outside of

her parents and in fact, the rest of her family was a "strong negative" influence.[116]

Once again, Doe attached her medical records and therapeutic notes along with an

updated letter from her psychotherapist.[117]  The therapist argued Mr. Whittle's assessment was

"simply erroneous on many levels" and requested a review using LOCUS standards from an

---

[110] *Id.*

[111] *Id.*

[112] *Id.* at IHC 572.

[113] Dkt. 215-1, *Ex. 30* at IHC 1576.

[114] *Id.*

[115] *Id.*

[116] *Id.* at IHC 1576–77.

[117] *Id.* at IHC 1576–81.

independent physician not on SelectHealth's payroll.[118]  The therapist argued Doe's treatment

was medically necessary under LOCUS and, according to research, highly effective.[119]  The letter

opined that Doe's variable symptoms were expected, given her severe trauma, and the staff had

reasonable expectations that Doe would improve with ongoing treatment at Austen Riggs.[120]

Finally, the therapist strongly disagreed with Whittle's recommendations for care in Utah.[121]  The

therapist explained why the two recommended programs were inappropriate to treat Doe's

symptoms and asked SelectHealth's independent reviewer "to address this concern so that these

two facilities do not continue to be suggested as adequate alternatives."[122]

A SelectHealth review committee, including Dr. Whittle, denied the second-level appeal

on March 9, 2018.[123]  The committee explained,

> SelectHealth covers residential treatment center services in limited circumstances
> when specific criteria are met.  The committee reviewed the medical records and
> agreed that the care provided does not meet criteria for residential level of care.
> The notes do not indicate any discharge planning or transition to an alternative
> level of care.  Furthermore, there is no indication of goals or progress towards
> goals except to address persistent SI.  There is no evidence of recovery during this
> stay.[124]

The letter then quoted the medical necessity provision from the Plan as the basis for the denial.[125]

Finally, the letter gave notice that the formal internal appeal process was complete but further

review was available through filing an ERISA claim.[126]

---

[118] *Ex. 30* at IHC 1579.

[119] *Id.* at IHC 1579–80.

[120] *Id.* at IHC 1579–81.

[121] *Id.* at IHC 1581.

[122] *Ex. 30* at IHC 1581.

[123] *Ex. 15* at IHC 2935.

[124] *Id.*

[125] *Id.*

[126] *Id.* at IHC 2936.

## B.  Second Stay

### 1.  *Initial Denial*

Doe requested preauthorization for the Second Stay in September 2017.  SelectHealth initially denied the request on September 18, 2017.[127]  The denial letter indicated the services did "not meet medical criteria."[128]  It quoted Policy 475 and concluded there were qualified services in Utah which were better suited to incorporate Doe's family and facilitate aftercare.[129]  Specifically, the letter referenced Center for Change and New Roads, a behavioral treatment center for adults with mental health and substance abuse disorders.[130]  Finally, the letter noted Doe had "already participated in this level of care with no real alteration of . . . outcome."[131]

After a peer-to-peer review, the preauthorization denial was upheld in a follow-up letter on September 22, 2017.[132]  This letter contained the same information found in the September 18 letter, with an additional statement reiterating that all the services provided to Doe were within the range and skill of local, in-network facilities.[133]

### 2.  *Level-One Appeal and Denial*

Doe appealed the denial of coverage for the Second Stay in March 2018.[134]  Doe argued a second residential stay at Austen Riggs was "essential" since her depression progressed despite

---

[127] Dkt.217-7, *Ex. 37* at IHC 697.

[128] *Id.*

[129] *Id.*

[130] *Id.*

[131] *Id.*

[132] Dkt. 217-6, *Ex. 36* at IHC 710.

[133] *Id.*

[134] Dkt. 214-1 at IHC 2106; Dkt. 217-5 at IHC 1719–1760.

the ECT and medications in Utah.[135]  She defended her perceived lack of progress during the First Stay, arguing the work required to process her severe and long-lasting trauma is destabilizing.[136]  She also challenged SelectHealth's Utah-based recommendations, writing "I have . . . researched the treatment options available in Utah and feel confident in saying they are completely inadequate for the complexity and severity of my psychiatric illness."[137]

Attached to the appeal were Doe's medical records and therapist notes from September to December 2017, along with letters from a treating doctor and psychotherapist.[138]  The letter from Doe's psychotherapist pointed out SelectHealth again incorrectly identified Doe's diagnosis as solely MDD, omitting her PTSD and other personality disorders.[139]  According to the psychotherapist, the combination of diagnoses required more intense treatment than SelectHealth could offer at the suggested Utah facilities.[140]  The therapist requested SelectHealth provide "a more elaborate explanation as to why [it] continues to recommend these psychiatric facilities which do not provide comparable intensive treatment . . . and do not seem geared toward the complex psychiatric co-morbidity that [Doe] suffers from."[141]  The letter then referenced the LOCUS standards and explained Doe met these criteria for residential psychiatric treatment.[142]

---

[135] Dkt. 214-1 at IHC 2106.

[136] *Id.*

[137] *Id.*

[138] Dkt. 217-5 at IHC 1719–1760.

[139] Dkt. 271-1 at IHC 2108.

[140] *Id.*

[141] *Id.*

[142] *Id.*

SelectHealth denied the first-level appeal for Doe's Second Stay on April 18, 2018.[143] The reviewing physician gave two bases for denial: 1) network facilities could provide the treatment Doe needed and there was "no evidence," other than the opinions of Doe and her therapist, to conclude network facilities were inadequate; 2) documentation did not establish Doe "met criteria for [residential treatment] level of care."[144]  Quoting the medical necessity provision from the Plan, SelectHealth rejected the appeal and denied coverage.[145]  The letter concluded by informing Doe of her appeal options and stated "second level mandatory review is required by the Plan before you may pursue judicial review" under ERISA.[146]

### 3. *Level-Two Appeal and Denial*

On June 14, 2018, Doe submitted a level-two appeal for the Second Stay.[147]  This appeal included another letter from Doe's psychotherapist and was accompanied by hundreds of pages of medical records and therapy notes—for the first time including all the documentation from April 2017 to April 2018.[148]  Doe's therapist argued SelectHealth's benefits denial was improper for three reasons.[149]  First, the plan's geographic restrictions were, according to the therapist, discriminatory and clinically insupportable.[150]  Second, SelectHealth failed to apply "generally accepted standards of medical practice" to evaluate her care, as required by the Plan.[151]  Third,

---

[143] Dkt. 221-3 at IHC 564.

[144] *Id.*

[145] *Id.*

[146] *Id.* at IHC 565.

[147] *See generally Ex. 15* at IHC 2109–2936.

[148] *See generally id.*

[149] *Ex. 15* at IHC 2110.

[150] *Id.*

[151] *Id.*

SelectHealth showed "flagrant disregard" for the clinical evidence showing Doe's care was medically necessary.[152]  The therapist went on to challenge SelectHealth's medical conclusions with references to scholarly research articles, Austen Riggs treatment statistics, and facts from the record.[153]

SelectHealth denied the level-two appeal for the Second Stay on July 19, 2018.[154]  Other than updating the dates and committee members in the opening paragraph, the letter quoted verbatim from the level-two denial letter for the First Stay.[155]  It relied on the same rationales for denial as on the First Stay (criteria unmet, no discharge planning or goal-setting, lack of recovery) with no new facts or analysis.[156]  The letter again quoted the medical necessity provision before concluding with information about Doe's litigation options.[157]

## IV.    Procedural History

Having exhausted her prelitigation options, Doe filed a Complaint with this court on October 17, 2018.[158]  After several amendments,[159] Plaintiff's operative Complaint includes seven causes of action: (1) individual claim for recovery of benefits under 29 U.S.C. § 1132(a)(1)(B); (2) individual claim for injunctive relief under 29 U.S.C. § 1132(a)(3)(A); (3) individual claim for equitable relief under 29 U.S.C. § 1132(a)(3)(B); (4) individual claim for statutory penalties

---

[152] *Id.*

[153] *Id.* at IHC 2110–20.

[154] Dkt. 221-9 at IHC 567.

[155] *Id.*

[156] *Id.*

[157] *Id.*

[158] Dkt. 2.

[159] The operative Complaint is the Third Amended Complaint. Dkt. 150.  The parties stipulated to the First Amended Complaint.  Dkt. 33.  Plaintiff filed the Second Amended Complaint after the court granted a Motion to Dismiss one claim from the First Amended Complaint.  *See* Dkts. 40, 68, 70, 74.  And, upon objections from Defendants, the court granted Plaintiff leave to file a Third Amended Complaint.  *See* Dkts. 112, 128, 131, 147.

under 29 U.S.C. § 1132(c); (5) class claim for recovery of benefits and to clarify future benefits;

(6) class claim for injunctive relief under 29 U.S.C. § 1132(a)(3)(A); and (7) class claim for

equitable relief under 29 U.S.C. § 1132(a)(3)(B).

On December 5, 2018, Doe requested certain Plan documents from IHC:

1. All instruments (including the NCQA Utilization Management Program
   Description) reflecting the non-quantitative treatment limitations imposed by
   the Select Med Plus Plan in 2017 and 2018, and all instruments analyzing the
   nonquantitative treatment limitations imposed by the Select Med Plus Plan in
   2017 and 2018[.]
2. Reimbursement methodologies and schedules for all out-of-network benefits
   for 2017 and 2018[.][160]

IHC responded the next month.[161] As to the first request, IHC took the position that

federal law did not require the disclosure of such documents because they are not binding on

SelectHealth and not part of the formal Plan documents.[162]  IHC did provide copies of the

policies and criteria applicable to Doe's claims, along with criteria for in-patient treatment on

selected disorders.[163]  IHC took the same position on the request for reimbursement schedules

and methodologies.[164]  In lieu of the requested documents, IHC enclosed copies of the 2017 and

2018 Health Insurance Handbooks with the pay schedules for in-network and out-of-network

facilities.[165]

Plaintiff subsequently filed a request for production seeking the Plan's 2017 and 2018

reimbursement methodologies and schedules, specifically those for inpatient mental health and

---

[160] Dkt. 221-10, *Ex. 49*.

[161] Dkt. 221-11, *Ex.50*.

[162] *Id.*

[163] *Id.*

[164] *Id.*

[165] *Id.*

medical/surgical benefits.[166]  SelectHealth created a reimbursement schedule for residential

mental health treatment for the purposes of responding to this discovery request.[167]  Defendants

objected to the other portion of the request seeking reimbursement schedules for inpatient

medical/surgical benefits.[168]  Nevertheless, they provided a number of other documents in

response, including: a summary of in-network target rates for certain analogous medical/surgical;

a summary of out-of-network rates for analogous care facilities; and, an explanation of

reimbursement methodology for different types of claims.[169]  With these documents, Defendants

asserted they had met their discovery obligations for this request.[170]

On July 22, 2022—the dispositive motion deadline—Plaintiff filed the present Motion

under Federal Rule of Civil Procedure 56(a) seeking summary judgment on Doe's individual

claims (Counts 1–4).[171]  Defendants did not file their own Rule 56(a) motion for summary

judgment but requested in their response brief "that summary judgment be entered in their favor

pursuant to Rule 56(f)(1) because Plaintiff has not met . . . her burden of proof on these

claims."[172]  On March 9, 2023, the court held a hearing on the Motion and now issues its

decision.[173]

---

[166] Dkt. 221-12, *Ex. 51*.

[167] Dkt. 221-13, *Ex. 52* at A.

[168] Dkt. 227-9, at 3–4.

[169] *Id.* at 4–9.

[170] *Id.* at 7.

[171] *See MSJ*.

[172] Dkt. 256, *Response to Plaintiff's Motion for Summary Judgment on Counts One Through Four* (*Response*) at 2.

[173] Dkt. 282, *Minute Entry for March 9, 2023.*

## LEGAL STANDARD

Summary judgment is appropriate under Rule 56(a) if the movant demonstrates there is "no genuine dispute as to any material fact" and it is "entitled to judgment as a matter of law."[174] The court must view the facts and draw all reasonable inferences in a light favorable to the nonmoving party.[175]

"[T]he moving party carries the burden of showing beyond a reasonable doubt that it is entitled to summary judgment."[176]  If the moving party also carries the burden of persuasion at trial, "a more stringent summary judgment standard applies."[177]  In those circumstances, the moving party obtains summary judgment only if it establishes, "as a matter of law, all essential elements of the issue."[178]  The nonmovant is then "obligated to bring forward any specific facts alleged to rebut the movant's case."[179]

Subsection (f) of Rule 56 allows a court to grant summary judgment for a nonmovant after giving the opposing party "notice and a reasonable time to respond."[180]  This rule recognizes district courts' "widely acknowledged . . . power to enter summary judgments sua sponte."[181]  But "[t]his power should be exercised sparingly and with great circumspection."[182]

---

[174] Fed. R. Civ. P. 56(a).

[175] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

[176] *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008) (internal quotation marks and citations omitted).

[177] *Id.* at 1280.

[178] *Id.* (internal citations and quotations omitted).

[179] *Id.*

[180] Fed. R. Civ. P. 56(f).

[181] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986).

[182] *McCoy v. Town of Pittsfield, NH*, 59 F.4th 497, *4 (1st Cir. 2023) (internal citations and quotations omitted); *see Oldham v. O.K. Farms, Inc.*, 871 F.3d 1147, 1150 (10th Cir. 2017) ("[T]hough we generally don't favor the granting of summary judgment *sua sponte*, a district court may do so if the losing party was on notice that she had to come forward with all her evidence.").

## ANALYSIS

There are four causes of action presently before the court: (1) an individual claim for wrongful denial of benefits under ERISA, (2) an individual claim for injunctive relief for violations of the Parity Act, (3) an individual claim for equitable relief for violations of the Parity Act, and (4) a request for statutory penalties.[183]  The court begins by evaluating the denial of benefits before turning to the Parity Act claims and the request for statutory penalties.

## I.        BENEFITS (Claim One)

ERISA was designed "to promote the interests of employees and their beneficiaries."[184] To that end, ERISA provides a civil enforcement mechanism, allowing plan participants to seek judicial review of an administrative denial of benefits and recover the benefits due under the terms of their ERISA plan.[185]  The deference a court affords a benefits determination on judicial review depends upon the amount of discretion granted the claims review fiduciary and whether the fiduciary properly exercised that discretion in denying the claim.[186]

Plaintiff seeks judicial review of SelectHealth's denial of benefits and asserts the court should review the determination de novo.  Plaintiff argues she is entitled to summary judgment on Doe's claim for benefits regardless the standard of review because SelectHealth violated Plan terms in declining coverage.[187]  SelectHealth disagrees, arguing its decision to deny benefits was

---

[183] *See MSJ* at 2; *Response* at 2.

[184] *Millsap v. McDonnell Douglas Corp.*, 368 F.3d 1246, 1249–50 (10th Cir. 2004) (internal citations and quotations omitted).

[185] *See Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1315 (10th Cir. 2009); 29 U.S.C. § 1132(a)(1)(B).

[186] *See Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 631–37 (10th Cir. 2003).

[187] *MSJ* at 25.  Doe was a beneficiary of the Plan and Smith, as her personal representative, acts on her behalf in litigating these claims.

proper under any standard of review.[188]  Before discussing the claim for denial of benefits, the

court addresses the applicable standard of review.[189]

### A.  STANDARD OF REVIEW

A denial of benefits is reviewed de novo unless the plan gives the claims review fiduciary

"discretionary authority to determine eligibility for benefits or to construe the terms of the

plan."[190]  If the plan grants the fiduciary discretionary authority, the court applies a deferential

standard of review, "asking only whether the denial of benefits was arbitrary and capricious."[191]

But this deferential standard of review applies only if the fiduciary properly exercised its

discretion by complying with ERISA in making its determination.[192]  Less deference is given

where the fiduciary fails to comply with ERISA's procedural requirements.[193]

The Tenth Circuit previously "declined to apply a hair-trigger rule requiring de novo

review whenever the plan administrator, vested with discretion, failed in any respect to comply

with the procedures mandated by" ERISA regulations.[194]  Instead, if an administrator

"substantially complied" with ERISA's procedural requirements, its decision was reviewed de

novo.[195]  Substantial compliance is met if the procedural irregularities shown are (1)

---

[188] *Response* at 59–74.

[189] *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010).

[190] *Rasenack*, 585 F.3d at 1315 (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).

[191] *LaAsmar*, 605 F.3d at 796.

[192] *Rasenack*, 585 F.3d at 1315 ("Under trust principles, a deferential standard of review is appropriate when trustees actually exercise a discretionary power 'vested in them by the instrument under which they act.'" (quoting *Firestone*, 489 U.S. at 111)).

[193] *Id.* at 1316–17.

[194] *LaAsmar*, 605 F.3d at 799 (internal citation and emphasis omitted).

[195] *See Gilbertson*, 328 F.3d at 634.

inconsequential, and (2) "in the context of an ongoing, good faith exchange of information between the administrator and the claimant."[196]

Subsequent amendments to ERISA have called into question the continued viability of the substantial compliance doctrine.[197]  Still, a failure to substantially comply with ERISA's procedural requirements warrants de novo review.[198]  The party arguing for a more deferential standard of review bears the burden of establishing its applicability.[199]

Neither party disputes the Plan grants SelectHealth discretionary authority to determine eligibility for Plan benefits and to construe the terms of the Plan.[200]  Plaintiff argues SelectHealth abused its discretionary authority by violating ERISA's procedural requirements in denying Doe's claims, thereby warranting de novo review of the benefits determinations.[201]  Specifically, Plaintiff argues SelectHealth committed three serious procedural irregularities: (1) the adverse benefits determinations "failed to identify any Plan term that was the basis for the denial," (2) the administrative appeal process did not provide Doe a full and fair review of her claims, (3) SelectHealth failed to reasonably consider all documents supporting the appeals.[202]  The court addresses each argument in turn.

---

[196] *Id.* at 635.

[197] *Rasenack,* 585 F.3d at 1316; *see Kellogg v. Metro. Life Ins. Co.,* 549 F.3d 818, 828 (10th Cir. 2008); *Hancock v. Metro. Life Ins. Co.*, 590 F.3d 1141, 1152 n.3 (10th Cir. 2009).

[198] *Rasenack*, 585 F.3d at 1315–17.

[199] *LaAsmar*, 605 F.3d at 796.

[200] Dkt. 127-2, *IHC Plan* at IHC 193 ("Intermountain as Plan Administrator has delegated its discretionary authority with respect to making and reviewing benefit claims determinations to SelectHealth.  As a claims review fiduciary, each such company has sole discretionary authority to determine the availability of benefits under the plan . . . .").

[201] *MSJ* at 22.

[202] *MSJ* at 23–24.

1. <u>Failure to Identify Specific Plan Provisions</u>

For denials of a claim, ERISA regulations require an administrator to reference "the specific plan provisions," and the "internal rule, guideline, protocol, or other similar criterion" relied upon in making the adverse determination.[203]  This information must be communicated "in a manner calculated to be understood by the claimant."[204]  "In simple English, what this regulation calls for is meaningful dialogue between ERISA plan administrators and their beneficiaries."[205]  A denial must be clearly stated and if more information is needed, an administrator must clearly ask for it.[206]  In the words of Judge Kozinski, "There is nothing extraordinary about this: it's how civilized people communicate with each other regarding important matters."[207]

Plaintiff argues Defendants violated this notice regulation by failing to identify the specific plan provision relied upon in denying Doe's claim for benefits.[208]  In reply, Defendants argue the denial letters sufficiently identified plan terms by referencing an internal policy, indicating Doe's request did "not meet medical criteria," and quoting the medical necessity provision of the plan in the first-level appeals.[209]  Plaintiff argues, and the court agrees,

---

[203] 29 C.F.R. § 2560.503-1(g)(1)(ii), (v)(A) (procedural requirements for notification of a benefit determination); 29 C.F.R. § 2560.503-1(j)(2), (5)(i) (procedural requirements for notification of a benefit determination on review).

[204] 29 C.F.R. § 2560.503-1(g), (j).

[205] *Gilbertson*, 328 F.3d at 635 (quoting *Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997).

[206] *See id.*; *see also Grossmuller v. Int'l Union*, 715 F.2d 853, 858 (3d. Cir. 1983) ("The fiduciary must notify the participant . . . in writing and in language likely to be understood by laymen . . . .").

[207] *Id.* (quoting *Booton*, 110 F.3d at 1463).

[208] *MSJ* at 23.

[209] *Response* at 62.

Defendants still fall short in communicating the basis for denial in a reasonably clear manner as required.[210]

Both initial denial letters fail to identify a "specific plan provision on which the benefit determination is made."[211]  The letters obliquely state Doe's request for coverage "does not meet medical criteria."  There's nothing specific about this reference, and Defendants do not claim this language refers to a specific Plan provision.[212]  The initial denial letter for the First Stay references the internal InterQual criteria for residential treatment mental health services but without tying it to the Plan.[213]  Similarly, the initial denial letters for the Second Stay reference internal Policy 475 without identifying how this Policy applies to the terms of the Plan.[214]  While the follow-up appeal denials are more helpful, none of them clearly identify both the Plan provision, and the internal policy and specific criteria relied upon for the benefits determination.[215]  A claimant reading these letters would be hard-pressed to understand the full basis for denial.  Thus, the court finds a serious procedural irregularity on this basis.[216]

---

[210] *Reply MSJ* at 7–8.

[211] *See* 29 C.F.R. 2560.503-1(g)(1)(ii); *see also Ex. 27* at IHC 670; *Ex. 36* at IHC 710; *Ex. 37* at IHC 697.

[212] *Response* at 62.

[213] *Ex. 27* at IHC 670.

[214] *Ex. 36* at IHC 710; *Ex. 37* at IHC 697.

[215] *See Ex. 44* at IHC 571–72 (first-level appeal for First Stay: mentions medical necessity but does not reference Policy 475 or InterQual criteria); *Ex. 43* at IHC 574 (second-level appeal for First Stay: same); *Ex. 42* at IHC 564–65 (first-level appeal for Second Stay: same); *Ex.48* at 567–68 (second-level appeal for Second Stay: same).

[216] Defendants briefly argue Doe cannot establish she was prejudiced by any failure to identify Plan provisions in denial letters.  *Response* at 62.  Defendants cite *Holmes v. Colorado Coalition for Homeless Long Term Disability Plan*, 762 F.3d 1195 (10th Cir. 2014) in support.  But in *Holmes*, the court evaluated prejudice in deciding whether a claim could be deemed denied and excuse the claimant's failure to exhaust administrative remedies.  762 F.3d at 1212–13 ("Although this circuit has not had prior occasion to consider application of the deemed-exhausted provision to violations of ERISA's notice and disclosure requirements, other circuits have consistently limited its application to situations where such violations prejudice claimants by denying them a reasonable review procedure.").  Without more, this does not provide a basis to apply the concept here, where the court is analyzing an administrator's compliance with ERISA's procedural regulations to determine the proper standard of review.

2. <u>Full and Fair Review</u>

ERISA requires plan administrators to afford participants a "reasonable opportunity" to obtain a "full and fair review" of an adverse benefits determination.[217]  To effectuate this policy, regulations impose upon administrators a duty to, among other things, provide adequate notice and an unbiased review of the claim.[218]  Plaintiff claims Doe did not receive a full and fair review in three ways: (a) the first-level appeals denial letters cited a new rationale, robbing Doe of notice and an opportunity to respond, (b) the same physician reviewer evaluated both levels of appeals for the First Stay, and (c) the first-level appeal denials incorrectly explained the review process and requirements.[219]  The court addresses each argument in turn.

a. *Notice and Opportunity to Respond*

First, as part of providing a full and fair review, claimants must be given notice and an opportunity to respond when an administrator uses new or additional rationale in a final benefits denial.[220]  As noted, both Doe's initial denial letters failed to mention medical necessity as grounds for denying coverage.[221]  After she appealed the benefits determination, the first-level appeals letters cited the medical necessity provision of the Plan as the basis for denial.[222]  Doe argues this violates ERISA's full and fair review requirement.[223]  But this was not a final adverse

---

[217] 29 U.S.C. § 1133.

[218] *See, e.g., Brimer v. Life Ins. Co. of N. Am.*, 462 Fed. App'x 804, 808–809 (10th Cir. 2012) (citing 29 C.F.R. § 2650.503-1(g)(1)(i)–(iii); 29 C.F.R. § 2560.503-1(h)(2)).

[219] *MSJ* at 24.

[220] 29 C.F.R. § 2590.715-2719(b)(2)(C)(2); *see Mark M. v. United Behav. Health*, No. 2:18-cv-00018-BSJ, 2020 WL 5259345, at *9 (D. Utah Sept. 3, 2020).

[221] *See Exs. 27, 36, 37.*

[222] *See Exs. 42, 43, 44, 48.*

[223] 29 C.F.R. § 2590.715-2719(b)(2)(C)(1)–(2); *see MSJ* at 24.

benefits determination and Doe had an opportunity to respond with her second-level appeals.[224]

Thus, the letters do not violate this requirement.

### b. Impartial Review

Next, a full and fair review also includes an appeal conducted by an impartial, properly

trained doctor.[225]  When an adverse benefits decision is "based in whole or in part on a medical

judgment," the regulations require the administrator to "consult with a health care professional

who has appropriate training and experience in the field of medicine involved," who is not "an

individual who was consulted in connection with the adverse benefit determination that is the

subject of the appeal."[226]

Plaintiff argues Selecthealth violated this provision by consulting with the same and only

psychiatrist for Doe's first- and second-level appeals on the First Stay.[227]  Defendants claim there

was no violation.[228]  They argue this provision only prohibits the doctor who issued the initial

benefits determination from reviewing the appeal, thus allowing the same doctor to consult on

different levels of appeal.[229]  In return, Plaintiff points to a case from New York and this

statement from the Department of Labor website: "[T]he second level of review is subject to the

same standards that apply to the first level of review. . . . [T]he reviewer must not be the same

---

[224] Plaintiff asserts Doe "only filed the second-level appeals because SelectHealth repeatedly misled her that two levels of review were required under the Plan." *Reply MSJ* at 8.  Regardless the reason, Doe was afforded an opportunity to respond to the new rationale.

[225] *See* 29 C.F.R. § 2560.503(h)(3)(ii), (v).

[226] *See* 29 C.F.R. § 2560.503(h)(3)(v).

[227] *MSJ* at 24.

[228] *Response* at 64.

[229] *Id.*

person who made the first level review decision on the claim."[230]  Although the law on this point is sparse, the available cases indicate SelectHealth violated this provision and committed a procedural irregularity.

The regulation does not define "adverse benefit determination."[231]  By its plain language, the phrase could include both an initial denial and denial of an appeal.[232]  Thus, the regulation could be read as prohibiting review by the same medical doctor "who was consulted in connection with" a denial of a first-level appeal that is now the subject of a second-level appeal.[233]

Courts are split over whether, based on this provision, a full and fair review requires a new medical professional to evaluate a second-level appeal.[234]  Most courts addressing the issue look to whether the administrator relied upon or gave deference to the opinion of the same doctor in the first and second appeal, or if the administrator consulted additional qualified doctors for

---

[230] *Reply MSJ* at 8 (quoting *Benefit Claim Procedure Regulation FAQs*, Dep't of Labor, https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/faqs/benefit-claims-procedure-regulation (last visited July 31, 2023)).

[231] *See* 29 C.F.R. § 2560.503-1(h)(3)(v).

[232] *See id.*; *see also Schultz v. PNC Fin. Servs. Grp., Inc. & Affiliates Long-Term Disability Plan*, 58 F. Supp. 3d 782, 791 (E.D. Ky. 2014) ("Admittedly, 'the plain meaning of the regulation's text does not clearly indicate whether all physicians consulted during the appeal process must be new physicians, or whether at least one new physician will suffice.'" (quoting *Wintermute v. The Guardian*, 524 F.Supp.2d 954, 963 (S.D.Ohio 2007))).

[233] *See* 29 C.F.R. § 2560.503-1(h)(3)(v).

[234] *Compare Krysten C. v. Blue Shield of Ca.*, 721 F. App'x 645, 647 (9th Cir. 2018) ("ERISA does not mandate new decision-makers for a review of an appeal."), *and White v. Standard Ins. Co.*, 895 F. Supp. 2d 817, 851 (E.D. Mich. 2012) ("ERISA does not require administrators who allow a voluntary second appeal to consult a third physician."), *aff'd,* 529 F. App'x 547 (6th Cir. 2013), *with Lafleur v. La. Health Serv. & Indem. Co.*, 563 F.3d 148, 156–57 (5th Cir. 2009) ("While the same doctor can participate in (rather than conduct) both administrative appeals, *exclusive reliance* on the opinion of the same doctor in both appeals runs afoul of § 2560.503-1(h)(3)(ii).")

the second appeal.[235]  Often, an administrator is allowed to use the same doctor for both appeals provided it "also considers the opinion of a new, qualified medical professional."[236]

Although the parties did not cite controlling caselaw, there are two cases with factually similar circumstances coming out of this court and the Tenth Circuit.[237]  In both cases, a doctor consulting on a second-level appeal had also participated in earlier decisions for the claim.[238]  Nevertheless, the courts determined the administrator complied with ERISA by ensuring the opinion of another unrelated and qualified medical reviewer provided the basis for denying the second appeal, thereby curing the procedural irregularity.[239]

While it is unclear exactly what ERISA requires in these circumstances, based on this case law, SelectHealth's failure to consult an unrelated, qualified reviewer for the second-level appeal on the First Stay denied Doe a fair and full review.  Dr. Scott Whittle, a board-certified psychiatrist, reviewed and denied Doe's first-level appeal for the First Stay.[240]  Doe's second-level appeal was then reviewed by "a committee consisting of a SelectHealth medical director who is board certified in family medicine, a manager in Pharmacy Services who is a licensed pharmacist, a manager in Product Development, and a consumer representative."[241]  The

---

[235] *See Wintermute*, 524 F. Supp.2d at 963 ("While ClaimSource did rely on Drs. Randolph and Stevens during the initial and appellate reviews, it also consulted with new physicians in the appeal process[.]"); *Crosby v. Blue Cross/Blue Shield of La.*, No. CIV.A. 08-693, 2012 WL 5493761, at *8 (E.D. La. Nov. 13, 2012) (evaluating whether use of the same doctor "'effectively' gave deference to the First Level Appeal determination"); *Hoffman v. Screen Actors Guild Producers Pension Plan*, 757 F. App'x 602, 612 n.9 (9th Cir. 2019) ("[N]othing in ERISA prohibits the Plan from *also* relying on the previous doctor's opinion, provided that the Plan also considers the opinion of a new, qualified medical professional.").

[236] *Hoffman*, 757 F. App'x at 612 n.9.

[237] *See Dardick v. Unum Life Ins. Co. of Am.*, 739 F. App'x 481, 488 (10th Cir. 2018); *Chatterron v. IHC Health Plans, Inc.*, No. 2:05-cv-130 TC, 2006 WL 1073466, at *15 (D. Utah Apr. 20, 2006).

[238] *Dardick*, 739 F. App'x at 484; *Chatterron*, 2006 WL 1073466 at *15.

[239] *Dardick*, 739 F. App'x at 488; *Chatterron*, 2006 WL 1073466 at *15.

[240] *Ex. 44* at IHC 571–72; *see also* Dkt. 221-1, *Ex. 40* at IHC 2098–99.

[241] *Ex.43* at IHC 574–75.

committee consulted with Dr. Whittle before denying the appeal.[242]  Thus, not only was Dr.

Whittle consulted for both the first- and second-level appeals for the First Stay, he was the only

healthcare professional with the proper qualifications to evaluate Doe's claim on both appeals.[243]

And a review of the committee notes shows the committee relied heavily on Dr. Whittle's

opinion to deny the claim.[244]  Unlike the Utah and Tenth Circuit cases cited, there was no other

doctor on the panel qualified to opine on Doe's records and cure the procedural irregularity

arising from exclusive reliance on the same doctor for both decisions.[245]  The court finds a

serious procedural irregularity on this basis.

### c.  Information Concerning Appeal Procedures

Finally, a full and fair review "requires administrators to provide plan participants with

the opportunity to submit additional documents [and] make sure participants have reasonable

access to information relevant to their claim."[246]  To that end, participants must be notified "in a

manner calculated to be understood by the claimant" of "any voluntary appeal procedures

offered by the plan" and their right to bring an action under ERISA.[247]

---

[242] *Ex.45* at IHC 577–78.

[243] *See* 29 C.F.R. § 2560.503-1(h)(3)(iii).

[244] *Ex.45* at IHC 577–80.

[245] *See Lafleur*, 563 F.3d at 157 ("While the same doctor can participate in (rather than conduct) both administrative appeals, *exclusive reliance* on the opinion of the same doctor in both appeals runs afoul of § 2560.503-1(h)(3)(ii)."); *Dardick*, 739 F. App'x at 488 ("Moreover, even if having Ms. Grover review the file twice was irregular, we agree with the district court that having Dr. Bartlett also review the medical evidence for the second appeal cured any irregularity."); *Chatterron*, 2006 WL 1073466 at *15 (finding an administrator substantially complied with ERISA because, even though the same doctor consulted in both appeals, it was not his opinion that was the basis for the second denial but another unrelated and qualified medical reviewer).

[246] *M.S. v. Premera*, 553 F. Supp. 3d 1000, 1023 (D. Utah 2021).

[247] 29 C.F.R. § 2560.503-1(j)(4)(i).

Plaintiff argues, and Defendants do not deny, that the denial letters misinformed Doe of her appeal rights.[248]  The denial letters for both first-level appeals stated, "the Plan allows you to request a second review of this appeal. . . . This second level mandatory review is required by the Plan before you may pursue judicial review."[249]  The Plan did not in fact require a claimant to file a second appeal before seeking judicial review.[250]  However, Defendants argue Plaintiff suffered no prejudice from this error because the statute of limitations did not expire, nor was her claim rejected for failure to exhaust.[251]  In Reply, Plaintiff asserts Doe "only filed the second-level appeals" due to the miscommunication.[252]

The court agrees Defendants' miscommunication constitutes a procedural irregularity but concludes it does not rise to the level of a "serious procedural irregularity."  Even though the letters confused the appeals procedure, the Plan documents were accurate.[253]  And although the information in the denial letters was internally inconsistent—first stating the second appeal was permissive and later stating it was mandatory—ultimately, Doe was informed of a right to appeal and her right to judicial review.[254]  If Doe was confused concerning the second-level appeals, she could clear up the miscommunication by referring to the Plan or calling the informational

---

[248] *MSJ* at 24; *Response* at 64.

[249] *Ex. 44* at IHC 572; *Ex. 42* at IHC 565.

[250] *Ex. 1* at IHC 87–89.

[251] *Response* at 64.

[252] *Reply MSJ* at 8.

[253] *Compare Ex. 44* at IHC 572, *and Ex. 42* at IHC 565, *with Ex. 1* at 87–89.

[254] *See Ex. 44* at IHC 572; *Ex. 42* at IHC 565.

number provided in the denial letters.[255]  As for prejudice, the court declines to apply this here given Defendants cite no case law analyzing prejudice in this context.[256]

Altogether, Plaintiff was denied a full and fair review due to serious procedural irregularities.  Doe did receive notice and an opportunity to respond and was informed of her right to appeal the denial, but she did not receive an unbiased, impartial review by an unrelated and qualified medical professional.

### 3.  Reasonable Consideration of All Submitted Documentation

ERISA regulations contemplate "meaningful dialogue" between plan administrators and claimants during the claim process.[257]  One means to accomplishing this is by providing claimants with "a review that takes into account all comments, documents, records, and other information submitted by the claimant."[258]  Plaintiff argues Selecthealth violated this provision because its second-letter denials failed to address documents submitted on appeal highlighting why facilities in Utah were unsuitable for Doe's diagnosis and "instead continu[ed] to assert that in-state treatment" facilities would be appropriate.[259]

But ERISA does not require an administrator "to explicitly discuss" or "affirmatively respond" to the evidence submitted by the claimant."[260]  All the regulations require are for the administrator to take into account the submitted materials.[261]

---

[255] *Ex. 44* at IHC 572; *Ex. 42* at IHC 565.

[256] *Response* at 64.

[257] *Gilbertson*, 328 F.3d at 635.

[258] 29 C.F.R. § 2560.503-1(h)(2)(iv).

[259] *MSJ* at 24–25.

[260] *Ian C. v. United Healthcare Ins. Co.*, No.2:19-cv-474, 2022 WL 3279860, at *7 (D. Utah Aug. 11, 2022); *Mary D. v. Anthem Blue Cross Blue Shield*, 778 F. App'x 580, 589 (10th Cir. 2019).

[261] *See* 29 C.F.R. § 2560.503-1(h)(2)(iv); *Mary D.*, 778 F. App'x at 589.

All indications here show SelectHealth accounted for the submitted materials when reviewing Doe's second appeal. Both times, the committee reviewed the submitted appeal and the medical records in making a determination.[262] For the First Stay, the committee also spoke with Doe and two Austen Riggs doctors concerning the appeal.[263] And internal emails show at least one committee member explicitly stated she "read through all of the documentation."[264] Plaintiff's claim that SelectHealth continued to assert in-state treatment would be appropriate is perplexing.[265] Both final adverse determinations denied the claim solely based on medical necessity and make no mention of forgoing treatment at Austen Riggs in favor of in-state facilities.[266] In sum, there is no evidence to suggest SelectHealth failed to account for the submitted appeal materials. The court therefore declines to find a serious procedural irregularity on this basis.[267]

In review, Defendants violated their ERISA obligations by failing to identify Plan terms that formed the basis for the denial and failing to provide an unrelated, qualified medical reviewer on second-level appeals. These procedural irregularities did not substantially comply with ERISA. The irregularities were not inconsequential, they fairly interrupted the process,

---

[262] *Ex. 43* at IHC 574; *see Ex. 48* at IHC 567–68.

[263] *Ex. 43* at IHC 574; *see Ex. 45* at IHC 577–79.

[264] *Ex. 45* at IHC 580.

[265] *MSJ* at 25.

[266] *Ex. 43* at IHC 574; *see Ex. 48* at IHC 567–68.

[267] During the pendency of this Motion, the Tenth Circuit issued two opinions addressing ERISA claims. *See D.K. v. United Behavior Health*, 67 F.4th 1224 (10th Cir. 2023); *David P. v. United Healthcare*, --- F.4th ----, 2023 WL 5209748 (10th Cir. 2023). Neither party filed a notice of supplemental authority to incorporate these cases into their arguments. In both cases, the Tenth Circuit interprets the same regulation at issue here but in a slightly different context—looking at the fulness of an administrator's explanation in denying a claim, as compared to this case which asks whether the administrator considered submission materials during administrative appeal. *Compare D.K.*, 67 F.4th at 1240–42, *and David P.*, 2023 WL 5209748 at *13, *with MSJ* at 24–25. Because Plaintiff raises a different argument and did not cite either of these cases as supplemental authority, the court declines to address them here.

denying Doe an "on-going, good-faith exchange of information."[268]  For that reason, the court

concludes Doe is entitled to de novo review on her claim for denial of benefits.

## B.  DENIAL OF BENEFITS

Under a de novo standard, the court accords no deference to SelectHealth's denial of

benefits.[269]  Instead, it independently reviews "the facts and opinions in the administrative

record" to determine whether SelectHealth made a correct benefits decision based on the

rationales articulated in the record.[270]  The claimant's award of benefits becomes an independent

decision made by the court considering the same evidence evaluated by the administrator.[271]

Thus, any arguments concerning the administrator's reliance on non-plan terms or improper

criteria have no bearing on the court's analysis.[272]  Rather, the question is whether, under the

plan, "the plaintiff's claim for benefits is supported by a preponderance of the evidence."[273]  The

plaintiff bears the burden of proving entitlement to benefits.[274]

This "distinct standard of review" is applied to the denial of benefits alongside the

overarching summary judgment standard governing the Motion.  Namely, whether Plaintiff

shows "(1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a

---

[268] *LaAsmar*, 605 F.3d at 800 (internal citation and quotations omitted).

[269] *See, e.g.*, *Niles v. Am. Airlines, Inc.*, 269 F. App'x 827, 832 (10th Cir. 2008).

[270] *Dewsnup v. Unum Life Ins. Co. of Am.*, No. 2:17-cv-00126-TC, 2018 WL 6478886, at *7 (D. Utah Dec. 10, 2018) (quoting *Richards v. Hewlett-Packard Corp.*, 592 F.3d 232, 239 (1st Cir. 2010)); *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1190 (10th Cir. 2007).

[271] *David P. v. United Healthcare Ins. Co.*, 564 F. Supp. 3d 1100, 1123 (D. Utah 2021).

[272] *Christine S. v. Blue Cross Blue Shield of N.M.*, No. 2:18-cv-00874-JNP-DBP, 2021 WL 4805136, at *4 (D. Utah Oct. 14, 2021).

[273] *L.C. v. Blue Cross & Blue Shield of Tex.*, No. 221-cv-00319-DBB-JCB, 2023 WL 1930227, at *12 (D. Utah Feb. 10, 2023).

[274] *Rasenack*, 585 F.3d at 1324.

matter of law," drawing all inferences and viewing the facts in a light most favorable to Defendants.[275]  The court must "apply this dual burden" in evaluating the denial of benefits.[276]

Here, before the court can evaluate whether Plaintiff established an entitlement to benefits, two preliminary determinations must be made.  First, the court must determine what rationales SelectHealth used in denying benefits.  And second the court must determine what properly constitutes Plan criteria for coverage.  The court will address those questions before turning to Doe's entitlement to benefits.[277]

### 1. Rationales for Denial[278]

On de novo review, "the federal courts will consider only those rationales that were specifically articulated in the administrative record as a basis for denying a claim."[279]  A rationale must be "written in a manner calculated to be understood by the participant."[280]  Plaintiff concedes one rationale used for denying Doe's claim was Policy 475.[281]  But Plaintiff contends SelectHealth cannot rely on medical necessity or InterQual criteria as rationales for denying the claim.  The court disagrees, as explained below.

---

[275] *Lyn M. v. Premera Blue Cross*, 966 F.3d 1061, 1064–65 (10th Cir. 2020).

[276] *Id.* at 1065.

[277] Plaintiff frames her arguments in terms of arbitrary and capricious review.  *See MSJ* at 26–30; *see also MSJ* at 26 n.3.  Since this is de novo review, the court addresses these arguments under a different framework.

[278] Plaintiff consolidates the denial rationales for the two stays, essentially treating the decisions to deny benefits for the two stays as one.  *See generally MSJ* at 25–30; *Reply MSJ* at 9–21.  While there may be a basis to evaluate coverage for each stay on its own terms—reviewing the denials and health records independently—Plaintiff does not make such a request.  Thus, the court considers the two stays and denial decisions as one collective decision.  *See Gielissen v. Reliance Standard Life Ins. Co.*, No. 21-1377, 2022 WL 5303482 n.5 (10th Cir. Oct. 7, 2022) (dismissing potential argument to address two benefits decisions separately because claimant chose "to treat the two decisions together" and offered no argument that they could be independently assessed, thus any such argument was forfeited and the court took her argument "as presented").

[279] *Spradley v. Owens-Illinois Hourly Employees Welfare Ben. Plan*, 686 F.3d 1135, 1140 (10th Cir. 2012) (internal citation omitted).

[280] *Lynn R. v. ValueOptions*, No.2:15-cv-00362-RJS-PMW, 2017 WL 3610477, at *5 (D. Utah Aug. 22, 2017).

[281] *MSJ* at 26.

*a.  Medical Necessity*

First, Plaintiff acknowledges SelectHealth raised lack of medical necessity as a basis for denying Doe's claims but argues it was an "impermissibl[e] . . . new rationale" and was included without citing the actual definition and its criteria.[282]  The court concludes the letters specifically articulated medical necessity as a basis for denial.

All four appeal denial letters state coverage is denied based on medical necessity and quote the Plan provision explaining the administrator's ability to evaluate medical necessity.[283]  The letters further indicate medical records show Doe did "not meet criteria" to show "medical need" for residential level of care.[284]  Then, the letters list reasons supporting this conclusion: lack of progress, lack of treatment plan for improvement.[285]  Admittedly, there are some deficiencies.  None of the initial denials of benefits reference medical necessity.[286]  And none of the letters define medical necessity or directly link the reasons for denial as medical necessity criteria.  Nevertheless, the letters can "reasonably be interpreted as denying coverage" based on medical necessity.[287]  Thus, medical necessity is one rationale specifically articulated in the administrative record and which the court must consider in its benefits determination.

---

[282] *MSJ* at 27.

[283] *Ex. 44* at IHC 571; *Ex. 43* at IHC 574; *Ex. 42* at IHC 564; *Ex. 48* at IHC 567.

[284] *Ex. 44* at IHC 571; *Ex. 43* at IHC 574; *Ex. 42* at IHC 564; *Ex. 48* at IHC 567.

[285] *Ex. 44* at IHC 571; *Ex. 43* at IHC 574; *Ex. 42* at IHC 564; *Ex. 48* at IHC 567.

[286] *Ex. 27* at IHC 670; *Ex. 37* at IHC 697; *Ex. 36* at IHC 710.

[287] *See Spradley*, 686 F.3d at 1141 (declining to accept a late-offered rationale for denial because the administrator's letters could not "reasonably be interpreted as denying coverage on the basis" that the administrator relied upon in litigation).

### b.  InterQual

Second, Plaintiff argues Defendants' reliance on InterQual criteria in evaluating entitlement to benefits is an "improper rationale."[288]  Plaintiff claims InterQual cannot be used to adjudicate Doe's claim because Doe could not have known her claim was being denied under InterQual.[289]  Plaintiff correctly points out the denial letters only mention Policy 475, not Policy 582.[290]  While Policy 582 is not referenced, the preauthorization denial for the First Stay explicitly cites InterQual criteria and explains its application.[291]  This citation was clear enough to notify Doe that InterQual is one basis for denying coverage.  For this reason, the court also considers InterQual as one rationale relied upon by SelectHealth to be reviewed in the benefits decision here.

### 2.  Plan Terms

The plan language is key to evaluating an ERISA claim for benefits.  Plan documents must be written so a beneficiary may "determine exactly what his rights and obligations are under the plan."[292]  The administrator may not impose "new conditions that do not appear on the face of a plan."[293]  Courts have recognized an administrator may establish and rely on internal procedures or policies properly incorporated into the plan.[294]  Internal policies can be incorporated into a plan if plan documents expressly authorize the administrator to use its own

---

[288] *Reply MSJ* at 12–13.

[289] *Id.* at 14.

[290] *Id.*

[291] *Ex. 27* at IHC 670.

[292] *Cirulis v. UNUM Corp.*, 321 F.3d 1010, 1013 (10th Cir. 2013) (internal citation and quotation omitted).

[293] *Id*.

[294] *Weiss v. Banner Health*, 416 F. Supp. 3d 1178, 1186 (D. Colo. 2019), *aff'd,* 846 F. App'x 636 (10th Cir. 2021) (collecting cases); *see also Foster v. PPG Indus., Inc.,* No. 06-cv-423-GKF-TLW, 2010 WL 3432249, at *3 (N.D. Okla. Aug. 31, 2010), *aff'd,* 693 F.3d 1226 (10th Cir. 2012).

criteria for determining eligibility.[295]  Nevertheless, an administrator may only rely on internal policies that reasonably interpret the plan, as compared to policies that are substantially inconsistent or in contravention of the plan's plain language.[296]  This is central to ERISA's mandate that "plans be written so as to provide employees with notice of their rights and obligations under the plan."[297]

When interpreting the plan language on de novo review, "[g]eneral principles of contract law apply."[298]  "Courts review ERISA claims as they would any other contract claim by looking to the terms of the plan and other evidence of the parties' intent."[299]  The court "considers the plan documents as a whole," interpreting words according to their "common and ordinary meaning."[300]  Unambiguous terms are applied as written.[301]  If plan terms are ambiguous—the meaning is uncertain or reasonably susceptible to multiple interpretations—the terms are construed against the insurer.[302]

Plaintiff raises two arguments concerning interpretation of Plan terms for coverage.  First, Plaintiff argues the Plan does not and cannot include Policy 475 as a criterion for determining

---

[295] *See Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1292 (10th Cir. 1999); *see also Lynn R.*, 2017 WL 3610477, at *8–9.

[296] *Mac v. Blue Cross Blue Shield of Mich.*, No. 16-cv-13532, 2017 WL 2450290, at *5–9 (E.D. Mich. June 6, 2017).

[297] *Cirulis*, 321 F.3d at 1013.

[298] *Robert O v. Harvard Pilgrim Health Care, Inc.*, No. 2:17-cv-1251-TC, 2019 WL 3358706, at *7–8 (D. Utah July 25, 2019) (citing *Salisbury v. Hartford Life & Acc. Co.*, 583 F.3d 1245, 1247 (10th Cir. 2009)).

[299] *Cardoza v. United of Omaha Life Ins. Co.*, 708 F.3d 1196, 1203 (10th Cir. 2013) (internal citation and quotation marks omitted).

[300] *Carlile v. Reliance Standard Life Ins. Co.*, 988 F.3d 1217, 1223 (10th Cir. 2021) (internal citation and quotation marks omitted).

[301] *Id.*

[302] *Id.*

coverage.[303]  Next, Plaintiff argues the Plan's medical necessity provision cannot be interpreted to include InterQual criteria.[304]  As explained below, both arguments fail.

> *a. Policy 475*

Plaintiff argues Policy 475 is not a Plan term and cannot be incorporated into the Plan because it conflicts with the Plan by adding a geographic restriction on coverage.  In response, Defendants argue the Plan expressly authorizes SelectHealth to determine eligibility according to its own criteria and Policy 475 is a policy developed under that authority.[305]  Defendants further argue the proximity criteria found in Policy 475 is consistent with Plan language.  The court agrees with Defendants.

First, the plain language of the Plan incorporates Policy 475 criteria into the medical necessity determination for coverage.  The Plan states "SelectHealth has developed medical policies to serve as guidelines for coverage decisions.  These guidelines detail when certain Services are considered Medically Necessary."[306]  The Plan then explains the "medical policies are based on constantly changing science" and provides a telephone number for participants to obtain more information.[307]  Policy 475 then references this language from the Plan before setting forth SelectHealth criteria for coverage at a residential treatment center.[308]

Plaintiff argues Policy 475 is "indisputably not a Plan term" and improper under *Cirulis v. Unum Corp.* because it imposes new conditions not found within the Plan.[309]  But this is not

---

[303] *MSJ* at 26–27.

[304] *Reply MSJ* at 12–15.

[305] *Response* at 67–68.

[306] *Ex. 1* at IHC 84.

[307] *Id.*

[308] *Policy 475* at IHC 3183.

[309] *MSJ* at 25–26 (citing *Cirulis*, 321 F.3d at 1013).

so.  In *Cirulis*, an employee was denied coverage having "no notice that [his] benefits would be conditioned on this provision."[310]  Here, the Plan language explicitly notified participants that additional medical policies were used to determine medical necessity.[311]  With this language, a participant had notice that plan coverage was conditioned on additional policies such as Policy 475.

Second, Policy 475 criteria reasonably interprets and is consistent with the Plan.  As relevant here, Policy 475 explains SelectHealth covers residential treatment only if the "center is provided in reasonable proximity to a members[sic] community or residence and support system."[312]  Plaintiff argues this criterion violates the Plan because it adds a geographic component to the Plan's definition for a residential treatment center and creates a "residential treatment" exception for the Plan's out-of-state coverage.  These arguments focus on Plan language in isolation.  As a whole, the Plan conditions benefits on the "appropriateness of the care setting."[313]  Medically necessary services must be "clinically appropriate in terms of type, frequency, extent, site, and duration; and not primarily for the convenience of the patient."[314]  Policy 475 further explains, "[w]ith regard to the issue of proximity . . . , [medical] organizations have noted that outcomes are improved when residential care is provided in close proximity to

---

[310] 321 F.3d at 1013.

[311] *Ex. 1* at IHC 84.

[312] *Policy 475* at IHC 3183–84.

[313] *Ex. 1* at IHC 80.

[314] *Ex. 1* at IHC 95.  Plaintiff argues the introduction of these Plan terms in briefing constitutes a new basis for SelectHealth's benefits denial that cannot be relied upon now.  *Reply MSJ* at 10–11.  But Defendants do not introduce this Plan language as a new rationale to explain SelectHealth's denial of Doe's claim.  *See Response* at 67–69.  Instead, it is a response to Plaintiff's arguments and merely used to explain how Policy 475 is consistent with the Plan.  *See id.*  The court does not view this usage as violative of ERISA law allowing consideration of only those "rationales asserted by the plan administrator in the administrative record."  *Spradley*, 686 F.3d at 1140 (internal quotation marks omitted).

the patient's home."[315]  Thus, rather than imposing a bare, geographic limitation, Policy 475

seeks to ensure clinically appropriate services.

Plaintiff argues the ordinary meaning of a clinically appropriate site refers to "a facility,

***not*** the geographic location of the facility."[316]  But "site" may identify both a geographic location

and a physical place.[317]  In this context, both definitions make sense.  The medical facility and its

geographic location can both have bearing on whether a site is clinically appropriate, as

explained in Policy 475.[318]  Plaintiff argues this usage would be inconsistent with other Plan

language requiring "on-site" services, which she claims is an unambiguous reference to a

facility.[319]  Even assuming this interpretation is correct, those references have little persuasive

value because the context and usage differs.  In sum, Policy 475's proximity criterion accords

with the Plan.

Finally, Plaintiff argues the proximity criterion is not required by the Plan and can be

disregarded.[320]  For example, SelectHealth covered the first five weeks at Austen Riggs.[321]  This

argument misses the fact that the medical records relied upon for the initial determination differ

from later records.  When Doe was admitted, she told intake she could not return to Utah and

---

[315] *Policy 475* at IHC 3185.

[316] *Reply MSJ* at 12.

[317] *See Site,* Black's Law Dictionary (11th ed. 2019); *Site,* Merriam-Webster Online, https://www.merriam-webster.com/dictionary/site (last visited July 22, 2023).

[318] *Policy 475* at IHC 3185.

[319] *Reply MSJ* at 12.

[320] *Id.* at 12, 18.

[321] *Ex. D* at IHC 684; *see also Ex. 27* at IHC 670.

there was nothing there for her.[322]  The initial records indicate Doe had no support system in

Utah.[323]  Throughout the following weeks, Doe's parents showed support for her by attending

family therapy, speaking with providers, and directly pledging assistance.[324]  Rather than

showing the criterion is unnecessary and can be disregarded, the facts indicate the criterion is an

essential part of determining coverage under the Plan.[325]

> Thus, the "proximity" criterion does not impose an impermissible geographic limitation

and Policy 475 is properly part of the Plan for considering coverage of residential treatment.

### b.  InterQual

> Plaintiff next argues InterQual cannot be used to determine coverage because "the Plan

does not expressly refer to or incorporate InterQual criteria as a Plan term."[326]  Yet, as mentioned

above, the express language of the Plan incorporates "medical policies" for use in determining

"when certain Services are considered Medically Necessary."[327]  SelectHealth Policy 582

identifies InterQual as the defining criteria for residential mental health coverage.[328]  The plain

---

[322] *Ex. 15* at IHC 2137 ("She stated that she does not believe she can return to Utah at this point, as she imagines she would become suicidal, given the loss of her career.  She also feels that it is 'pathetic' that she does not have much in her life, including a romantic relationship, family/kids, or career." Dated 4/10/2017); *see also id.* at IHC 2149 ("She does not have robust family support, she is socially isolated[.]" Dated 4/14/2017); *id.* at IHC 2151 (therapist notes from 4/28/2017 indicating "I have not had any contact with [Doe's] family").

[323] *Ex. 15* at IHC 2137, 2145.

[324] *Id.* at IHC 2202 (explaining Doe's plan was to return "to live with her parents in Utah upon her discharge"); 2205 (treatment notes documenting conversations with mother and stepfather); 2207 (talking to mother during casework session and planning to call mother on bi-weekly basis); 2208 (stepfather included in patient meeting).

[325] To be clear, while Doe's mother and stepfather were engaged and committed to supporting her treatment, the notes are mixed on whether or not that was always helpful to Doe.

[326] *Reply MSJ* at 13.

[327] *Ex. 1* at IHC 84.

[328] *Ex. 1* at IHC 2940.

language of the Plan through Policy 582 incorporates InterQual criteria into the medical necessity determination for coverage.

Plaintiff rebuts this conclusion, arguing Policy 475 does not mention InterQual when listing its coverage criteria for Doe's selected type of plan and it does mention InterQual for other plans.[329]  Plaintiff argues the inclusion of InterQual for other plans suggests that its omission was intentional for Doe's Plan.[330]  Yet Policy 475 directly refers claimants to Policy 582 as a related medical policy.[331]  Any inference that the omission leads to the conclusion InterQual does not apply to Doe's Plan is undermined by this express reference to Policy 582. Accordingly, the InterQual criteria may be considered in determining coverage for Doe's claim.

### 3.  De Novo Review of the Claim for Benefits

Having resolved these issues, the court now considers the denial for benefits using only those rationales asserted by the plan administrator—namely, whether Doe met the criteria for coverage articulated in Policy 475 and InterQual.  The merits of the claim are reviewed under the summary judgment standard alongside the applicable ERISA standard, which is de novo review here.  The court concludes there are issues of fact precluding Plaintiff from establishing by a preponderance of the evidence that Doe's claim for benefits is covered under the Plan.

#### a.  Policy 475: Reasonable Proximity Criterion

Plaintiff has not shown by a preponderance of evidence Doe's treatment at Austen Riggs was "in reasonable proximity" to her support system.  There are two genuine disputes preventing Doe from establishing this criterion.  First, whether there existed facilities within Utah to provide

---

[329] *Reply MSJ* at 13–14.

[330] *Id.* at 13.

[331] *Policy 475* at IHC 3183.

services in reasonable proximity.  Second, whether individuals in Utah qualified as a support system.

Plaintiff contends the facilities recommended by Defendants—New Roads Behavioral Health and Center for Change—could not have provided the necessary services in reasonable proximity.  On this point, there are genuine disputes over whether Doe was the type of client served by the facilities and whether they provided the care she needed.

It is unclear whether Doe would qualify as the proper clientele for the recommended facilities.  Plaintiff claims New Roads serves only young adults with mental health challenges, while Defendants assert New Roads offers mental health care to patients of all ages who are transitioning out of residential care.[332]  Record documents show New Roads' residential program caters to young adults aged "17.5–28" but also provides transitional mental health programs which Defendants argue are for individuals of all ages.[333]  Likewise, Plaintiff claims Center for Change "is exclusively for patients with primary, significant eating disorders" and Doe did not have a primary eating disorder.[334]  Defendants contend Doe was diagnosed with an "Unspecified Feeding and Eating Disorder" at Austen Riggs and was receiving treatment for it.[335]  Plaintiff points to record notes stating Doe had "trouble maintaining hydration and nutritional status, not related to a formal eating disorder but likely associated with complex PTSD."[336]  Both parties select treatment notes that are helpful to their argument.  Records from Austen Riggs during the

---

[332] *MSJ* at 12–13; *Response* at 21–22.

[333] *Ex. 15* at 2847–52; *Response* at 22.

[334] *MSJ* at 12–13.

[335] *Response* at 21.

[336] *Ex. 15* at 2453.

First Stay show constant concern surrounding Doe's weight and over-exercise.[337]  Yet there were minimal comments about Doe's food intake and exercise regimen during the Second Stay.  The notes show only some renewed concern near the end of her Second Stay.[338]  To resolve these issues, the court would need to weigh the evidence, make credibility determinations, and draw inferences about conflicting facts.  None of these tasks are proper on a motion for summary judgment.[339]

Further, the parties dispute whether Doe needed residential care.[340]  Defendants argue residential care was not the most appropriate treatment setting for Doe.  She stabilized after five weeks at Austen Riggs and her condition actually deteriorated the longer she was there.[341]  Then, Doe's condition improved during her stay at home, showing that outpatient care with family support was the best option.[342]  Plaintiff points to this deterioration as evidence that Doe needed to remain at Austen Riggs.[343]  From the record, there appear to be a number of factors contributing to this deterioration.  Among other things, it is not entirely clear how much is attributable to Doe's lack of participation and how much is attributable to Austen Riggs' treatment program.  Plaintiff also disputes Doe's family could be a support by highlighting treatment notes where Doe discusses challenges with them.[344]  The court cannot on this record

---

[337] *See id.* at IHC 2149, 2155, 2156–57, 2160, 2162–64.

[338] *Id.* at IHC 2470–71.

[339] *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50 (1986) ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

[340] *Response* at 70–72; *Reply* at 21–22.

[341] *Response* at 70–72.

[342] *Id.* at 72.

[343] *Reply* at 21.

[344] *Id.*

determine whether residential care was the proper setting because to do so requires assigning weight to the evidence.

More importantly, even if the court concluded none of these facilities could have provided Doe the necessary services, Plaintiff still fails to establish Austen Riggs was "in reasonable proximity to [Doe's] community . . . and support system."[345]  Plaintiff contends Austen Riggs was in reasonable proximity because Doe did not have a community or support system in Utah.  Specifically, Plaintiff asserts Doe was unemployed, lacked close friends, and family members were alternatively highly triggering or unable to provide the necessary support.[346]  Record facts on this point are inconclusive.  There is no disputing Doe was unemployed and had certain family members that were a negative influence.[347]  Still, Doe's mother and stepfather consistently engaged in Doe's treatment—they participated in family therapy, cared for Doe between Stays, and visited her at Austen Riggs.[348]  After a month at home with them, Doe returned to Austen Riggs exhibiting less suicidality, normalized eating and exercise habits, and improved affect.[349]  Treatments notes offer conflicting opinions on Doe's parents.  At times the notes indicate Doe's mother and stepfather were a good source of support, most notably after her month at home with them.[350]  Other times the notes explain Doe's mother and stepfather contributed to Doe's stress and could not fully help her or keep her safe from self-harm.[351]  Differing conclusions may be drawn from these facts and, without impermissibly

---

[345] *Policy 475* at IHC 3184.

[346] *MSJ* at 24; *Reply MSJ* at 20–21.

[347] *Ex. 16* at IHC 1442; *Ex. 15* at IHC 2137, 2445–72.

[348] *Ex. 15* at IHC 2156–57, 2160, 2162–64, 2201–17; *Ex. 16* at IHC 1480.

[349] *Ex. 15* at IHC 2445–47, 2485, 2631.

[350] *Ex. 15* at IHC 1088, 1576, 2263, 2485; *Ex. 65* at IHC 1083.

[351] *Ex. 15* at IHC 2117, 2155, 2578.

weighing the evidence, the court is unable to conclude whether Doe's mother and stepfather qualify as a community and support system.[352]  Accordingly, the court cannot on summary judgment determine Austen Riggs was "in reasonable proximity to [Doe's] community . . . and support system."[353]  Because this criterion is necessary to obtaining coverage, Plaintiff cannot establish Doe's entitlement to benefits.

### b.  InterQual

Plaintiff also fails to establish treatment at Austen Riggs was medically necessary under InterQual criteria.  To obtain residential mental health treatment under InterQual, a patient must: (1) have improved to a point where discharge can be expected, (2) be improving even if not clinically stable for discharge, or (3) worsening and requiring more intensive level of care.[354]  Doe's records are inconclusive.  Treatment notes do not show Doe was improving to a point that discharge could be expected.  On a couple occasions Doe's providers noted progress, but for the most part there's little record evidence showing sustained improvement.[355]  The notes frequently indicate Doe's symptoms waxed and waned.[356]  In general, she was not improving and the therapeutic community was unhelpful, in part because Doe disengaged and isolated herself.[357]  While Doe suffered from persistent suicidal ideation, aside from her hospitalization at the end of

---

[352] Plaintiff argues Defendants ignored certain facts and cherrypicked evidence to "ground their baseless factual findings."  *Reply MSJ* at 20.  But this court is not bound by the administrator's factual findings in de novo review.  *See Niles*, 269 Fed. App'x at 834.  Neither does the court rely on the administrator's factual findings.  *See id.*  Instead, the court does its own review of the record evidence.  *See id.*  Thus, any errors in this regard are immaterial to the court's analysis.

[353] *Policy 475* at IHC 3184.

[354] *Ex. H* at IHC 2087–88.

[355] *Compare Ex. 15* at 2457–58 (seeing "positive changes in Doe's participation"), *with id.* at 2155 (noting Doe was "minimally participative"); 2160 (noting Doe failed to participate); 2470 (noting Doe was "stubbornly opposed" to joining groups and discussing possible move to lesser level of care).

[356] *Ex. 15* at IHC 2152, 2457–58.

[357] *Id.* at IHC 2148, 2152, 2160, 2162–64, 2463–64, 2467–69, 2470.

her First Stay, the notes do not indicate the risk was increasing and Doe needed more intensive care.[358]  That is not to say Doe's mental health struggles were not severe.  But to qualify for coverage under the Plan, a preponderance of the evidence must show treatment is medically necessary.  Doe's medical records are contradictory.  Altogether, they do not demonstrate by a preponderance of the evidence that services at Austen Riggs qualified as medically necessary under InterQual.

Plaintiff's arguments fail to undermine this conclusion.  Plaintiff claims SelectHealth made several errors when applying InterQual: it used the wrong InterQual guidelines,[359] and it conceded medical necessity was met.[360]  But "because the court's review is de novo, any incorrect reliance" or concessions made by the administrator do not affect the analysis.[361]  The court evaluates only whether, after examining all the evidence, Doe's claim to benefits is supported by a preponderance of the evidence.[362]

Plaintiff also argues Defendants' medical necessity determination was "patently unreasonable in light of external standards."[363]  According to Plaintiff, Doe satisfied medical necessity criteria under the LOCUS standard, a different evaluation standard "used extensively in 26 states and internationally."[364]  The implication being LOCUS is a better tool than InterQual. Defendants' use of InterQual is "a matter of Plan design and structure, rather than

---

[358] *Id.* at IHC 2141, 2149, 2160, 2162–64, 2231–42.

[359] *Reply MSJ* at 14–15.

[360] *Id.* at 29.

[361] *Christine S.*, 2021 WL 4805136, at *4 n.1 (internal quotation and citation omitted).

[362] *Niles*, 269 Fed. App'x at 834.

[363] *MSJ* at 30.

[364] *Id.*

implementation."[365]  And an administrator's decisions setting plan terms are "not subject to ERISA's fiduciary standards and judicial review."[366]

Lastly, Plaintiff makes a policy argument, claiming Defendants' denials "were antithetical to the purposes of the Plan."[367]  However, Plaintiff cites no legal authority or basis for evaluating policy concerns when deciding a claim for coverage.[368]  The court considers this argument no further.[369]

Plaintiff has not met her burden on summary judgment.  Record evidence is inconsistent. It does not indisputably show by a preponderance of the evidence that Austen Riggs was in reasonable proximity to Doe's support network or that Doe met InterQual criteria for medical necessity.  Thus, the court denies summary judgment on Plaintiff's claim for benefits.

## II.    PARITY ACT (Claims Two and Three)

Plaintiff next moves for summary judgment on claims two and three, seeking equitable and injunctive relief for violations of the Parity Act.  The Parity Act was designed to end discrimination in mental health care coverage by ensuring the restrictions imposed on mental

---

[365] *Jones*, 169 F.3d at 1291–92.

[366] *Averhart v. US WEST Mgmt. Pension Plan*, 46 F.3d 1480, 1488–89 (10th Cir. 1994) (An employer is free to develop an employee benefit plan as it wishes[.]" (internal citation and quotations omitted)).

[367] *MSJ* at 30.

[368] *See id.*

[369] In the context of challenging Defendants' medical necessity decision, Plaintiff also argues "Defendants' denial was not the result of a principled process."  *MSJ* at 29.  Plaintiff then highlights alleged procedural errors made by Defendants during the benefits determination.  *See id.*  While an administrator's procedural errors can provide a basis for reversal separate from a claim on the merits, *see Niles*, 296 Fed. App'x at 833, the court does not interpret Plaintiff's argument as a separate claim for relief.  These procedural-based arguments were presented within Plaintiff's section targeting the merits of the denial of the claim rather than as a separate basis for reversal.  *See MSJ* at 25–30, 29; *see also Niles*, 296 Fed. App'x at 833 ("Ms Niles sought reversal both on procedural grounds and on the merits. . . . These procedurally-based arguments were presented separately from her argument targeting the *merits* of the [administrator's] determination.").  Thus, the court declines to consider these arguments as a separate basis for relief.

health services are comparable to those for analogous medical/surgical services.[370]  A provider

offering both mental health and medical/surgical benefits violates the Parity Act by imposing

more restrictive treatment limitations on mental health benefits than those placed on analogous

medical/surgical benefits or imposing separate treatment limitations applicable only to mental

health benefits.[371]

      Treatment limitations include both quantitative (numerical caps on services) and

nonquantitative (affecting scope or duration of services) limitations.[372]  Parity Act regulations

provide that, "as written and in operation, any processes, strategies, evidentiary standards, or

other factors" used in applying nonquantitative treatment limitations on mental health benefits

must be "comparable to, and applied no more stringently" than those used for medical/surgical

benefits in the same classification."[373]  Thus, Parity Act violations may be alleged facially, based

on express plan terms, or as-applied, based on application of plan terms.[374]

      To state a Parity Act violation, a plaintiff must show[375]:

> (1) the relevant group health plan is subject to the Parity Act; (2) the plan
> provides both medical/surgical benefits and mental health or substance use

---

[370] 29 C.F.R. § 2590.712(c)(2)(i); *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 356 (2d Cir. 2016) ("Congress enacted the [Parity Act] to end discrimination in the provision of insurance coverage for mental health and substance use disorders as compared to coverage for medical and surgical conditions in employer-sponsored group health plans.").

[371] 29 U.S.C. § 1158a(a)(3)(ii); 29 C.F.R. § 2590.712(c)(2)(i).

[372] 29 C.F.R. § 2590.712(a); *see David S. v. United Healthcare Ins. Co.,* No. 2:18-cv-803, 2019 WL 4393341, at *3 (D. Utah Sept. 13, 2019).

[373] 29 C.F.R. § 2590.712(c)(4)(i).

[374] *Jeff N. v. United HealthCare Ins. Co.*, No. 2:18-cv-00710-DN-CMR, 2019 WL 4736920, at *3–4 (D. Utah Sept. 27, 2019).

[375] The Tenth Circuit has not spoken on what is required to state a Parity Act claim.  *Johnathan Z. v. Oxford Health Plans*, No. 2:18-CV-383-JNP-PMQ, 2020 WL 607896, at *13 (D. Utah Feb. 7, 2020).  Courts in this district have promulgated two tests to analyze such claims—a three-part and four-part inquiry.  *Nathan W. v. Anthem Bluecross Blueshield of Wisc.*, No. 2:20-cv-00122-JNP-JCB, 2021 WL 842590, at *6 (D. Utah Mar. 5, 2021).  The parties apply differing tests in their briefing.  *MSJ* at 32 (using the four-part test); *Response* at 75 (using the three-part test).  Because the tests are "materially indistinguishable" and neither party objects to either test, the court uses the four-part test here.  *See Nathan W.*, 2021 WL 842590, at *6 (internal citation omitted).

disorder benefits; (3) the plan includes a treatment limitation for mental health or substance use disorder benefits that is more restrictive than medical/surgical benefits; and (4) the mental health or substance use disorder benefit being limited is in the same classification as the medical/surgical benefit to which it is being compared.[376]

In reviewing a Parity Act claim, the court affords no deference to a benefits administrator.[377]  It examines "the plan documents as a whole" to determine whether treatment limitations violate the Parity Act.[378]

Plaintiff alleges Defendants violated the Parity Act in two ways.  First, the Plan facially violates the Parity Act by imposing a geographic limitation (Policy 475) for mental health services not found in the medical/surgical analogs.[379]  Second, Defendants' disparate application of their network adequacy standards violates the Parity Act "by failing to ensure an adequate network of residential treatment centers."[380]  The parties do not dispute the first two elements, so the court limits its analysis to the latter two elements.[381]

### A.  POLICY 475

Plaintiff first argues the use of Policy 475 criteria for residential mental health coverage creates a facial geographic treatment limitation.[382]  Because Defendants "did not have any documents creating geographic limitations" for comparable in-patient medical and surgical care,

---

[376] *Michael D. v. Anthem Health Plans of Ky., Inc.*, 369 F. Supp. 3d 1159, 1174 (D. Utah 2019).

[377] *Joseph F.*, 158 F. Supp. 3d at 1258 (explaining that deciding a Parity Act claim is a matter of interpreting a statute, which is a legal question afforded no deference).

[378] *Weber v. GE Grp. Life Assur. Co.*, 541 F.3d 1002, 1011 (10th Cir. 2008) ("[A]s the first step towards interpreting an ERISA plan, we scrutinize the plan documents as a whole and, if unambiguous, construe them as a matter of law." (internal citations and quotations omitted)).

[379] *MSJ* at 33–34.

[380] *Id.* at 34–35.

[381] *Id.* at 32 ("[I]t is undisputed that [Doe's] Plan satisfies the first and second elements.").

[382] *Id.* at 33.

Plaintiff argues they are in violation of the Parity Act.[383]  She asserts, "by definition, the geographic eligibility criterion for residential treatment . . . was more restrictive than for medical/surgical benefits."[384]

Defendants contend Plaintiff fails to meet her burden to show a Parity Act violation based on Policy 475.[385]  As an initial matter, Defendants note Plaintiff does not identify the analogous medical/surgical classification, which they argue "is an essential element of her claim."[386]  More importantly, Defendants argue Plaintiff's claim fails on the merits because she does not "demonstrate that Policy 475 lacks comparability to any criteria used to determine the medical necessity of analogous medical services."[387]  According to Defendants, the criterion identified in Policy 475 is one of many used for determining the medical necessity of residential mental health care.[388]  Medical necessity varies "in accordance with generally accepted standards of medical practice . . . among other things."[389]  Defendants argue differing limitations violate the Parity Act only when they are incomparable—the appropriate inquiry is not whether criteria for mental health treatment are different than those for analogous medical treatment, but rather, whether the two criteria are comparable.[390]  The court agrees.

---

[383] *Id.*

[384] *Id.* at 34 (internal quotations omitted).

[385] *Response* at 78.

[386] *Id.*

[387] *Id.*

[388] *Id.* at 76.

[389] *See id.* at 76, 78.

[390] *See Response* at 76–78.

A plan facially violates the Parity Act when by its terms the plan imposes more restrictive treatment limitations on mental health care than on medical/surgical care.[391]  Plaintiff establishes the third element of her claim by identifying what she alleges is a limitation on mental health care that is more restrictive than medical/surgical benefits—the geographic criteria in Policy 475.[392]  It is the fourth element that is lacking—identifying and comparing a medical/surgical limitation in the same classification.[393]

When a plaintiff alleges a facially disparate mental health nonquantitative limitation, like the one identified here,[394] a court must analyze whether "the processes, strategies, evidentiary standards, and other factors used to apply the limitation . . . are comparable to and applied no more stringently" than those used to determine coverage for analogous medical/surgical care.[395]  Thus, "[t]o sufficiently plead a facial claim, the plaintiff must correctly identify the plan's express limitation and compare it to a relevant analogue."[396]  Plaintiff fails to do so here.

Initially, Plaintiff identified no medical/surgical analogs.  She generally alleged that Policy 475 violates the Parity Act because there is no geographic requirement "for any of [Defendants'] medical/surgical benefits during the relevant period."[397]  In a late-filed errata, this is changed to read "for [24-hour subacute] medical/surgical benefits."[398]  Yet, even though

---

[391] 29 U.S.C. § 1185a(a)(3)(A)(ii); *see Johnathan Z.*, 2020 WL 607896, at 14.

[392] *Michael D.*, 369 F. Supp. 3d at 1174; *see MSJ* at 33–34.

[393] *Michael D.*, 369 F. Supp. 3d at 1174; *see MSJ* at 33–34.

[394] *MSJ* at 31 ("[T]his case involves nonquantitative treatment limitations . . . .").

[395] 29 C.F.R. § 2590.712(c)(4)(i).

[396] *Jeff N.*, 2019 WL 4736920, at *3.

[397] *MSJ* at 33.

[398] Dkt. 278, *Errata to Plaintiff's Motion for Summary Judgment and Reply in Support Thereof* at 2.

Plaintiff eventually identified an arguably analogous care level,[399] she never produced the Plan's nonquantitative treatment limitations for 24-hour subacute medical/surgical care, nor did she request it in discovery.[400] By failing to identify and compare the analogous care limitations, the court is unable to determine as a matter of law whether the criteria of Policy 475 are "comparable to, and applied no more stringently"[401] than the criteria used to determine coverage for medical/surgical benefits in the same classification.[402]

Plaintiff's claim also fails on the merits. She asserts Policy 475 is a bare geographic limitation, but in briefing later acknowledges it is an eligibility criterion for coverage.[403] That difference is key to Plaintiff's Parity Act claim. A categorical geographic limitation—such as a blanket plan provision excluding "coverage for inpatient, out-of-network treatment of chemical dependency when obtained outside of the State where the policy is written"—violates the Parity Act.[404] However, imposing different medical criteria for coverage based on the illness or ailment "is not an impermissible disparity; it is a logical consequence of the undeniable reality that every

---

[399] The court assumes without deciding that 24-hour subacute care is analogous to residential treatment. Plaintiff filed her errata after briefing was complete, denying Defendants an opportunity to respond.

[400] *Response* at 78; *Reply* at 23–24, 24 n.11 (explaining discovery requests sought "geographic limitations applicable to any and all medical/surgical benefits"); *see also* Dkt. 221-13, *Ex. 52* at 5 (requesting documents "showing or describing all geographic treatment limitations on care at 24-hour subacute medical/surgical facilities").

[401] 29 U.S.C. § 1185a(a)(8)(A)(iv).

[402] Plaintiff asserts Defendants confirmed they did not have any comparable treatment limitations because they provided none in discovery. *MSJ* at 33. But for a Parity Act claim, the burden is on Plaintiff to show other limitations are incomparable. *See Jeff N.*, 2019 WL 4736920, at *3–4.

[403] *MSJ* at 31 ("Defendants violated the Parity Act . . . through the geographic limitation on coverage for psychiatric treatment . . . ."); *MSJ* at 34 ("[T]he geographic eligibility criterion for residential treatment for behavior health services was 'more restrictive' than for medical surgical benefits.").

[404] 29 C.F.R. § 2950.712(c)(4)(iiii)(Example 10); *see Johnathon Z.*, 2020 WL 607896, at *14–15 ("This court has ruled that the categorical exclusion of certain types of mental health/substance abuse care is a treatment limitation under the Parity Act.").

illness is inherently different and requires different treatment."[405]  "This is why the Parity Act only requires comparability, not equality, between limitations."[406]

Policy 475 sets out "criteria for coverage" at psychiatric residential treatment centers, including but not limited to:

- Psychiatric evaluation, initial within 1 business day, subsequent at least 1x/week
- Psychosocial assessment and substance evaluation within 48-hours
- Individual/group/family therapy at least 2x a week
- Structured therapeutic program at least 4 hours a day
- *Residential treatment center is provided in reasonable proximity to a members[sic] community or residence and support system*[.][407]

The Policy includes a "summary of medical information," citing studies and research showing the medical bases for the criteria.[408]

In context, the provision at issue is not a blanket or categorical geographical exclusion. Rather, it is a subjective criterion for coverage.[409]  As such, it violates the Parity Act only if Plaintiff demonstrates the "reasonable proximity" criterion is more restrictive than, or there is no comparable criterion for, medical/surgical care.[410]  Here, Plaintiff merely relies on the fact that discovery requests produced no "geographic treatment limitations" in other policies to show the

---

[405] *James C. v. Anthem Blue Cross & Blue Shield*, No. 2:19-cv-38, 2021 WL 2532905, at *20 (D. Utah June 21, 2021), *appeal dismissed* (Nov. 30, 2021).

[406] *Id.*

[407] *Policy 475* at IHC 3183–84.

[408] *Id.* at IHC 3184–85 ("With regard to the issue of proximity of the residential treatment in reasonable proximity to a member's community or residence and support system, SAMSHA and other organizations have noted that outcomes are improved when residential care is provided in close proximity to the patient's home.").

[409] In her Reply, Plaintiff argues this is a "true" geographic limitation based in part on how SelectHealth applied the criterion to Doe. *Reply* at 22–23 (stating the criterion limited treatment by geography as "reflected in SelectHealth's initial denials of [Doe's] claims").  This argument has no bearing on this claim for a *facial* violation of the Parity Act.  *MSJ* at 33 ("Plaintiff makes a facial challenge to Defendants' geographic limitation on mental health treatment.").

[410] 29 U.S.C. §§ 1158a(a)(3)(A)(ii); 1158a(a)(8).

Plan violates the Parity Act.[411]  But many Policy 475 criteria may not be found in analogous

medical/surgical policies, understandably so as mental health care needs differ from

medical/surgical needs.[412]  That alone does not create a Parity Act violation: showing the criteria

are "different[] is not enough."[413]  The disputed criteria must impose more restrictive or disparate

limitations on mental care than medical surgical care to run afoul the Parity Act.[414]

This is not to say a criterion such as this could not violate the Parity Act.  A participant

could very well show a plan violates the Parity Act by demonstrating analogous medical/surgical

limitations do not impose comparable criteria.[415]  Plaintiff does not do so here, and thus her

Parity Act claim based on Policy 475 fails.

## B.  ADEQUATE PROVIDER NETWORK

Plaintiff next argues Defendants violated the Parity Act by failing to ensure there was an

adequate network of residential facilities to treat Doe.[416]  There are genuine disputes of fact that

preclude summary judgment on this claim.

For an as-applied Parity Act claim, a plaintiff must identify a facially neutral treatment

limitation and identify how the administrator applied the treatment limitation more restrictively

---

[411] *MSJ* at 33–34; *Ex. 52* at 5.

[412] *See James C.*, 2021 WL 2532905, at *20 ("While these standards are clearly different, they are neither disparate nor incomparable, as they both stem from the guidelines' rationale that the need for treatment is governed by the severity of a patient's illness.").

[413] *Id.* (explaining that "different" is not enough, "the court must also look beyond the definitions to determine whether the Plan imposes more restrictive" limitations).

[414] 29 U.S.C. §§ 1158a(a)(3)(A)(ii); 1158a(a)(8).

[415] *See, e.g.*, *Johnathan Z.*, 2020 WL 607896, at *14–17.

[416] *MSJ* at 34–35.

to mental health benefits than to analogous medical health benefits.[417]  Here, Plaintiff identifies

facially neutral language in the introduction of the Plan, stating

> SelectHealth . . . is committed to maintaining *an adequate provider network* for
> each of its Qualified Health Plans. . . . An adequate provider network is
> characterized by the following four key attributes:
>
> The network has a <u>sufficient number of providers</u> in each medical specialty . . . [,]
>
> The providers in the network are <u>geographically positioned</u> to be within an
> acceptable distance of health plan members.
>
> The provider network <u>accommodates special needs or preferences</u> of health plan
> members. . . .
>
> The provider network is able to <u>provide medical and behavioral health services in
> a timely manner</u> to health plan members.[418]

Plaintiff argues SelectHealth applied these adequacy standards differently for mental health

benefits than for medical benefits.[419]  Essentially, Plaintiff argues the disparity in network

facilities for mental health care limited Plaintiff's coverage.  Plaintiff relies on two main facts to

support this argument, both of which are insufficient to meet the burden for summary judgment.

First, Plaintiff claims SelectHealth's failure to ensure an adequate network of mental

health facilities and disparate criteria is evidenced by its inability to identify any suitable in-

network or in-state options for Doe.[420]  As mentioned, SelectHealth recommended two Utah

facilities for Doe—New Roads Behavioral Health and Center for Change.[421]  But the parties

strongly dispute whether Doe was a candidate for services at these facilities and whether these

---

[417] *See M.S.*, 553 F. Supp. 3d at 1033.

[418] Dkt. 193-5, at IHC 3193 (emphasis added).  Plaintiff calls these "adequacy standards" but supplies no authority
for the proposition that aspirational language in a plan has the force and effect of a treatment limitation, as that term
is applied in ERISA law.  It is not clear to the court that this kind of language can form the basis of a Parity Act
claim.  Because these points are not addressed by Defendants, the court will proceed with the analysis as framed by
the parties.

[419] *MSJ* at 34–35.

[420] *MSJ* at 34.

[421] *Ex. 37* at IHC 697; *Ex. 36* at IHC 710.

facilities provided the services Doe needed.[422]  The record does not clearly establish these facts. Thus, on this basis, the court cannot determine as a matter of law whether the network adequacy standards were applied in a discriminatory manner.

Second, Plaintiff highlights the disparity between the number of in-state, in-network skilled nursing facilities with the number of in-state, in-network residential mental health facilities to show the standards were unevenly applied.[423]  Essentially, Plaintiff attempts to use quantitative facts to show the network was discriminately applied to Doe.[424]  But the fact that SelectHealth operated more skilled nursing facilities than residential mental health facilities fails to show how the network was inadequate for Doe.  It may create an inference that there's less likelihood of adequate facilities, but it does not show there were none suitable for Doe.[425]

In conclusion, Plaintiff fails to meet her burden on summary judgment for both Parity Act claims.  She does not show Policy 475 applies disparate criteria compared to medical analogs, nor does she point to a more restrictive treatment limitation on mental health care.  Accordingly, the court denies Plaintiff's Parity Act claims on summary judgment.

## III.    STATUTORY PENALTIES (Claim Four)

Plaintiff also moves for summary judgment on her fourth cause of action seeking statutory penalties under 29 U.S.C. § 1132(c).[426]  This section grants courts discretion to award penalties to a plan participant or beneficiary when the administrator violates its disclosure

---

[422] *See supra* Section I.B.3.a.

[423] *MSJ* at 34–35.

[424] Plaintiff's argument sounds more like a challenge to a quantitative limitation, "which are expressed numerically (such as 50 outpatient visits per year)."  *See David S.*, 2019 WL 4393341, at *3.  But because these are facially neutral terms, Plaintiff can only challenge this as a nonquantitative limitation, "which otherwise limit[s] the scope or duration of benefits for treatment under a plan."  *See id.*

[425] *MSJ* at 34.

[426] *Id.* at 2, 37–38.

obligations found in 29 U.S.C. § 1024.[427]  Congress imposed these disclosure obligations to

ensure plan participants and beneficiaries were sufficiently informed about their rights under a

plan.[428]

Relevant here, § 1024 requires an administrator to "furnish a copy of the latest updated

summary, plan description, . . . or other instruments under which the plan is established or

operated" upon written request from a participant or beneficiary.[429]  "To establish a violation of

this provision, a claimant must demonstrate (1) the participant submitted a written request for

information, (2) that information is within the scope of 29 U.S.C. § 1024(b)(4), and (3) the

administrator failed or refused to provide the information within 30 days after the request."[430]  A

violation of § 1024 can result in statutory penalties of up to $110 a day being imposed against the

administrator.[431]

The parties' dispute centers on the second element, whether Plaintiff established the

requested documents must be disclosed pursuant to § 1024.  It is undisputed Plaintiff submitted a

written request for certain documents on December 5, 2018.[432]  Plaintiff claims Defendants are

unlawfully withholding two sets of requested documents: (1) "all instruments analyzing the

nonquantitative treatment limitations imposed by the [Plan] in 2017 and 2018," and (2) the

administrator's "[r]eimbursement methodologies and schedules for all out-of-network benefits

---

[427] 29 U.S.C. § 1132(c)(1) (providing a plan administrator may be liable to a plan participant for penalties up to $100/day for failing or refusing to supply required information within thirty days after a request).

[428] *See Firestone Tire*, 489 U.S. at 118; *Moothart v. Bell*, 21 F.3d 1499, 1503 (10th Cir. 1994) ("These sections [29 U.S.C. §§ 1024(b) and 1132(c)] were included in ERISA so that plan participants and beneficiaries would be in a position to make informed decisions about how best to protect their rights.").

[429] 29 U.S.C. § 1024(b)(4).

[430] *M.S.*, 553 F. Supp. 3d at 1033.

[431] 29 U.S.C. § 1132(c)(1)(B); 29 C.F.R. § 2575.502c-1.

[432] *Ex. 49.*

for 2017 and 2018."[433]   According to Plaintiff, these documents constitute "other instruments under which the plan is established or operated" and by failing to produce them, Defendants are subject to § 1132 penalties. [434]   In response, Defendants do not dispute they have not produced these documents, in part because the documents did not exist when Doe requested them.[435] Defendants argue Plaintiff "cannot establish that [Doe] was entitled to these documents under ERISA, that any responsive documents were withheld, or that Intermountain's conduct warrants sanctions."[436]   The court agrees with Defendants on the first point and denies summary judgment on that basis.

Courts vary widely in interpreting § 1024's catchall provision, requiring disclosure of "other instruments under which the plan is established or operated."[437]   The majority of circuits have adopted a narrow interpretation, concluding the provision includes only "formal or legal documents under which a plan is set up or managed."[438]   At least one circuit concluded a narrow interpretation is inapposite to the purpose of ERISA and inhibits a beneficiary's ability to evaluate plan rights.[439]   In 2014 amendments to the Parity Act, Congress clarified the provision:

> "Instruments under which the plan is established or operated include documents
> with information on medical necessity criteria for both medical/surgical benefits,
> as well as the processes, strategies, evidentiary standards, and other factors used

---

[433] *Complaint* ¶ 87; *MSJ* at 37–38; *see also Ex. 49* at 1–2 (Dec. 5, 2018 letter from Doe to IHC requesting Plan documents).

[434] *MSJ* at 38 (quoting 29 U.S.C. § 1024(b)(4)).

[435] *Response* at 89–90.  Defendants aver that documents analyzing nonquantitative treatment limitations did not exist when Doe requested them.  *Response* at 89.  The requested reimbursement schedules, other than the one created for litigation (as discussed below) do not exist at all.  *Response* at 90.

[436] *Response* at 86.

[437] *See M.S.*, 553 F. Supp. 3d at 1034–35 (explaining that the catchall provision in § 1024 "was the subject of a circuit split").

[438] *See, e.g., Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 653–54 (4th Cir. 1996); *Williamson v. Travelport, LP*, 953 F.3d 1278, 1294 (11th Cir. 2020).  The Tenth Circuit has not yet interpreted this provision.  *See Hernandez ex rel. Hernandez v. Prudential Ins. Co. of Am.*, No. 2:99-CV-898B, 2001 WL 1152835, at *4 (D. Utah Mar. 28, 2001).

[439] *See Bartling v. Fruehauf Corp.*, 29 F.3d 1062, 1070–71 (6th Cir. 1994).

to apply a nonquantitative treatment limitation with respect to medical/surgical benefits and mental health or substance use disorder benefits under the plan."[440]

Plaintiff argues this regulation "affirms that the documents requested by [Doe] constitute plan instruments" subject to disclosure under § 1024.[441]  But even taking a broad interpretation, the requested documents do not fall within § 1024.

It is axiomatic that a plan cannot be established or operated under a document that does not exist.[442]  Plaintiff does not assert the requested documents existed nor does she make any showing that the plan was operated or administered under the requested documents.  Neither does Plaintiff argue ERISA imposed an obligation to create these documents and that a failure to do so violates statutory disclosure obligations.[443]  The crux of her argument is merely that analyses of nonquantitative treatment limitations and reimbursement schedules constitute plan documents requiring disclosure and thus Defendants' nonproduction is subject to penalties.[444]  If these documents existed, that argument might be persuasive.  But there is no need or basis to evaluate whether hypothetical documents fall within the scope of an administrator's disclosure obligations under § 1024.

---

[440] 29 C.F.R. § 2590.712(d)(3).

[441] *MSJ* at 38.

[442] *See Bennett v. Aetna Life Ins. Co.*, No. 2:12-cv-139 TS, 2013 WL 4679482, at *10 (D. Utah Aug. 30, 2013) (declining to award penalties where requested document did not exist).

[443] Defendants acknowledge that, as of February 2021, administrators are required create documentation analyzing their nonquantitative treatment limitations.  *Response* at 89 (citing Consol. Appropriations Act, 2021, 2021 Pub. L. No. 116-260, Div. BB, Title II, § 203).  Plaintiff concedes the obligation for analyses did not exist when Doe requested the documents but then appears to waffle on the basis for the request of statutory penalties by asserting Doe "also requested the [nonquantitative treatment limitations] themselves, which existed before the Parity Act was amended to add the requirement of comparative analysis of [treatment limitations]."  *Reply MSJ* at 32.  But Plaintiff has not asserted Defendants failed to produce the treatment limitations.  And the record shows Defendants produced nonquantitative treatment limitations for nine medical/surgical and mental health benefits.  *See* Dkt. 39, at 3.  Moreover, throughout the case Plaintiff consistently claimed she is entitled to statutory penalties because the administrator "has not produced any documents analyzing the Plan's nonquantitative treatment limitations."  *Complaint* at 31, 33; *MSJ* at 20, 38. Thus, the court declines to consider this argument.

[444] *MSJ* at 38; *Reply MSJ* at 31–32.

One requested document, a 2018 reimbursement schedule, was produced well after the statutory deadline.[445]  Plaintiff argues she is entitled to statutory penalties for this document for the same reasons she is entitled to penalties for the other unproduced documents.[446]  This argument is similarly unpersuasive.  This document was created in 2020 during litigation, long after SelectHealth decided Doe's claims for benefits (in 2017 and 2018).[447]  Plaintiff has not established how the Plan was "established or operated" under this document that was not in existence at the time SelectHealth made its benefits determination.  A plan administrator's existing reimbursement schedule may fall within the scope of § 1024.  But the court has no occasion to undertake that inquiry here, where the question is whether a plan is established and operated under a document that did not exist at the relevant time.  Plaintiff offered no arguments to answer this question and thus she has not met her burden on summary judgment.

For the reasons explained, the court denies Plaintiff's Motion for Summary Judgment on her individual claim for statutory penalties.[448]

## IV.    RULE 56(f)

Defendants did not move for summary judgment but requested Plaintiff's Counts 1–4 be dismissed under Federal Rule of Civil Procedure 56(f)(1).[449]  Defendants assert summary

---

[445] *MSJ* at 38.

[446] *See Id.* at 38–39; *Reply MSJ* at 31.

[447] *See Response* at 38.

[448] In a footnote, Plaintiff also requests the court "declare that SelectHealth violated [Doe's] privacy by failing to ensure that her confidential health records would be protected."  *MSJ* at 39 n.8; *see also Reply MSJ* at 31 (same). While there may be a legal basis for such a request, a statutory penalties claim under § 1132(c) is not the proper vehicle. *See* 29 U.S.C. § 1132(c) (explaining this section allows a plan participant or beneficiary to bring a civil action for penalties against plan administrator who fails to disclose documents falling within the scope of § 1024, the ERISA disclosure provision).  The court therefore declines this request.

[449] *Response* at 2.

judgment should be entered in their favor because "Plaintiff has not met—and cannot meet—her burden of proof on these claims."[450]  The court declines this request.

Under Rule 56(f)(1), a court may "grant summary judgment for a nonmovant" after giving the party "notice and a reasonable time to respond."[451]  Where notice is lacking, summary judgment may still be granted sua sponte if the losing party would suffer no prejudice.[452]  Rule 56(f) exists largely for efficiency reasons, to save courts from proceeding with trials that are plainly unnecessary.[453]  However, granting summary judgment sua sponte is generally disfavored.[454]

Summary judgment under 56(f) is improper here.  As an initial matter, requests for relief cannot be raised in a response to a motion.[455]  Additionally, while Rule 56(f)(1) gives the court a basis to grant summary judgment, it does not enable a party to request summary judgment.[456]  If Defendants seek to obtain this affirmative relief, they must file a motion.  On the merits, the record evidence does not clearly indicate whether Doe was entitled to benefits.  Reasonable minds could draw conflicting inferences about material facts.  This is not a case where trial is plainly unnecessary.  It is less clear that Plaintiff has a basis to move forward on the Parity Act

---

[450] *Id.*

[451] Fed. R. Civ. P. 56(f)(1).

[452] *See Oldham v. O.K. Farms, Inc.*, 871 F.3d 1147, 1150 (10th Cir. 2018) ("[E]ven if such notice is lacking, we will still affirm a grant of summary judgment if the losing party suffered no prejudice from the lack of notice." (quoting *Johnson v. Weld Cnty*, 594 F.3d 1202, 1214 (10th Cir. 2010)).

[453] 10A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2720.1 (4th ed. 2008).

[454] *Oldham*, 871 F.3d at 1150.

[455] DUCivR 7-1(b)(1)(A) ("No motion, including but not limited to cross-motions and motions pursuant to Fed. R. Civ. P. 56(d), may be included in a response or reply memorandum."); *see Plumb v. Whitaker*, No. 2:20-cv-00574-TC-JCB, 2021 WL 5007751, at *2 (D. Utah Oct. 28, 2021).

[456] *See* Fed. R. Civ. P. 56(f)(1).

and Statutory Penalties claims, but the parties can address these issues at trial or during pre-trial proceedings.

## V.     CONCLUSION

For the reasons stated, the court DENIES Plaintiff's Motion for Summary Judgment on Counts One Through Four[457] and DENIES Defendants' request for summary judgment under rule 56(f).[458]

IT IS SO ORDERED.

DATED this 21st day of August, 2023.

BY THE COURT:

ROBERT J. SHELBY
United States Chief District Judge

---

[457] Dkt. 192.

[458] Plaintiff identifies remedies and requests the opportunity to provide additional briefing on remedies and attorney fees. *MSJ* at 39–40.  Because the court denies Plaintiff's motion and neither party is awarded judgment on the merits of the claim for coverage, it would be premature to address remedies at this time.